F I L E D
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

JAN 1 8 2007

DAVID J. MALAND, CLERK
BY
DEPUTY_____

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | | |
|---|---|---|
| IVAN A. CANTU, | ) | CIVIL ACTION NO. |
| | ) | |
| Petitioner, | ) | <u>2:06 CV 166</u> |
| | ) | |
| v. | ) | |
| | ) | |
| NATHANIEL QUARTERMAN, Director | ) | |
| Texas Department of Criminal | ) | |
| Justice, Institutional Division, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOVANT'S PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. §2254

**Broden & Mickelsen**

**F. Clinton Broden III**
**2707 Hibernia Street**
**Dallas, TX 75204**
**(214) 720-9552**
**(214) 720-9594 (Facsimile)**

**Gersten Savage LLP**

**Adam D. Mitzner**
**600 Lexington Avenue**
**New York, New York 10022**
**(212) 972-5200**
**(212) 980-5192 (Facsimile)**

TABLE OF CONTENTS ............................................................................ii

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ....................................................................1

STATEMENT OF FACTS ...........................................................................3

    A. Guilt/Innocence ............................................................................3

        1. The Crime Scene ...............................................................3

        2. The Testimony of Amy Boettcher .........................................3

        3. The Search of Cantu's Home ...............................................6

        4. Other Physical Evidence ....................................................7

        5. The Cantu Phone Call ........................................................8

    B. The Penalty Phase .........................................................................8

ARGUMENT .............................................................................................10

I. CANTU WAS DENIED HIS SIXTH AMENDMENT
CONSTITUTIONAL RIGHT TO EFFECTIVE
ASSISTANCE OF COUNSEL ....................................................................12

      A.    Cantu's Trial Counsel's Failure to have Cantu Examined by
           a Mental Health Professional was Well Below Reasonable
           Norms ...............................................................................13

      B.    There was a Reasonable Probability of a Different Outcome
           at Trial Had Counsel Not Been Deficient .............................16

      C.    Application .........................................................................12

II. THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT TO SUPPORT CANTU'S SENTENCE OF DEATH.................................18

    A. The Evidence Does Not Support the Jury's Finding that Cantu Posed a Future Danger to Society.................................18

    B. The Evidence Does Not Support the Jury's Finding that there did not Exist Mitigating Circumstances Warranting a Sentence of Life Imprisonment.................................21

III. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT THEY COULD CONSIDER THAT CANTU WAS SUBJECT TO A FORTY YEAR MINIMUM SENTENCE FOR PAROLE ELIGIBILITY.................................23

IV. CANTU WAS DEPRIVED HIS CONSTITUTIONAL RIGHTS BECAUSE THE COURT'S INSTRUCTION CONCERNING MITIGATION DID NOT REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATION CIRCUMSTANCES BEYOND A REASONABLE DOUBT.................................27

V. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW DUE TO THE REQUIREMENTS THAT IT TAKE AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT NEGATIVE ISSUES.................................30

    A. The 12/10 Rule Creates Unconstitutional Juror Confusion.......31

    B. The 12/10 Rule Unconstitutionally Allows Jurors to Believe that their Individual Vote is Meaningless.................................32

VI. TEXAS CODE CRIM PROC. ART. 37.071 AND ART. 44.251 VIOALTE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION BECAUSE THEY FAIL TO PROVIDE MEANINGFUL REVIEW OF PUNISHMENT ISSUES.................................34

VII. THE SEARCH OF THE APARTMENT IN WHICH MR. CANTU RESIDED VIOLATED HIS FOURTH AMENDMENT RIGHTS............36

VIII. TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE CANTU'S CLAIMS OF ACTUAL INNOCENCE..........38

IX. CANTU'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AN ISSUE ON APPEAL RELATED TO THE TRIAL COURT'S ERROR IN NOT GIVING A REASONABLE DOUBT INSTRUCTION FOR EXTRANEOUS OFFENSES..............................39

X. MR. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL...............................41

XI. MR. CANTU'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO EXTRANEOUS VICTIM IMPACT TESTIMONY.................................................................................43

XII. THE STATE'S USE OF A PREEMPTORY CHALLENGE TO DISQUALIFY AN HISPANIC JUROR WAS IMPROPER UNDER BATSON V. KENTUCKY...................................................................45

XIII. THE INVESTIGATION CONCERNING CANTU'S ACTUAL INNOCENCE CONTINUES, AND, ON THAT BASIS, CANTU PRESERVES THIS CLAIM.................................................................50

CONCLUSION...................................................................................51

CERTIFICATE OF SERVICE..............................................................52

# TABLE OF AUTHORITIES

## CASE LAW

Apprendi v. New Jersey, 530 U.S. 466 (2000) ...........................27, 28, 29

Batson v. Kentucky, 476 U.S. 79 (1986).....................................45

Beazley v. Johnson, 242 F.3d 248 (5th Cir.) cert. denied,
534 U.S. 945 (2001)...........................................................34

Boyd v. State, 811 S.W.2d 105 (Tex. Crim. App.),
cert. denied, 402 U.S. 971 (1991)..........................................25

Brasfield v. United States, 272 U.S. 448 (1926)...........................31

Brown v. Texas, 522 U.S. 940 (1997) ..................................25, 26

Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App.),
cert. denied, 522 U.S. 994 (1997)..........................................43

Carlson v. Ferguson, 9 F. Supp. 2d 654 (S.D. W. Va. 1997)..............37

Clemons v. Mississippi, 494 U.S. 778 (1990).............................34

Duhamel v. Collins, 955 F.2d 962 (5th Cir. 1992)......................39, 45

Furman v. Georgia, 408 U.S. 233 (1972)..................................34

Halley v. State, 173 S.W, 3d 510 (Tex. Crim. App. 2005.................43

Herrera v. Collins, 506 U.S. 390 (1993)...................................50

Jackson v. Virginia, 443 U.S. 307 (1979).................................18

Jacobs v. Scott, 31 F.3d 1319 (5th Cir. 1994), cert. denied,
513 U.S. 1067 (1995).........................................................30

Jaffe v. Redmond, 518 U.S. 1 (1996)............................................15

Janecka v. Cockrell, 301 F. 3d 316 (5th Cir. 2002), cert. denied,
123 S. Ct. 1264 (2003)...............................................................37

Jones v. United States, 526 U.S. 227 (1999)...............................27

Kubat v. Theirot, 867 F.2d 351 (7th Cir.), cert. denied,
493 U.S. 874 (1989)...................................................................33

Lowenfeld v. Phelps, 484 U.S. 231 (1988).................................31

Martinez v. Johnson, 255 F.3d 229 (5th Cir. 2001)..........18, 38, 39, 41, 45

Miller v. Johnson, 200 F.3d 274 (5th Cir. 2000)........................23

Mills v. Maryland, 486 U.S. 367 (1988)......................30, 32, 33

Mitchell v. Esparza, 540 U.S. 12 (2003).....................................10

Parker v. Dugger, 498 U.S. 308 (1991).......................................34

Penry v. Lynaugh, 492 U.S. 302 (1989)......................................34

Ring v. Arizona, 536 U.S. 584 (2002)..........................................28

Smith v. State, 898 S.W.2d 838 (Tex. Crim. App.),
cert. denied, 516 U.S. 843 (1995).................................................25

Simmons v. South Carolina, 512 U.S. 154 (1994)...............24, 25, 26

State v. Huziar, 12 S.W.3d 479 (Tex. Crim. App. 2000)..............39

State v. Williams, 392 S. 2d 619, 631 (La. 1980).......................32

Stone v. Powell, 428 U.S. 465 (1976)....................................36, 37

Strickland v. Washington, 466 U.S. 668 (1984)..........................12

Taylor v. Illinois, 484 U.S. 400 (1988)...............................................42

United States v. Cronic, 466 U.S. 648, (1984).....................................13

United States v. Gagnon, 470 U.S. 522 (1985).....................................41

United States v. Garza Lopez, 410 F.3d 268 (5th Cir.),
cert. denied. 298 S. Ct. 298 (2005).....................................................27

Vela v. Estelle, 708 F.2d 954 (5th Cir. 1983)........................................13

Wiggins v. Smith, 539 U.S. 510 (2003)..................................11, 13, 17

Williams v. Taylor, 529 U.S. 362 (2000).......................................10, 36

Willingham v. State, 897 S.W.2d 351 (Tex. Crim. App. 1994),
cert. denied, 516 U.S. 946 (1995).........................................................25

## STATUTES

Tex. Code Crim. Proc. Art. 37.071, § 2(d)(2).............................30, 34, 39

Tex. Code. Crim. Proc. Art. 44.251........................................................34

28 U.S.C. § 2254(d)...............................................................................37

Tex. Crim. Code § 19.03(a)(7)..............................................................43

## OTHER

Randy Hertz & James S. Leibman, *Federal Habeas Corpus Practice &
Procedure*, §27.1 at 1242 (4th ed. 1998)..............................................31

Petitioner Ivan Abner Cantu, by his attorneys, Broden & Mickelson and Gersten Savage LLP, hereby submits this Memorandum of Law in support of his Writ of Habeas Corpus pursuant to 28 U.S.C. §2254.

## **PRELIMINARY STATEMENT**

James Mosqueda and Amy Kitchen were murdered in their home on November 4, 2000. (31 R.R. 111-116.[1]) Mosqueda was a well-known drug dealer who sold in large quantities. (34 R.R. 127, 36 R.R. 182.) He further associated with several other well-known drug dealers. (43 R.R. 131; 36 R.R. 193; 34 R.R. 119-121.) Despite Mosqueda's drug connections, his cousin, Ivan Cantu, was charged with the murders.

Cantu was convicted on October 16, 2001 (41 R.R. 61), and he was sentenced to death October 26, 2001. (48 R.R. 8.) Cantu's direct appeal was denied on June 30, 2004, and his State Writ of Habeas Corpus was denied on January 18, 2006.

Cantu now brings this Federal Writ of Habeas Corpus seeking to address several errors that deprived him of numerous of his constitutional rights. These issues run the gamut from the ineffectiveness of his trial

---

[1] References to the Record shall be designated as "__ R.R. __" indicating the volume followed by the page number.

1

counsel for not investigating important grounds for mitigating the death penalty sentence to certain constitutional violations that deprived Cantu of a fair trial.

## STATEMENT OF FACTS

The following statement of facts is derived from the record in this matter.

### A.     Guilt/Innocence

#### 1.     The Crime Scene

On the afternoon of November 4, 2000, Mosqueda and Kitchen were found murdered in their home. The crime scene indicated that Mosqueda and Kitchen had been shot while in their nightclothes in their bedrooms. There were no signs of forced entry and no gun was found at the scene. (32 R.R. 59-62.)

#### 2.     The Testimony of Amy Boettcher

Amy Boettcher was Ivan Cantu's girlfriend at the time of the murders. (35 R.R. 87.) At trial, Boettcher provided the major account of Cantu's whereabouts and conduct around the time of the murders.

At the time of the murder, Boettcher was twenty-five years old. (35 R.R. 80.) She had already lived with many men, and was an admitted drug user, testifying that she preferred ecstasy, speed and cocaine. (35 R.R. 87-95, 111; 34 R.R. 99-100.) She was on probation and had not been gainfully employed in some time, preferring to spend her time sleeping all day and partying all night, and relied on Cantu to pay for this lifestyle. (36 R.R. 65-

66.) By contrast, at the time of the murders, Cantu had been successful in several legitimate businesses. (37R.R.18-19.)

According to Boettcher's testimony, the chronology of the events surrounding the murders was as follows:

- Cantu called Mosqueda at 11:20 p.m. on November 3, and asked to go see him. (34 R.R. 121.)

- Cantu told Boettcher that he was going to kill Mosqueda and Kitchen. (43 R.R. 121.)

- Boettcher testified that Cantu had his gun with him when he left (34 R.R. 124, 125), and when he returned, his face was swollen, and there was blood on his jeans and he had a different shirt on. (36 R.R.57, 58.)

- Boettcher claimed that Cantu then took her back to the crime scene to look for cocaine. (35 R.R. 129.)

- After seeing the dead bodies, Boettcher claimed that she and Cantu went clubbing until the early hours of the morning. (34 R.R. 120.)

- Approximately mid-morning on November 4, Cantu and Boettcher drove to Arkansas to visit with her parents. (35 R.R. 153-58.)

- Boettcher did not tell her mother or stepfather (who was a retired police officer) or anyone else about the murders, and made no effort

to call the police during their two day stay in Arkansas, despite the fact that there were several times she was not with Cantu. (36 R.R. 19, 26, 27, 79-81.)

- Boettcher claimed that on the evening before the murders, Cantu fired a shot at her in their apartment. (35 R.R. 188.)

- On November 7, Boettcher accompanied Cantu back to Dallas. (35 R.R. 168.) On the way back from Arkansas, Cantu and Boettcher stopped at the home of Tawny Svihovec, a former girlfriend of Cantu. (35 R.R. 172.)

- On November 8, 2000, Boettcher received a telephone call from Cantu telling her that he had been arrested. (34 R.R. 183.) Boettcher claimed that Cantu told her that he had left her money under a couch cushion. (35 R.R. 184-85.)

- Boettcher further claimed that with this found money, she purchased a plane ticket to return to Arkansas. (34 R.R. 184.)

- Once she was back in Arkansas, Boettcher agreed to cooperate with the authorities. (36 R.R. 19, 26, 27.)

As a result of Boettcher's cooperation, she was not charged in connection with the murders, despite her claimed presence at the scene shortly after the crime. (36 R.R. 19-20, 31.) Moreover, although her

continued drug use violated a condition of her parole in connection with a previous conviction for drunk driving (36 R.R. 32, 44), the authorities made no effort to revoke her probation. (36 R.R. 44.) To the contrary, the case's lead detective arranged for her to complete her probation in Arkansas, and told Boettcher that if she had any problems with her probation officer, she should contact him. (36 R.R. 69-71, 94.)

### 3. The Search of Cantu's Home

On the evening that the bodies were discovered (November 4), Sylvia Cantu, Cantu's mother and Mosqueda's aunt, allegedly requested that officers take her to the Cantu/Boettcher home. (32 R.R. 76, 81.) Officers Junger and Illif took Ms. Cantu to the residence. (32 R.R. 76, 81.)

Officer Junger did not have a search warrant to enter the home. (32 R.R. 109.) Nonetheless, he used the manager's key to gain entry at 8:25 p.m. (32 R.R. 78, 82), and spent approximately ten minutes alone inside the small one-bedroom apartment, ostensibly looking for some evidence that Cantu or Boettcher had been harmed. (3 R.R. 46-48.) Ms. Cantu was not permitted inside the home during this search. (32. R.R. 100.)

Officer Junger testified that when he was leaving the apartment, he noticed a small hole by the door, which he said he thought was a bullet hole.

(32 R.R. 87, 112.) Junger did not mention this bullet-hole in his report. (32 R.R. 89.)

On November 7, 2000, Detective Anthony Winn obtained a search warrant for the Cantu/Boettcher residence. On his direct appeal, Cantu argued that this search was illegal.

During this search, the following items were seized: a pair of jeans, white socks, one box of 380 bullets and assorted keys, including a silver and gold Mercedes key that started Kitchen's Mercedes and another key that unlocked the door from the garage to the Mosqueda/Kitchen's house. (SX 105; SX-1.) Later forensic tests indicated that the jeans and socks had the decedents' blood on them. (37 R.R. 185, 186.)

### 4. Other Physical Evidence

In the course of their investigation, the police uncovered the murder weapon at the home of Svihovec. (33 R.R. 148.) Cantu's fingerprints were on the removable clip, but not the weapon itself. (34 R.R. 150.)

After executing a second search warrant, police determined that the bullet hole in the Cantu/Boettcher home, which Boettcher claims occurred when Cantu shot at her two days before the murders, contained a bullet fired from the murder weapon. (34 R.R. 172-174.) Mosqueda's Corvette was also located parked nearby the Cantu/Boettcher residence. (33 R.R. 154.)

### 5. **The Cantu Phone Call**

On November 5, 2000, Cantu called Carlos Gonzales, a mutual acquaintance of Cantu and Mosqueda. (33 R.R. 60.) Unbeknownst to Cantu, Gonzales invited Detective Winn to listen to that conversation. (33 R.R. 62.)

During this call, Cantu told Gonzales that a man dressed as a pizza deliveryman had threatened Cantu on November 2. (3 R.R. 97.) The man told Cantu that Mosquada owed him money for drugs and that when he left he shot into the wall. (3R.R. 97.) Cantu further explained that he went to Mosqueda's house on November 3 to alert Mosqueda to this threat, and, at that time, Mosqueda requested that Cantu take his car and leave Cantu's Honda so that it would appeared that someone was visiting Mosqueda at home. (33 R.R. 67-68.)

### B. **Penalty Phase**

After Cantu was found guilty of the murders, the case proceeded to the penalty phase. Cantu's prior criminal record consisted mostly of charges for reckless driving, intoxication and one deferred adjudication for possession of cocaine. (42 R.R. 17, 25, 42 R.R. 105.) The state's other punishment evidence largely concerned Cantu's alleged violence toward his two wives, and an argument he had with his mother. A topless dancer named Michelle Gonzales claimed that she had seen bruises on Cantu's second

wife, Jennifer. (42 R.R. 79, 84.) That account was disputed by Cantu's mother. (44 R.R. 142.) Another witness, Patrick Swann, testified that he saw Cantu screaming at his mother (43 R.R. 4-14), although Mr. Swann further admitted that he was a wife-abuser himself. (43 R.R. 18.) Cantu's first wife, Michelle Traister, testified that there had been violence in her marriage to Cantu (43 R.R. 109-133), but acknowledged that there was also considerable drug use, which fueled Cantu's anger.

Cantu's trial counsel, however, had failed to uncover and therefore failed to introduce, significant evidence demonstrating Cantu's various mental defects that would have certainly been weighed by the jury as important evidence of mitigation. This evidence is set forth more fully below.

## ARGUMENT

Under AEDPA, a federal court may not grant a writ of habeas corpus "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the petitioner shows that the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or that the state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §2254(d)(1); Williams v. Taylor, 529 U.S. 362, 402-13 (2000). A state court's decision is "contrary to" clearly established federal law if (1) the state court "applies a rule that contradicts the governing law" announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts. Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003)(internal quotation marks omitted). A state court's application of clearly established federal law is "unreasonable" within the meaning of AEDPA when the state court identifies the correct governing legal principle from Supreme Court precedent, but applies that principle to the case in an

objectively unreasonable manner. <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003).

## CANTU WAS DENIED HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Cantu's trial counsel failed to investigate or put on any evidence regarding his mental health problems. Specifically, trial counsel failed to have Cantu diagnosed by a mental health expert for the purpose of introducing evidence concerning Cantu's mental defects, dysfunctional childhood or drug use, in the event that Cantu was found guilty of the crime. Such an investigation was necessary to proffer evidence of mitigation at the sentencing phase. This failure by trial counsel denied Cantu of his constitutional right under the Sixth Amendment to effective trial counsel.

It is axiomatic that defendants enjoy a constitutional right to effective counsel. For counsel to be deemed ineffective such that the accused's constitutional right has been violated, the accused must show that his counsel fell below an objective standard of reasonableness and that there was a "reasonable probability" that the results of the trial would have differed but for counsel's deficient performance. Strickland v. Washington, 466 U.S. 668, 687-688 (1984). Both of the prongs of the Strickland test have been met here.

**A.    Cantu's Trial Counsel's Failure to Have Cantu
Examined By a Mental Health Professional
Was Well Below Reasonable Norms**

During the sentencing phase, trial counsel failed to either look for or introduce evidence of mitigation on the ground of Cantu's mental condition. This failure rendered trial counsel ineffective and deprived Cantu his rights under the Sixth Amendment.

As a general matter, courts reviewing the effectiveness of counsel will consider trial counsel's performance as a whole, although an isolated error may by itself render counsel's performance constitutionally deficient. United States v. Cronic, 466 U.S. 648, 657, n. 20 (1984); Vela v. Estelle, 708 F.2d 954, 965 (5th Cir. 1983), cert denied, 464 U.S. 1053 (1984).

In this case, trial counsel failed to make an independent investigation of the facts regarding mitigation because he failed to investigate the possible psychiatric causes that led to the crime. The duty to conduct such an investigation is central to counsel's obligations to provide effective assistance. See Wiggins v. Smith, 539 U.S. 510 (2003).

The record below makes clear that trial counsel failed to conduct any investigation into the mental disorders that would have led the jury to impose a lesser sentence than death. During the State Writ process, Cantu's Habeas counsel conducted such an investigation by retaining Dr. Daneen

Milam, PhD, a psychologist and the director of the McCullough Assessment Center. Dr. Milam examined Cantu and prepared a written report of her findings. (A true and correct copy of that report is attached hereto as Exhibit A.)

Dr. Milam's examination of Cantu revealed that Cantu suffers from a bi-polar disorder. (Id. paras 6, 7, 14.) In addition, Dr. Milam opined that Cantu's history of drug abuse, including ecstasy, mushrooms, speed and cocaine, required trial counsel to conduct a drug assessment and prepare a social history. (Id., paras 8, 12.) Had such an evaluation been performed, Dr. Milam believed that this would have enabled trial counsel to place Cantu's actions in context so that the jury could better understand what might have motivated him to commit this crime. (Id., para 15.)

There can be little doubt that trial counsel's failure to even investigate the possible mental defects that could have existed and therefore contributed to Cantu's commission of this crime was inexcusable. Trial counsel must have known that in the event that Cantu was found guilty, the issue of his psychiatric health would be central to any claim of mitigation at sentencing. Failing to investigate a possible defense to the death sentence on this ground is clear ineffective assistance.

During the State Writ process, Cantu's trial counsel submitted an affidavit stating that he relied exclusively on statements made by Cantu and Cantu's mother to assess Cantu's psychiatric disorders. (Attachment B, at 8.) Trial counsel further substituted his own layperson's assessment of this complicated mental disorder for that of a trained professional, and determined that because Cantu could recall facts, was not incoherent, and offered other forms of assistance, that he did not suffer from a psychiatric disorder and, therefore, that no further inquiry was necessary. Id.

Trial counsel further claimed that he chose not to have a psychiatrist evaluate Cantu for fear that such an opinion would be adverse to Cantu. Id. However, this rationale is highly questionable given that any psychiatric evaluation would be cloaked under the attorney-client privilege (as well as doctor-patient privilege). Jaffe v. Redmond, 518 U.S. 1 (1996). As a result, the possible adverse impact of such an evaluation, which trial counsel claims was the reason that he chose not to have Cantu examined, was completely unfounded.

Indeed, it is the very purpose of the attorney-client privilege to allow an attorney to conduct a full investigation without fear of adverse facts being introduced at trial. Trial counsel's decision to forgo a psychiatric examination for fear that such an examination would result in an adverse

opinion is no different than failing to ask your client the facts behind his defense for fear that he will admit his guilt.

## B. There was a Reasonable Probability of a Different Outcome at Trial Had Counsel Not Been Deficient

After the jury found Cantu guilty of the double-murders, they had to consider whether to impose the death sentence. Unfortunately, as a result of counsel's failure to reasonably discharge his duties, the jury was not provided with evidence concerning Cantu's bi-polar disorder, his dysfunctional childhood, or his drug abuse.

Had the jury heard the findings of Dr. Milam, they would have assuredly concluded that Cantu's conduct was motivated by a severe mental disorder. As Dr. Milam explained in her submission accompanying the State Habeas Writ (and would have explained to a jury), bi-polar disorder is a medical condition "caused by a difference in how a person's brain and nervous system regulates basic behavior patterns. It is not a choice, but is instead, a breakdown of the inhibitory system." (Exhibit A, para 6.)

Such evidence could not have helped but to have had an impact on the jury. Faced with the prospect of sentencing to death a young man who committed this murder due to a mental defect, as opposed to a venal choice, the jury would likely have shown leniency.

The Court of Criminal Appeals rejected Cantu's State habeas Writ on this ground, claiming that trial counsel's strategy was sound. However, this ruling is contrary to well-established federal law. In <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), the Court found that the issue was not whether counsel's strategy decision was sound, but rather whether counsel had conducted a sufficient investigation to make such a strategy decision. <u>Id</u>. at 539. Here there can be no doubt that counsel did not perform an adequate investigation to make the strategic decision not to put on psychiatric mitigation evidence because counsel never had Cantu examined by a psychiatrist in the first place. As a result, there can be little doubt that counsel was ineffective in this regard.

## II.

### THE EVIDENCE AT TRIAL WAS LEGALLY INSUFFICIENT
### TO SUPPORT CANTU'S SENTENCE OF DEATH

The United States Court of Appeals for the Fifth Circuit will conduct a sufficiency review to determine the sufficiency of evidence related to the jury's determination of Texas's special issues. Martinez v. Johnson, 255 F.3d 229, 241 (5th Cir. 2001), cert. denied, 535 U.S. 1091. In doing so, it applies the standard announced by the United States Supreme Court in. Jackson v. Virginia, 443 U.S. 307 (1979). Johnson, 255 F.3d at 241 In this case, the evidence (or lack thereof) which allegedly supports the jury's findings of future dangerousness and/or lack of mitigation fails to meet this basic standard.

### A.    The Evidence Does Not Support the Jury's Finding
### that Cantu Posed a Future Danger to Society

The State failed to put on sufficient evidence to support the jury's finding that Cantu posed a future danger to society. This was a crime involving Cantu's family members. Although the nature of the crime was horrific, there was nothing in Cantu's background to indicate that he would be a future danger to society.

The State's evidence concerning punishment was woefully inadequate to support the death penalty. Cantu's prior criminal record consisted mostly

of charges for reckless driving, intoxication and one deferred adjudication for possession of cocaine. (42 R.R. 17, 25, 42 R.R. 105.) Cantu's probation officer admitted that Cantu had successfully completed his supervision and his felony was dismissed. (42 R.R. 105-108.) Cantu had also successfully completed a drug program, and had converted to Christianity. (44 R.R. 101.)

In addition, the jury heard evidence that Cantu has had no disciplinary infractions while he has been in custody. (44 R.R. 61; 45 R.R.160.) The two officers who had been involved in Cantu's prior arrests both testified that Cantu exhibited no aggressive behavior during those arrests. (42 R.R. 37, 45-46.)

Finally, Cantu relied on two experts. Dr. Mark Cunningham, a forensic psychologist, explained to the jury that future dangerousness was an assessment of the risk of violence while mitigation explained what forces shape a defendant's choices. (45 R.R. 72.) In this regard, Dr. Cunningham explained that capital offenders are less likely to engage in serious acts of violence than the rest of the prison population. (45 R.R. 112.) He further explained that in Cantu's case, the risk of further violence would be decreased in prison because the factors that put Cantu at risk to commit such violence (drugs, unstructured environment) would no longer be a factor. (45 R.R. 160-161.)

The defense also offered the testimony of Walter Quijano, Ph.D., a clinical psychologist who is very familiar with the Texas Prison system. Dr. Quijano testified that a family murder – like the one here – is not likely to be repeated because the dynamics that lead up to it are no longer present in prison. (46 R.R. 219.)

By contrast, the State's evidence of "future dangerousness" was sparse, indeed. The State relied largely on the evidence from dubious sources to further the claim that Cantu had been abusive to his wives. For example, a topless dancer named Michelle Gonzales claimed that she had seen bruises on Cantu's second wife, Jennifer. (42 R.R. 79, 84.) That account was disputed by Cantu's mother. (44 R.R. 142.) Another witness, Patrick Swann, testified that he saw Cantu screaming at his mother (43 R.R. 4-14), although Mr. Swann further admitted that he was a wife-abuser himself. (43 R.R. 18.) Cantu's first wife, Michelle Traister, testified that there had been violence in her marriage to Cantu (43 R.R. 109-133), but acknowledged that there was also considerable drug use, which fueled Cantu's anger.

The crime at issue involved family members, and was brought about by drug abuse. The other instances of alleged violent conduct were, if believed, all directed toward family members and, likewise, all had drug use

as a triggering factor. As a result, the evidence was insufficient to support the jury's conclusion of future dangerousness.

In sum, there was no credible evidence that Cantu would be a continuing threat to society. It is a travesty of justice to put to death a man who had never been arrested for a crime of violence and only other interaction with the criminal justice system were relatively minor infractions involving drugs, on the theory that he was a continuing threat to society.

**B.    The Evidence does not Support the Jury's Finding that There Did Not Exist Mitigating Circumstances Warranting a Sentence of Life Imprisonment**

In a similar fashion, the trial record does not support the jury's finding that there were not sufficient mitigating circumstances to warrant life imprisonment as an alternative to the death sentence. The jury was provided with significant evidence of Cantu's rehabilitative ways while in prison, including his religious studies.

Most notably, Cantu's mother testified that Cantu had a difficult childhood, marked by their family moving often and Cantu having to attend many different schools. (44 R.R. 17, 31.) Cantu was eight when his parents divorced (44 R.R. 33), and began abusing drugs at an early age. (44 R.R. 47.)