Ms. Cantu explained that in September 2000, she had concerns that Cantu was suicidal, and he was taken to Parkland Psychiatric Services. (44 R.R. 91-92.) She did not believe that her son was guilty of the murders. (44 R.R. 142, 148.)

In sum, there was simply not sufficient evidence to justify a finding that there was not sufficient mitigating evidence to justify a life sentence.

## III

## CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND TO DUE PROCESS OF LAW BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT THE JURY THAT THEY COULD CONSIDER THAT CANTU WAS SUBJECT TO A FORTY YEAR MINIMUM SENTENCE FOR PAROLE ELIGIBILITY2

The Court's jury charge at the punishment phase contained the

following instruction:

> Under the law applicable in this case, if the defendant is sentenced to imprisonment in the institutional division of the Texas Department of Criminal Justice for life, the defendant will become eligible for release on parole, but not until the actual time served by the defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this defendant if the defendant is sentenced to a term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

> You are instructed not to consider or discuss the possible actions of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are of no concern to the judge or jury.

---

[2] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas jury instruction regarding the irrelevance of parole eligibility is constitutional. See Miller v. Johnson, 200 F.3d 274, 290 (5th Cir. 2000). Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

By contrast to the trial court's instruction that the jury should not consider parole eligibility when determining Cantu's future dangerousness to society, the Constitution requires that the jury consider such "truthful information." As the United States Supreme Court unequivocally declared in Simmons v. South Carolina, 512 U.S. 154 (1994):

> [I]f the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

Id. at 168-69.

In Texas, the State necessarily relies on the justification of "future dangerousness" in every death penalty case. See Texas Code Crim. Pro. 37.071, § 2(b)(1). As a result, it was constitutionally required that Cantu be able to allow the jury to actually consider that he would not be eligible for parole for at least forty years. Simmons, 512 at 168-69.

The fact that the trial court referenced Cantu's ineligibility for parole and then instructed that the jury could not consider that fact actually exacerbated the problem. Id. at 170-171. For due process to have been satisfied, Cantu must have been afforded the right to answer the State's

future dangerousness allegations with information regarding his parole ineligibility. Id.

Courts in Texas have interpreted the Supreme Court's directive to be inapplicable on the theory that "future dangerousness" applies to the population both in and out of prison. Smith v. State, 898 S.W.2d 838, 846 (Tex. Crim. App.), cert. denied, 516 U.S. 843 (1995); Boyd v. State, 811 S.W.2d 105, 118, n.12 (Tex. Crim. App.), cert. denied, 402 U.S. 971 (1991). On this basis, the Texas Court of Criminal Appeals has traditionally determined that juries need not be told about minimum parole eligibility because the defendant continues to be a threat to his fellow inmates even in the absence of parole. See, e.g, Willingham v. State, 897 S.W.2d 351, 359 (Tex. Crim. App. 1994), cert. denied, 516 U.S. 946 (1995).

The troubling aspect of the Texas law was addressed by the Supreme Court in a written opinion by Justice Stevens in Brown v. Texas, 522 U.S. 940 (1997). Although respecting the Court's denial of a petition for writ of certiorari Justice Stevens, joined by Justices Souter, Ginsberg and Breyer, noted the "obvious tension" between the Texas rule prohibiting the introduction of parole ineligibility information and the Court's basic holding in Simmons. Justice Stevens went on to state:

> The situation in Texas is especially troubling. In Texas, the jury determines the sentence to be imposed after conviction in a significant

number of non-capital felony cases. In those noncapital cases, Texas law *requires* that the jury be given an instruction explaining when the defendant will become eligible for parole. [footnote omitted]. Thus, the Texas Legislature has recognized that, without such an instruction, Texas jurors may not fully understand the range of sentencing options available to them. Perversely, however, in capital cases, Texas law *prohibits* the judge from letting the jury know when the defendant will become eligible for parole if he is not sentenced to death. The Texas rule unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose.

Id.

As Justice Stevens and his colleagues opined in Brown v. Texas, it is impossible to reconcile the Texas rule prohibiting the consideration of parole ineligibility and the constitution dictates in Simmons v. South Carolina. The trial court's refusal to allow the jury to consider Cantu's parole ineligibility for forty years denied Cantu his rights under the United States Constitution – specifically, the rights to an impartial jury, against cruel and unusual punishment and to due process of law, guaranteed by the Sixth, Eighth and Fourteen Amendments.

## IV.

**CANTU WAS DEPRIVED HIS CONSTITUTIONAL RIGHTS BECAUSE THE COURT'S INSTRUCTION CONCERNING MITIGATION DID NOT REQUIRE THE STATE TO PROVE THE ABSENCE OF SUFFICIENT MITIGATION CIRCUMSTANCES BEYOND A REASONABLE DOUBT[3]**

The trial court followed the current "mitigation" special issue in Texas, and instructed the jury as follows:

> Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

(RC VII-1455.) This jury charge did not impose any burden of proof on either the State or the defense.

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000) and <u>Jones v. United States</u>, 526 U.S. 227 (1999), the United States Supreme Court held that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged

---

[3] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has upheld the constitutionality of the Texas jury instruction regarding the failure to prove the second special instruction beyond a reasonable doubt See <u>United States v. Garza Lopez</u>, 410 F.3d 268, 276 (5th Cir.), <u>cert. denied</u>. 298 S.Ct. 298 (2005). Cantu nevertheless, submits this argument in order to preserve it for higher court review.

in the indictment, submitted to a jury, and proven beyond a reasonable doubt." Jones, 526 at 243, n. 6. In other words, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Apprendi, 530 U.S. at 482-483. The Court went on to hold that a "sentencing factor" that served to increase a sentence beyond the maximum sentence otherwise statutorily authorized (in Apprendi that being a hate-crime), "is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict. Indeed, it fits squarely within the usual definition of an 'element' of the offense." Id. at 494, n. 19.

More recently, in Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court held that the Constitution prohibited Arizona's scheme in which trial judges determined whether aggravating factors existed which justified imposition of the death penalty. The Court concluded that "because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury." Id. at 605.

In this case, the jury's guilty verdict cannot result in the imposition of the death penalty unless both special issues are answered. The first – that

there was a probability that Cantu would commit criminal acts of violence that would constitute a continuing threat to society – requires the jury to answer in the affirmative beyond reasonable doubt. However, the second special issue – whether "taking into consideration all of the evidence . . . do you find that there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?" – contains no reasonable doubt requirement. Despite the fact that it is worded in the negative, the special instruction is nevertheless the "functional equivalent of an element of a greater offense," Apprendi, 530 U.S. at 494 n. 19, because it serves to increase the offense from one punishable by life without parole to a capital offense punishable by death. As a constitutional matter, therefore, under Apprendi and its progeny, the jury is required to make this finding by beyond a reasonable doubt.

# V.

## CANTU WAS DENIED HIS CONSTITUTIONAL RIGHTS AGAINST CRUEL AND UNUSUAL PUNISHMENT AND DUE PROCESS OF LAW DUE TO THE REQUIREMENTS THAT IT TAKE AT LEAST TEN "NO" VOTES FOR THE JURY TO RETURN A NEGATIVE ANSWER TO THE PUNISHMENT NEGATIVE ISSUES[4]

Under Texas law, for the death penalty to be imposed, two special issues must be decided by the jury. The first concerns the future dangerousness of the defendant, and all twelve jurors must vote affirmatively for the death penalty to be imposed. The second concerns whether mitigation requires the imposition of a life sentence, and that requires only that ten jurors vote negatively. See Tex. Code Crim. Proc. Art. 37.071, § 2(d)(2) (hereinafter referred to as the "12/10 Rule"). In this case, the trial court instructed the jury according to Texas law. (CR.I-254-255.)

The Texas 12/10 Rule is constitutionally deficient for two reasons. First, it generates considerable juror confusion. Second, it violates the Eighth Amendment principle in Mills v. Maryland, 486 U.S. 367 (1988), by leaving reasonable jurors to believe that their individual vote in favor of returning a

---

[4] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas jury instruction regarding the 12/10 Rule is constitutional. See Jacobs v. Scott, 31 F.3d 1319, 1328 (5th Cir. 1994), cert. denied, 513 U.S. 1067 (1995). Cantu nevertheless submits this argument in order to preserve it for higher court review.

life sentence based on mitigating factors is meaningless unless they are joined by nine other jurors on this same mitigating factor.

## A. The 12/10 Rule Creates Unconstitutional Juror Confusion

The 12/10 Rule generates the considerable likelihood that jurors who would otherwise hold out against voting for the death sentence, instead adopt a "majority rules" approach and change their vote to conform to the will of the majority. The United States Supreme Court has repeatedly criticized any form of minority juror coercion. See, e.g., Lowenfeld v. Phelps, 484 U.S. 231, 239-240 (1988); Brasfield v. United States, 272 U.S. 448, 450 (1926). As the Court held in Lowenfeld v. Phelps, "inquiry into the jury's numerical division necessitated reversal because it was generally coercive and almost always brought to bear 'in some degree, serious although not measurable, an improper influence on the jury." Lowenfeld, 484 U.S. at 239, citing Brasfield, 272 U.S. at 450.

The 12/10 Rule is akin to an impermissible "dynamite charge" which has been recognized as a possible Eighth Amendment violation in the capital sentencing context. See Lowenfeld, 484 U.S. at 240-41. In addition, the 12/10 Rule injects arbitrariness into the sentencing process, by causing each juror to question the importance of his or her vote, leaving the juror free to speculate as to what the outcome would be in the event that there was no

unanimity, including the possibility that individual jurors would surmise that their disagreement would result in a new sentencing hearing or new trial. Such uncertainty – especially when it surrounds the imposition of a death sentence – is constitutionally improper. See State v. Williams, 392 So.2d 619, 631 (La. 1980)(on rehearing) (Louisiana Supreme Court holding that such uncertainty amongst jurors was a constitutional violation.)

### B. The 12/10 Rule Unconstitutionally Allows Jurors to Believe that their Individual Vote is Meaningless

The 12/10 Rule also violates the Eighth Amendment because it leaves reasonable jurors to believe that their individual vote in favor of returning a life sentence based on a particular mitigating factor is meaningless. In this way, a reasonable juror could well believe that there must be a meeting of the minds between his or her fellow jurors as to whether a mitigating factor sufficient to impose a life sentence is present.

Under Mills v. Maryland, 486 U.S. 367 (1988), it is unconstitutional to effectuate a scheme in which jurors believe that their vote is meaningless unless joined by others. "Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk." Id. at 400.

The 12/10 Rule clearly violates the rule of <u>Mills</u>. In <u>Kubat v. Theirot</u>, 867 F.2d 351 (7th Cir.), <u>cert. denied</u>, 493 U.S. 874 (1989), in reviewing a scheme virtually identical to the 12/10 Rule in Texas, the Seventh Circuit held.

> Kubat's jurors were never expressly informed in plain and simple language that even if one juror believed that the death penalty should not be imposed, Robert Kubat would not be sentenced to death . . . [T]here is a substantial possibility that one or more of Kubat's jurors might have been precluded from granting mercy to Kubat because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously.

<u>Kubat</u>, 867 F.2d at 373.

Moreover, it is possible that jurors concluded that even if a majority of them believed that mitigating factors existed so that the death penalty should not be imposed, that unless ten of them agreed on the <u>specific</u> mitigating factor, there was not sufficient mitigation to avert a capital penalty. This, too, is unconstitutional under <u>Mills</u>.

In sum, Texas' 12/10 Rule is unconstitutional. The trial court's use of that rule requires that Cantu be given a new trial.

## TEXAS CODE CRIM PROC. ART. 37.071 AND ART. 44.251 VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION BECAUSE THEY FAIL TO PROVIDE MEANINGFUL REVIEW OF PUNISHMENT ISSUES[5]

The Texas courts did not review the legal sufficiency of the jury's determination concerning whether sufficient mitigation existed against the imposition of the death penalty (special issue no. 2.) (Order of Court of Appeals Attached as Exhibit C.) As a matter of constitutional right, Cantu was entitled to a meaningful appellate review of his death penalty sentence. Parker v. Dugger, 498 U.S. 308 (1991); Penry v. Lynaugh, 492 U.S. 302 (1989).

There can be little doubt that meaningful review and the reweighing of evidence when appropriate is necessary to give meaning to an accused's constitutional rights. Indeed, as the Supreme Court held in Clemons v. Mississippi, 494 U.S. 778 (1990), failure to perform an appellate review is tantamount to an automatic affirmance. Similarly, in Furman v. Georgia, 408 U.S. 233 (1972), the Court held that decisions that give rise to the death penalty must be subject to appellate review.

---

[5] Cantu acknowledges that the United States Court of Appeals for the Fifth Circuit has held that the Texas Code Articles 37.071 and 44.251 are constitutional. See Beazley v. Johnson, 242 F.3d 248 (5th Cir.) cert. denied, 534 U.S. 945 (2001). Cantu nevertheless submits this argument in order to preserve it for higher court review.

Under the Texas scheme, however, there was no review whatsoever of the jury's finding that mitigation sufficient to spare Cantu the death penalty was not present. As a result, the death sentence imposed here is not constitutionally sustainable.

# VII

## THE SEARCH OF THE APARTMENT IN WHICH MR. CANTU RESIDED VIOLATED HIS FOURTH AMENDMENT RIGHTS

As noted above, a great deal of the evidence against Mr. Cantu was gathered as a result of the search of the apartment he was living in with Amy Kitchen. Mr. Cantu argued on direct appeal that the search violated his rights under the Fourth Amendment. A majority of the Court of Criminal Appeals assumed arguendo that, in fact, the search was constitutionally deficient but concluded that this was harmless. See Attachment C. Notably, three judges dissented and found that the illegally seized evidence contributed to the verdict. Id. ("Such testimony [identified by the majority in its harmless error analysis] might be sufficient to support the conviction without illegal evidence, but I do not see how it could remove every reasonable doubt that the illegal DNA evidence even contributed to the verdicts." (emphasis in original)). As such, three of the nine Court of Criminal Appeals judges thought Mr. Cantu's conviction should have been reversed.

The Court of Criminal Appeals' decision on this issue is "contrary to, or involved an unreasonable application of, clearly established Federal law" as that term was explained by the United States Supreme Court in Williams v. Taylor, 529 U.S. 362 (1999). Mr. Cantu further submits that the

roadblock erected in <u>Stone v. Powell</u>, 428 U.S. 465 (1976), should not apply to this claim. Indeed, commentators have noted that it is arguable that <u>Stone</u> "does not apply to capital cases." See, e.g., Randy Hertz & James S. Leibman, *Federal Habeas Corpus Practice & Procedure*, §27.1 at 1242 (4th ed. 1998). Likewise, one court has held that, by failing to exclude Fourth Amendment claims from its standard of review, the revised 28 U.S.C. § 2254(d) has effectively abolished the distinction drawn by *Stone* between Fourth Amendment claims and other claims and requires federal courts to employ a uniform standard for assessing all claims raised under 28 U.S.C. § 2254. <u>Carlson v. Ferguson</u>, 9 F. Supp. 2d 654 (S.D. W. Va. 1997).[6]

---

[6] Unfortunately, pending review by a higher court, Mr. Cantu must acknowledge the inapplicability of the <u>Stone</u> roadblock is currently foreclosed by the Fifth Circuit's decision in <u>Janecka v. Cockrell</u>, 301 F. 3d 316 (5th Cir. 2002), <u>cert. denied</u>, 123 S. Ct. 1264 (2003) given that the Fifth Circuit applied the Stone roadblock in that case despite the fact that it was both a capital case and governed by the ADEPA cases

# VIII.

## TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE CANTU'S CLAIMS OF ACTUAL INNOCENCE[7]

Cantu's trial counsel failed to conduct even a minimal investigation into the possibility that Cantu was innocent of the charges. Trial counsel failed to retain a private investigator, or interview potential witnesses who could exculpate Cantu.

Federal Habeas counsel, with the assistance of a private investigator, is currently seeking to do what trial counsel did not – seek out evidence of Cantu's actual innocence. When such evidence becomes available, Cantu will submit it to the Court in order to demonstrate that there was a reasonable probability of a different outcome had trial counsel not been deficient.

---

[7] In the event this Court was to agree that Cantu's ineffective assistance of counsel was partially defaulted, Cantu asserts that he is excused based upon the deficient performance of his habeas counsel. While Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez v. Johnson, 255 F.3d 229, 245 (5th Cir. 1999). Cantu nevertheless, submits this argument in order to preserve it for higher court review.

## IX.

## CANTU'S APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING TO RAISE AN ISSUE ON APPEAL RELATED TO THE TRIAL COURT'S ERROR IN NOT GIVING A REASONABLE DOUBT INSTRUCTION FOR EXTRANEOUS OFFENSES[8]

At the punishment phase of the trial, Cantu's trial lawyer requested that, pursuant to Tex. Code Crim. P. 37.07, the trial court instruct the jury that it must believe that the extraneous offenses introduced against Cantu at the punishment hearing occurred beyond a reasonable doubt before it could consider them in its deliberations. (47 R.R. 29-30). The trial court denied this request. (47 R.R. 30). Without question, this was error. State v. Huziar, 12 S.W.3d 479 (Tex. Crim. App. 2000). Likewise, on appeal this error could have resulted in Cantu receiving a new punishment hearing. Id.

It is axiomatic that an appellate attorney provides ineffective assistance of counsel on appeal by failing to raise a claim that "would have had a reasonable probability of success on appeal." Duhamel v. Collins, 955 F.2d 962 (5th Cir. 1992). Here, it is inexplicable why Cantu's appellate counsel did not raise a claim regarding the trial court's failure to follow

---

[8] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez, 255 F.3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

binding case law exactly on point. Given these clear facts, Cantu received

ineffective assistance from his appellate counsel.

# X.

## MR. CANTU WAS DENIED HIS CONSTITUTIONAL RIGHT TO BE PRESENT AT ALL STAGES OF HIS TRIAL[2]

At one point in the trial, there was a hearing conducted outside the presence of the jury. During the hearing, the lead detective in this case, Anthony Winn, was questioned regarding claims that another person, Mario Rojas, committed the murders of Mr. Mosqueda and Ms. Kitchen. This was the first time that the defense had learned of this alternative suspect who the police long knew about through an anonymous tip. Despite the importance of this information, however, Mr. Cantu was not present during the questioning of the detective. Moreover, when the trial court noticed Mr. Cantu's absence, Mr. Cantu's trial counsel inexplicably "waive[d] Ivan's appearance" despite the fact that there is no evidence that he had Mr. Cantu's permission to do so. (33 R.R. 182-202.)

The right to be present at all trial proceedings is grounded in the Sixth Amendment and the due process clause of the United States Constitution. See United States v. Gagnon, 470 U.S. 522 (1985). Moreover, this right is

---

[9] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g. Martinez, 255 F.3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

one of those "basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the defendant." Taylor v. Illinois, 484 U.S. 400, 417-18 (1988). Nevertheless, this is exactly what Mr. Cantu's trial counsel did in this case.

In sum, Mr. Cantu's trial was rendered constitutionally defective when he was denied his Sixth Amendment and due process rights to be present at a hearing, conducted during the middle of trial, in which it was learned for the first time that the police had been informed of an alternative suspect in the murders for which Mr. Cantu was standing trial. As such, Mr. Cantu would be entitled to habeas relief and a new trial.

# XI.

## MR. CANTU'S TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT TO EXTRANEOUS VICTIM IMPACT TESTIMONY[10]

Mr. Cantu was indicted separately for the murder of James Mosqueda and Amy Kitchen. The state elected to try the cases separately and the instant case was based upon the killing of James Mosqueda. (Indictment of Ivan Cantu attached as Exhibit D.) While it is true that the state alleged the killing of Amy Kitchen in the instant indictment as one of the "methods" of committing capital murder under Tex. Crim. Code § 19.03(a)(7), there should be no dispute that the complainant in the case was only James Mosqueda.

Texas law is very clear that, while the state, in capital cases, may introduce victim impact evidence related to the complainant, victim impact testimony related to the victim of an extraneous offense is generally *inadmissible*. *See* Halley v. State, 173 S.W, 3d 510 (Tex. Crim. App. 2005); Cantu v. State, 939 S.W.2d 627 (Tex. Crim. App.), *cert denied*, 522 U.S. 994 (1997). In this case, however, the state introduced victim impact

---

[10] Mr. Cantu must again acknowledge that this ground for relief was not raised in his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Mr. Cantu would submit that he is excused based upon the deficient performance of his habeas counsel. Mr. Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. *See, e g,* Martinez, 255 F 3d at 245. Mr. Cantu, nevertheless, submits this argument in order to preserve it for higher court review.

evidence regarding Amy Kitchen as well as James Mosqueda. Indeed, the last witness the state called during the punishment phase was Bernadine Kitchen, Amy Kitchen's mother, who testified regarding her relationship with Amy and Amy's relationship with her niece. ((47 R.R. 16-19.) In addition, Bernadine Kitchen testified as to Amy's career plans, and the effect Amy's death has had upon her, Amy's brother, Amy's niece and Amy's father. (47 R.R. 16-19.) For example, when talking about the impact Amy's death had on Amy's father, Bernadine Kitchen testified that he told her "I wish I could just go to sleep and never wake up. I miss her so bad. I just want to be with her in heaven." (47 R.R. 19.) Bernadine Kitchen ended her testimony stating "I just can't seem to imagine to want to go on without her." (47 R.R. 19.)

Given the well established case law on this point, there could have been no reason for Mr. Cantu's trial counsel not to object to Bernadine Kitchen's testimony. His failure to do so rises to the level of ineffective assistance of counsel under *Strickland* and should provide Mr. Cantu with a new punishment hearing with competent counsel.

## XII.

## THE STATE'S USE OF A PREEMPTORY CHALLENGE TO DISQUALIFY AN HISPANIC JUROR WAS IMPROPER UNDER *BATSON V. KENTUCKY*[11]

In Batson v. Kentucky, 476 U.S. 79 (1986), the United States Supreme Court held that the Equal Protection Clause prohibits a prosecutor to challenge potential jurors solely on their race. During Cantu's trial, prosecutors peremptorily challenged juror Hilda Lauriello on the grounds that she, like Cantu, was Hispanic. (11 R.R. 67.) Cantu's counsel objected to this preemptory challenge as a violation of Batson, but the trial Court overruled that objection. (11 R.R. 97.) The trial court's determination was in error and permitting the prosecutor to exclude juror Lauriello deprived Cantu of his rights under the Equal Protection Clause.

As with all Equal Protection challenges, Cantu bears the burden of showing that the prosecutor's preemptory of juror Lauriello was as a result of racial discrimination. Batson, 476 U.S. at 93. Once the defendant makes

---

[11] Cantu acknowledges that this ground was not raised in either his direct appeal or his State Habeas Writ. In the event this Court believes that this claim has been either completely or partially defaulted, Cantu asserts that he is excused based upon the deficient performance of his direct appeal and/or habeas counsel. Cantu has a right to effective direct appeal counsel. *See* Duhamel, 955 F.2d at 962. As to state habeas counsel, Cantu acknowledges that the United States Court of Appeals has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. See, e.g, Martinez v. Johnson, 255 F.3d 229, 245 (5th Cir. 1999). Cantu raises the latter argument in order to preserve it for higher court review.

this requisite showing, the burden shifts back to the State to explain adequately the racial exclusion. Id. "Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or affirming his good faith in making individual selections . . . The prosecutor must therefore articulate a neutral explanation related to the particular case to be tried." Id. at 98.

In this case, Cantu made the requisite showing that juror Lauriello was struck based on her Hispanic heritage, and the Court shifted the burden to the State to show a neutral basis for its preemptory challenge. (11 R.R. 69.) In response, the State failed to provide an adequate racially neutral motivation, but instead resorted to the type of "good faith denials" that have been held to be deficient. Batson, 476 U.S. at 98.

For example, the State claimed that the juror "seemed to be hostile to me in her answers," by virtue of the fact that juror Lauriello told the prosecutor that he was being "callous" and "insensitive" in his treatment of fellow jurors. (11 R.R. 70.) However, when asked if juror Lauriello's alleged feelings about the prosecutor would interfere with her ability to be an impartial juror, Lauriello responded (according to the prosecutor as this was not a transcribed conversation), "I don't think so," or "I can't see that happening." (11 R.R. 70-71.) Rather than believe juror Lauriello would be

impartial, the State saw that response as further indicating that she was tainted. (Id.)

Importantly, the main basis for the State's challenge was due to the State's own provocation of this potential juror. (11 R.R. 83.) In addition, the State's discharge of juror Lauriello based on her statement that she "didn't think" her feelings toward the prosecutor would render her unable to be impartial was directly different conclusions than the prosecutors drew when white jurors answered in similar fashion. For example, Juror No. 1, Mr. Calhoun, also told prosecutors that he "thought he could" be impartial, or a similarly equivocal statement as offered by juror Lauriello, but prosecutors did not object to his presence on the jury. (11 R.R. 84.)[12]

Perhaps most troubling of all, the trial Court's ruling manifested a misunderstanding of the nature of a challenge under Batson. The trial court's entire ruling on this complicated issue was as follows:

> I tell you what. I observed the witness myself. And I found her to be attractive and articulate and really a person of nondescript ethnicity. If she had Hispanic on her questionnaire, she – if I had guessed, I could have guessed her to be any number of things, some sort of Mediterranean or perhaps ordinary American lineage.
>
> I note, too, that she appears to have been born in New York. And so if I were going to speculate, I would speculate that she was more apt to be Puerto Rican than Mexican. And so, and I assume that

---

[12] Although the prosecutor denied that Juror Calhoun provided an equivalent response, he claimed that he could not recall what Calhoun answered. (11 R.R. 84-85.)

the — that the defendant is of Mexican decent, although I don't know that either.

MR. GOELLER [Trial Counsel]: We'll just say Hispanic, Your Honor, slash Latino.

THE COURT: But I don't know that her ethnicity, if we were going to say that, would be identical to his. But be that as it may, if you can lump everyone into Hispanic, then he's a Hispanic and, I suppose, so is the juror. At any rate, I'll find that based upon all the evidence before me that the State's strike was not based on ethnicity or race."(11 R.R. 97.)

The trial court's ruling indicates numerous violations of Cantu's Equal Protection rights. First, the trial court clearly assumed that it would be permissible to use a preemptory on juror Lauriello if the prosecutor believed she was Puerto Rican and the defendant was Mexican. The law, however, is to the contrary. Batson is unequivocal in its reach that any racial motive in selecting a jury violates the constitution. Batson, 476 U.S. at 88 ("the Constitution prohibits all forms of racial discrimination in selection of jurors").

Second, the trial court's ruling was based on his assumption that the prosecutor did not know that juror Lauriello was Hispanic — a fact not supported by the record. The prosecutor never claimed when justifying the preemptory strike that he didn't know that juror Lauriello was Hispanic. (11 R.R. 85-97.) Nevertheless, the trial judge's decision places considerable weight on the fact that juror Lauriello was not, in the trial court's mind,

identifiably Hispanic—"I found her to be a ... a person of nondescript ethnicity of some sort of Mediterranean or perhaps ordinary American lineage." (11 R.R. 97.)

Third, and even more problematic, the trial court's conclusion on this ground seemed to be based on racial stereotypes. The only support in the record for the conclusion that juror Lauriello was of "nondescript ethnicity" or "some sort of Mediterranean or perhaps ordinarily American Heritage" (11 R.R. 97) was the fact that the trial court "found her to be attractive and articulate" (11 R.R. 97) – as if attractive, articulate people could not be Hispanic. The trial judge's bias in this regard was further highlighted by, not only his speculation that the "attractive and articulate" juror was non-Hispanic, but that the defendant was likely "Mexican" (11 R.R. 97) – another fact that was not in the record.

For all of these reasons, the disqualification of juror Lauriello by use of the State's preemptory challenge violated Cantu's constitutional right under the Equal Protection Clause of the Fourteenth Amendment.

## XIII.

## THE INVESTIGATION CONCERNING CANTU'S ACTUAL INNOCENCE CONTINUES AND, ON THAT BASIS, CANTU PRESERVES THIS CLAIM

Pursuant to the United States Supreme Court's pronouncement in Herrera v. Collins, 506 U.S. 390 (1993), proof of actual innocence constitutes another ground for vacatur of Cantu's conviction. At this time, counsel continue their investigation in an effort to obtain evidence of Cantu's actual innocence. Cantu hereby raises this ground for habeas relief so that it is not waived. Immediately upon obtaining information concerning his actual innocence, Cantu will supplement the brief on this issue.

## CONCLUSION

For the foregoing reasons, petitioner Ivan Abner Cantu respectfully requests that his judgment of conviction and/or sentence of death be vacated and that he be granted a new trial. In the alternative, Cantu requests a new sentencing hearing.

Dated: January 17, 2007

**BRODEN & MICKELSEN**

F. Clinton Broden
2707 Hibernia Street
Dallas, TX 75204
(214) 720-9552
(214) 720-9594 (Facsimile)

**GERSTEN SAVAGE LLP**
Adam D. Mitzner
600 Lexington Avenue
New York, New York 10022
(212) 752-9700
(212) 980-5192 (Fax)

## CERTIFICATE OF SERVICE

I, F. Clinton Broden, certify that on January 17, 2007, I caused the foregoing document to be served via U.S. mail, first class, postage prepaid, on the Texas Attorney General's Office, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

F Clinton Broden