# AFFIDAVIT

1. My name is Daneen A. Milam, I am over 21 years of age and am competent in all respects to make this affidavit. I am a licensed psychologist and certified as a Health Service Provider in the state of Texas. I am board certified in clinical neurpsychology by the American Board of Professional Neurpsychology. I practice clinical neuropsychology in San Antonio, Texas and have been the director of an assessment center for more than fifteen years. I have served on the editorial board of Archives of Clinical Neuropsychology, the official scholarly journal of the National Academy of Neuropsychology for the past five years. Much of my present clinical practice is in the area of forensic neuropsychology and I have conducted more than 20 examinations of criminal defendants.

2. I have reviewed the summation statements from the trial of the State of Texas vs. Ivan Abner Cantu, the Social History produced by Shelli S. Schade, LMSW, DAPA, the medical records from Parkland Hospital, the medical records from Parkland Hospital, Texas Department of Corrections records, and a case summary from the Texas Department of Criminal Justice. I have read in its entirety the correspondence of Ivan Cantu to his attorney, his mother, and his grievance to the State Bar of Texas. I have reviewed Ivan's questions and objections regarding the quality of his representation during both the guilt/innocence portion of his trial and the mitigation stage.

3. There are multiple, overlapping indicators that would have led a a neuropsychologist or similar specialist, when presented with this information, to suspect that Mr. Cantu may suffer from organic brain damage or a severe mood altering disorder.

4. First, Ivan's father, Abner Cantu has a long history of alcohol and cocaine addiction. In a review of Ms. Schade's social history, there is a significant history of substance abuse and

*Exhibit A*

violent behaviors that were noted in several paternal family members. Ivan's grandfather committed murder and Ivan's uncle committed suicide. In reviewing Ivan's father's family, there was clearly a long history of depression, and Abner was later diagnosed with Bi-Polar disorder. Research indicates that 60% of all adults diagnosed with Bi-Polar Disorder suffer from alcoholism and drug abuse, with stimulants causing escalation of Bi-Polar symptoms.

5. Secondly, Ivan's mother, Sylvia and his brother, Erik have both been diagnosed with Bi-Polar Disorder. One aunt has had a series of manic moods that are consistent with a Bi-Polar diagnosis but has never officially received treatment. Ivan's maternal grandfather had a violent temper that was "inherited" by Sylvia. Physical and substance abuse have been noted across three generations of the family.

6. Thirdly, Ivan exhibited many of the symptoms that are common to Bi-Polar Disorder. He exhibited rapid mood swings, grandiose thinking patterns and violent nightmares. One of the side effects of Bi-Polar disorder is difficulty working through logical problems and errors in comprehension. His pattern of leaving school, walking off of jobs, going AWOL from the Navy, and his inability to learn from failed personal relationships are all commonly seen patterns of behavior of a Bi-Polar diagnosis. A Bi-Polar disorder is caused by a difference in how a person's brain and nervous system regulates basic behavior patterns. It is not a choice, but is instead, a breakdown of the inhibitory system. Bi-Polar is a regulatory error that is caused by a complicated mix of environmental factors, genetic potential, and differences in brain structure.

7. In reviewing Ivan's records, his suicidal gestures, grandiose thinking, poor insight, and substance abuse, illuminate a pattern of manic highs and depressive lows. In addition, in each instance where Ivan was using a stimulant, he became abusive in his personal relationships. Friends noted that he was disoriented, irritable and paranoid. Bi-Polar individuals

respond to stimulants with defiance, moodiness, and may become violent. Taken together, with his dysfunctional childhood and family history of Bi-Polar, Mr. Cantu's behavior strongly suggest symptoms suggestive of Bi-Polar from an early age. Had he been evaluated prior to the punishment phase of his capital murder trial, and had a mental health professional been provided with the information above, I believe that any reasonably competent psychiatric professional would have recognized the need to subject Ivan Cantu to a complete Neuropsychological evaluation to rule out an organic cause of his behavior pattern.

8. I was retained by Mr. Cantu's habeas counsel to assist with the clinical aspects of Mr. Cantu's case. I traveled to the Polanski Unit in Livingston in May of 2004 to examine and evaluate Mr. Cantu. I spent approximately 11 hours examining and testing Mr. Cantu in a small room on Death Row. We were alone in the room; two guards watched the assessment through a glass window. His handcuffs were removed during this period but his leg irons remained in place.

9. First, I conducted a clinical interview with Mr. Cantu. I then performed a mental status examination to check his orientation to time, place, and person. After determining he was both willing and capable of being assessed, I spent approximately ten hours conducting formal neuropsychological testing which included a formal measure of intellectual potential, a memory measure, portions of the Halstead-Reitan Neuropsychological Battery for Adults, and several other psychological and neuropsychological tests. Mr. Cantu was also evaluated, formally and informally for malingering. These tests are all accepted and recognized as reliable within the neuropsychological community.

10. During Mr. Cantu's evaluation he consistently exhibited pressured speech, an exaggerated sense of self confidence, (noting that when he was released he planned to attend Harvard University), and tended to place himself in a leadership role in

each and every job he has held since high school. His response pattern was one of impulsivity and poor planning on structured tasks. His response style was consistently one of distractibility, and an inflexible thought process that is consistent with obsessive-compulsive behavior patterns. His motor skills were moderately poor but very fast. He exhibited constructional dyspraxia but his error pattern was consistent with a regulating difficulty rather than an organic dysfunction. Comparing across all instruments, Mr. Cantu exhibited a range of difficulty with measures of central nervous system integrity; attentional deficits, impulsivity, organizational deficits, constructional dyspraxia, along with the partial loss of the ability to inhibit responses. He has moderate memory and attention deficits. The overall results indicate a consistent pattern of poor regulation of thoughts, feelings and abilities which is consistent with a diagnosis of Bi-Polar disorder.

11. Bi-Polar Disorder is a medical problem that is not the result of lack of will power, oppositional or defiant behavior or poor parenting, although neglectful and abusive parents will worsen the course of a Bi-Polar disorder. The effects of Mr. Cantu's inherited disorder were no doubt aggravated by the chaotic, traumatic home environment in which he spent his formative years. Children who suffer from Bi-Polar disorder require intensive limit setting and a stable environment. It appears extremely unlikely that any adult in Mr. Cantu's household could provide this kind of structure and discipline. Mr. Cantu was placed in charge of his three year old brother when he was ten years old. His mother was working two jobs and rarely home. The records provided by Ms. Schade, after interviewing many family members, indicate that Mr. Cantu spent the earliest years of his life in a home environment marked by poverty, alcoholism, and drug abuse, physical abuse and neglect, mental illness and death of more than one close family member. His uncle committed suicide in front of the family at a Thanksgiving gathering.

12. It is significant that on August 29, 2000, sixty five days before the murder of his cousin, Mr. Cantu was taken to Parkland Hospital for suicidal gestures. This indicates a severe mood disorder that generally requires intensive medication and/or therapy. He was released the same day he was admitted and an opportunity to remediate his Bi-Polar disorder was missed. By Labor Day weekend he had moved into a manic phase, met Amy Boettcher, married her within a few weeks, and began to abuse Crank, Ecstasy, and Speed. Clearly these drugs interact with a Bi-Polar disorder to cause difficult and unpredictable behavior, irritability, agitation, and cause biological and chemical malfunctions to escalate. It is a common side effect that as self medication escalates, the roller coaster ride of ups and downs alienate the people capable of providing a support system. People with Bi-Polar disorder rarely realize how impaired they are and blame others for their problems, isolating them even more.

13. During my interview with Mr. Cantu, he advised me in no uncertain terms that he had not committed the offense for which he is now on death row. However, I have been asked by counsel for Mr. Cantu to address the mitigation special issue at the punishment phase of his trial. My observations are intended solely and strictly to assist in the evaluation of counsel's performance at the punishment phase of Mr. Cantu's trial and are not to be interpreted to be an admission, either implicit or explicit, of any criminal liability on Mr. Cantu's part whatsoever.

14. There is a lot of evidence that Bi-Polar Disorder is a deficit in mechanisms of programming and reprogramming neurons. Life stresses, difficult relationships, drug use, disruption in sleep cycles all seem to bring on the symptoms and begin a rapid cycling episode. Children of parents diagnosed with Bi-Polar disorder are at high risk for developing Bi-Polar disorder and the risk is several times that of the general population. Some estimate the risk to be as high as 1:4 for developing some kind of mood disorder. None of this is a choice of the individual. Mr.

Cantu did not choose to be born into a dysfunctional family. He did not choose to develop a Bi-Polar disorder. He did not choose to be misdiagnosed and receive medication that would escalate the symptoms rather than help his disorder. More than 60% of all individuals who develop Bi-Polar disorder suffer from alcoholism and substance abuse. His choice to use drugs was mediated by this fact.

15. It is my opinion that, without a through evaluation and differential diagnosis, the presentation of the defense case at the punishment phase of Mr. Cantu's trial was inadequate and failed to inform the jury of many important and relevant aspects of his psychological functioning. Without access to this information the jury would not be able to make a fair and balanced assessment of his personal moral culpability.

Further affiant sayeth not.

_Daneen A. Milam, Ph.D., ABPN_

SUBSCRIBED AND SWORN TO BY DANEEN A. MILAM BEFORE ME, THE UNDERSIGNED AUTHORITY, ON THIS 24TH DAY OF MAY, 2004, TO CERTIFY WHICH, WITNESS BY HAND AND OFFICIAL SEAL OF OFFICE.

_Notary Public, State of Texas_

DONNA GAYLE BASSE
NOTARY PUBLIC
State of Texas
Comm. Exp 05-12-2006