IN THE

COURT OF CRIMINAL APPEALS

OF TEXAS

AUSTIN, TEXAS

AND

THE 380TH JUDICIAL DISTRICT COURT

COLLIN COUNTY, TEXAS

| | | |
|---|---|---|
| EX PARTE | § § § § § | NO  W-380-80047-01 (HCl) |
| IVAN ABNER CANTU | | |

## AFFIDAVIT OF J. MATTHEW GOELLER

Comes now J. Matthew Goeller, and submits the following affidavit as ordered by the 380th

District Court, said Court having denied and overruled Affiant's Objection previously filed on

September 21, 2004   This affidavit is given in response to the Court's Order of September 21,

2004, and April 20, 2005, regarding the following:

*1) WHETHER APPLICANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL*

*BECAUSE HIS TRIAL ATTORNEYS-- FAILED TO UNCOVER AND--INTRODUCE INTO*

*EVIDENCE EXPERT TESTIMONY DEMONSTRATING THAT APPLICANT HAD A*

*A. DYSFUNCTIONAL CHILDHOOD,*

*B. ABUSED DRUGS,*

*C. AND SUFFERS FROM A BIPOLAR DISORDER,*

FILED

2005 OCT 12  AM 9: 39

Page 1 of 13

HANNA ERNICLE
DISTRICT CLERK
COLLIN COUNTY TEXAS
BY_____DEPUTY

*Exhibit B*

151

*2) WHETHER THE AFFIDAVIT OF DR. DANEEN MILAM CORRECTLY IDENTIFIES*

*DEFICIENCIES IN THE PERFORMANCE OF TRIAL COUNSEL;*

*3) COUNSEL'S SENTENCING TRIAL STRATEGIES IN PRESENTING APPLICANT'S*

*DEFENSE TO A COLLIN COUNTY JURY;*

*4) ANY OTHER INFORMATION COUNSEL DEEMS RELEVANT TO RESPOND TO*

*APPLICANT'S ALLEGATIONS, INCLUDING THE EXTENT TO WHICH APPLICANT*

*PARTICIPATED IN DICTATING A COURSE OF ACTION.*

BEFORE ME, THE UNDERSIGNED AUTHORITY, on this day personally appeared J. MATTHEW GOELLER, who after being duly sworn deposed and stated:

"My name is J MATTHEW GOELLER, I am an attorney licensed to practice in the State of Texas My bar number is 08059260. My address is 400 Chisholm Place, Suite 400, Plano, Texas 75075. I have been licensed to practice law since November 1984 I have been board-certified in criminal law since 1990.

On December 5, 2000, I was appointed as lead trial counsel for IVAN A CANTU, in the above-referenced cause number. Mr Don N. High was appointed as my co-counsel on January 2001. Mr CANTU was charged with the offense of Capital Murder Mr Cantu's case was pending in the 380ᵗʰ Judicial District Court of Collin County, Texas The case number is 380-80047-01

Don High and I worked very closely together in all aspects of our defense of Mr. Cantu Therefore , we have worked together in the preparation of our affidavits.

### Review of File

Mr. Cantu was accused of murdering his cousin, Mr James Mosqueda, and Mr.

Mosqueda's girlfriend, Miss Amy Kitchen. At the outset, I reviewed the offense report, crime scene report, detective's summary, autopsy and all other documents relevant to the charges against Mr. Cantu  My review revealed that on November 4, 2000, the decedents were found murdered in their home at 18663 Gibbons, Dallas, Texas by George Snowden, a firefighter who was asked to perform a "safety check" at the behest of Amy's mother  The couple was last seen the previous evening by Amy's father, Mr. Jerry Kitchen, when they went out for dinner with him at the El Rancho Restaurant in Oak Cliff  He left them for his home in Arlington at approximately 10:30 p.m. while James and Amy drove up the tollway to their home in North Dallas in James's black Corvette.

Both Mr. Kitchen and his ex-wife, Ms. Bernadine Kitchen, made several attempts to contact the couple on Saturday, November 4, but were unsuccessful  Ms. Kitchen was to go shopping with Amy on Saturday. After trying to contact Amy all day, Ms. Kitchen went to the house at around 4:00 p.m.; when no one answered the door, she went to the fire station and asked for a safety check.

Upon realizing he was entering a crime scene, Lt. Snowden called the police  The call was answered by Officers Frank Della (who arrived at the scene first) and Barry Maxwell of the Dallas Police Department, who arrived at the house around 5:45  These officers made a search of the premises and secured the area until detectives arrived an hour later  The decedents had apparently been shot while in their night clothes in their bedroom  James was lying in the middle of the bed while Amy's body was on the floor next to the bed. There were no signs of forced entry or a struggle, and no gun was found at the scene

Officer Steve Junger arrived at 6:30 p.m. to assist in securing the crime scene. At approximately 8:00 p.m., Officer Junger and his partner, Officer Illiff, accompanied Applicant's mother Sylvia Cantu, to an apartment at 4753 Old Bent Tree No. 1004, which was occupied by Applicant and his fiancee, Amy Boetcher, to perform an "emergency search" of the apartment There was no search warrant  No owner of the apartment was home at the time  Junger entered by using a manager's key at 8:25 p.m  Junger searched the apartment for about ten minutes out of the presence of Ms. Cantu  Upon exiting the apartment, Officer Junger noticed a small hole by the door which he later testified appeared to be a bullet hole  However Junger did not

mention the supposed bullet hole in his report. Later, when Junger was contacted by his sergeant, he was asked whether he saw a black Corvette in the parking lot. At that time, Junger informed the sergeant of the bullet hole in the wall.

On November 4, 2000, applicant and his fiancee, Amy Boetcher, drove to Arkansas to meet her parents. This trip had been planned for some time. They stayed with her parents until November 7th, when they returned to Dallas.

While Applicant and Boetcher were in Arkansas, it was determined that James's black corvette and wallet were missing, along with Amy Kitchen's engagement ring. The Corvette was later recovered in the parking lot of the Pear Ridge Apartments on November 5, 2000 Detective Anthony Winn, the lead detective, testified that he had been invited to listen to a telephone conversation between Applicant and Carlos Gonzales, a friend of Applicant's. According to Winn, Applicant called from Arkansas to tell his friend that he had been threatened by a man dressed as a pizza delivery man on November 2nd. The man told him that James owed him a lot of money for drugs. Applicant went to James's house on Friday, the 3rd to discuss it. James asked him to leave his Honda in front of the house and take his Corvette because he feared this man and wanted it to look as if someone were visiting their home

On November 7, 2001, Detective Winn obtained a search warrant authorizing what Applicant contends was an illegal search of Applicant's apartment. As a result of this search, the following items were confiscated from Applicant's apartment: a pair of jeans, white socks, one box of 380 bullets, and assorted keys, including a silver and a gold Mercedes key. The key started Amy's Mercedes, and one key unlocked the door from the garage to the decedents house. The jeans and the socks were later shown to have the decedents' blood on them.

Applicant and Boetcher returned to Dallas on November 7th. Applicant was arrested November 8th, and Amy Boetcher flew back to her parent's home in Arkansas.

Amy Boetcher is a girl that has lived with many men from an early age and at the time of the murder was Applicant's fiancee. She enjoyed doing drugs, mostly ecstasy, speed and cocaine, paid for by Applicant She was not interested in employment. Amy Boetcher and Applicant lived together at the Pear Ridge Apartments, where Amy's name was on the lease, but Applicant paid the bills and had the only key. She enjoyed her lifestyle where she slept all day,

partied all night and paid for nothing. Applicant has been successful in several legitimate businesses and was employed at the time.

According to Amy Boetcher, Applicant called James at 11:20 p.m. and asked to go see him. Applicant supposedly told Boetcher that he was going to kill James and Amy. He came home about an hour later with his face swollen, blood on his jeans, and wearing different shoes and shirt. He told her that James had hit him with a baseball bat. He had his gun with him. Applicant and Boetcher returned to the crime scene together and looked for some cocaine. Afterwards she and Applicant went clubbing through the early hours of the morning, because she wanted to go to Club Seven. While in Arkansas, with her parents, Amy made no attempt to call the police or even tell her parents about the murders (her stepfather is a retired police officer). When she and applicant returned on November 7, they went to Tawny Svihovec's apartment. The gun alleged to be the murder weapon was found in the home of Tawny Svihovec. Applicant's fingerprint was found on a removable clip, not the handle of the gun.

After his arrest, Applicant spoke with Detective Winn and later called Amy Boetcher to tell her about it. He had left some money for her under a couch cushion. She took some of the money and flew back home to Arkansas. At no time from November 4 until November 8 did Boetcher notify the authorities.

When she returned to Arkansas, Amy Boetcher did not tell her parents about Applicant's arrest until the next morning. While in Arkansas, Boetcher gave no less than four different accounts to law enforcement officials, including her stepfather and Officer Winn: She wrote a statement to an Arkansas Sheriff Joe Martz, around November 10, 2000; She made a statement to an Arkansas state trooper; her third statement was to Detective Winn on November 22, 2000; and her fourth statement was to her stepfather, Richard Kremer, after her Statement to Winn. Amy was coached by her stepfather to included the phrase "I'm not implicated I'm not a suspect in anything." Boetcher was not investigated for her role in this incident. Amy was on probation for a DWI from 1999 until 2002. Her continual drug use would be a violation of that probation. She has never been served with a Motion to Revoke her probation. Detective Winn arranged for her to complete her probation in Arkansas, and told her that if she had any problems to have her probation officer contact him.

Page 5 of 13

155

Amy Boetcher returned to Dallas to pick up her belongings and did so on the same day that Winn executed the second search warrant to remove the bullet from Applicant's apartment James Mosqueda was a known drug dealer who sold large quantities  His friend, Carlos Gonzales, and Anthony Fonseca were also dealers.  Chris Head and Anthony Fonseca were currently in the narcotics business.  During his investigation, Detective Winn received an anonymous tip that Mosqueda owed Rojas a lot of money for drugs

After I became familiar with the factual allegations against Mr. Cantu, Mr  High and I discussed our initial opinions regarding our defense of the case.  We interviewed Ivan Cantu on several occasions, both together, and separately, in order to get his input regarding the facts and to apprize him of the information we had obtained  Initially, Cantu had lied to us about the facts of the case and his involvement, taking the position that he knew nothing about the murders. Cantu thereafter changed his recollection of his involvement in the murders.  Cantu refused to participate in any psychological mitigation strategies--Cantu wished to focus on the guilt/innocense stage, despite overwhelming evidence of his guilt in the murder of Mosqueda and Kitchen  Throughout my representation, Cantu displayed animosity toward myself and Mr  High because of strategy designed to defeat the "future dangerousness" special issue in the punishment phase of the trial  Cantu, despite his ultimate recognition of the evidence against him, continuously advanced his demand that "we try this case to obtain a not guilty."  Cantu repeatedly questioned our punishment phase preparation, stating several times that our punishment phase strategy was premised on "losing" the guilt-innocense phase of the trial

Since the courts order has limited this affidavit in scope, I will limit any further comments regarding our trial strategy to the *punishment phase* only.  Based upon our knowledge of the case up to that point, Mr  High and I agreed that our best strategy regarding punishment involved four main points:

1. Ivan Cantu's dysfunctional childhood and family,
2. Ivan Cantu's misuse of drugs and alcohol, some of which was supplied by the decedent Mosqueda.
3 Ivan Cantu's lack of future dangerousness when drugs and alcohol were removed from his access, i.e., a plea for a life sentence.

4. The advent of Ivan Cantu's recent spiritual conversion experience, making him a "born again Christian", thereby reducing his likelihood for future violence, and *filling the void* brought about for the now-missing drugs and alcohol.

This strategy remained consistent throughout the trial and on into the punishment phase, despite Cantu's demand that our efforts concentrate on guilt/innocense, and not mitigation in the punishment phase.

## Motions filed

As part of our defense of Mr. Cantu, Don and I filed twenty-four (24) motions. These are all available for review in the clerk's file. The court reporter's record contains the hearing, and subsequent ruling on each of these motions. Of particular note is the motion to appoint a Mitigation Specialist in the case, specifically Mr. Vince Gonzales of Lubbock, Texas.

## Strategy during Jury Selection

Jury Selection began August 20, 2001. Throughout jury selection, our criteria for jurors remained consistent: we were looking for jurors who would strongly scrutinize the punishment phase issues mentioned above. Additionally, based upon Mr. Cantu's good behavior during his incarceration in Collin county, and his recent conversion to being a "born again Christian", we were looking for jurors who could consider the fact that our client was not a future danger as long as he was locked up--away from drugs and alcohol--those things which had made him dangerous at the time of the commission of the offense.

## Evidence on Mitigation

From our initial discussions regarding our strategy in Mr. Cantu's case, Don and I, along with our mitigation specialist, Vince Gonzales, discussed the issue of mitigation evidence. Early on, we asked Mr. Cantu to provide us an account of his life prior to being arrested for the current offense. We specifically asked Mr. Cantu to provide information regarding his childhood, any abuse he suffered (at the hands of anyone, including his parents), any traumatic injuries he had suffered, and anything else he could think of that would assist us in convincing a jury to spare his life should the trial reach that final question. We also addressed these same questions to his

mother, Ms Sylvia Cantu. We asked both of them to provide the names and addresses of any witnesses we could interview on these topics. Any information that they provided was given to Vince Gonzales who did extensive interviews with these people to develop a detailed mitigation plan. As a result of our mitigation evidence not being very extensive, Mr. Cantu's behavior while in jail, and his success in the business world, ultimately became much more important to us.

## Bi-Polar Disorder

At my initial meeting with Mr. Cantu, and throughout all subsequent dealings I had with him, I found him to be able to intelligently discuss the allegations made against him. He readily discussed trial strategy with us, especially when he disagreed with a proposed course of action Mr. Cantu understood the factual allegations against him as well as the day-to-day courtroom proceedings. He communicated with us intelligently throughout our representation of him. Never was he incoherent, or "in another time, place, or space". Mr. Cantu was able to recall the facts regarding his involvement with the deceased, as well as other individuals who gave testimony in the trial Mr. Cantu was able to comprehend the factual allegations against him (both regarding the guilt/innocence and punishment allegations) and offer assistance in his defense.

Throughout the trial, Mr. Cantu paid attention and continually proposed questions he wanted us to ask each witness These questions were generally relevant and had the potential to elicit a helpful answer.

From the beginning, Vince Gonzales, Mr. High and I discussed the ramifications of having a psychiatrist evaluate Ivan Cantu We knew that under *Lagrone v State*, 942 SW2d 602, the trial court may order a defendant to submit to a state-sponsored psychiatric exam on future dangerousness when the defense introduces, or plans to introduce, its own future dangerousness expert testimony Of great concern in deciding whether or not to subject Cantu to a State-sponsored psychiatric examination was the fact that Cantu was manipulative and had lied on several occasions to his own counsel. Cantu's participation in his defense consisted of (1) an initial denial of any knowledge or complicity in the murders; (2) a subsequent statement involving a conspiracy between friends and a pizza-delivery man who killed Mosqueda and

158

Kitchen; (3) his admission that he had indeed killed Mosqueda for "ripping him off" on a drug deal, and Kitchen just happened to be at the Mosqueda home, and that "I didn't want to leave any witnesses"; (4) that despite his previous statements and admission to counsel, he desired to advance an insanity defense that involved a conspiracy between Mosqueda, Kitchen, and Boetcher to "brain-wash" him with the drug 'Rohypnol" that ultimately caused him to commit the murders. When Cantu was admonished that counsel would not be involved in nor sponsor perjured testimony, Cantu replied that "Your (counsel's) job is to get me home, period." Based on the foregoing, we obviously had concern about Cantu being evaluated by a State psychiatric expert, as such would have likely lead to findings of manipulation, a commonly-sought State theme in the punishment phase. We ultimately decided not to have Ivan Cantu evaluated because (1) Cantu did not wish to participate in psychiatric-based mitigation evidence; (2) we did not believe Cantu would receive a favorable report, based on the fact that Cantu had admitted that to us that he killed Mosqueda and Kitchen because Mosqueda had not paid Cantu for Cantu having supplied Mosqueda with a 2.5 kilos of cocaine that was subsequently sold by Mosqueda for several thousands of dollars (and, thus, the murders were motivated by revenge, per Cantu); (3) the State's evidence regarding Cantu's prior violent acts against women, coupled with the particularly gruesome nature of the execution-style of the instant murders, concerned myself, Mr. High, and Mr. Gonzales of the probability that a state-sponsored psychiatric evaluation would indicate Cantu displays a sociopathic personality. We were of the opinion that any such evidence would substantially lower our already slim chance for a life sentence, considering the fact that Cantu was indicted for the murder of two people who were at home in their own bed. Although Daneen Milam, Ph.D., states in her affidavit that the failure of the defense to obtain a psychiatric evaluation was ineffective assistance of counsel, she fails to recognize that Cantu himself objected to any strategy that involved psychiatric-based mitigation evidence (if any such evidence did exist), and, further, failed to recognize the substantial sociopathic-type punishment evidence in possession of the State.

Everything we had observed about Ivan Cantu (from our personal interaction, to discussions with family members and friends, to our review of all of the relevant documents regarding his life history) led us to believe that a psychological evaluation would reveal him to be

159

a sociopath and accordingly, a future danger.

Furthermore, we had no evidence to support the theory that Mr. Cantu was suffering from any kind of mental deficiency, and in particular a bi-polar disorder. (Pursuant to previous mental health proceedings, in my seventeen years as a practicing attorney, I have represented many individuals afflicted with this disorder, and am well acquainted with its effects and symptoms) On the contrary, Mr. Cantu's behavior during our interaction with him showed him to be of average, to above average intelligence. This conclusion was supported by Mr. Cantu's self-penned legal documents as well as his letters to us and other individuals. This was further supported by evidence revealed in childhood and adult records that Sylvia Cantu provided to us, and in the Collin County jail records.

To be more specific, our evaluation of Ivan Cantu's mental capacity was based on our considerable face-to-face interaction with him, as well as our review of all the relevant documents in his case. Furthermore, our interviews with knowledgeable witnesses supported the conclusion that Ivan Cantu was not afflicted with a Bipolar Disorder. His family members were questioned by Mr. Gonzales, Mr. High, and myself, and none of them ever stated (or even remotely suggested) that Mr. Cantu's mental capacity was significantly diminished. None of these individuals ever mentioned a Bi-Polar or Schizophrenic Disorder.

Mr. High and I elected not the have Mr. Cantu evaluated by a psychologist for a number of reasons. Foremost in our minds was that Mr. Cantu would most likely be determined to be a sociopath. Based upon all the facts in our possession, our assessment of Mr. Cantu was that he is controlling and manipulative. Mr. Cantu will purposely behave in whatever manner he believes will accomplish his objective.

We certainly saw nothing in Mr. Cantu's interactions with us that would indicate he was bipolar or suffered from shcizophrenia. We did not witness any tremendous mood swings or changes in his personality. We *did witness* actions by Mr. Cantu indicating he was quite intelligent and fairly stable. For example, during jury selection, Mr. Cantu would laugh and joke with us, and draw pictures of the prosecutors, and tease with us about the good food he was getting in the jail. He would interact with us about his spiritual development, and the assistance he felt he was providing the other inmates. It is important to note that our social history revealed

that Ivan Cantu was an above-average student, who gained considerable financial success as a mortgage broker prior to the commission of these murders. Cantu stated that part of his financial success in the mortgage business was his ability to "scrub" poor credit histories, such "scrubbing" having involving a complicated scheme involving kickbacks to personnel working for credit-reporting agencies.

### Testimony of Dr. Mark Cunningham

On the 24th of June 2001, I contacted Dr. Mark Cunningham to inquire about his opinion on the issue of Ivan Cantu's future dangerousness (or lack thereof). I met with Dr. Cunningham and provided him an overview of Mr. Cantu's case. I explained the details of the allegations against him. I also detailed the potential punishment evidence against Mr. Cantu, as well as all pertinent documents we had gathered for our social history. At a later date, we provided Dr. Cunningham with the Collin County jail records regarding Mr. Cantu.

Dr. Cunningham and I discussed the fact that Ivan had been incarcerated for almost a year. We explained that our review of the relevant records demonstrated that as long as Mr. Cantu was in custody, and away from drugs and alcohol, he was not dangerous.

Dr. Cunningham indicated that, if our evaluation of Ivan Cantu's behavior while in custody was accurate, he had numerous studies to support the theory that Ivan Cantu was not a future danger as long as he was incarcerated. Dr. Cunningham took the records and began his review. I specifically asked Dr. Cunningham to evaluate these records with an eye for any information he felt was relevant and helpful to us in mitigation.

After reviewing the records, Dr. Cunningham concurred in our evaluation and we agreed he should testify on behalf of Ivan Cantu. Dr. Cunningham prepared a visual demonstration and this, along with his oral testimony, was presented to the jury.

Dr. Cunningham was not asked to perform a psychological assessment of bi-polar disorder or any mental retardation of Ivan Cantu for the same reasons as I have stated earlier. (We did not suspect this disorder, we certainly *had not observed any evidence of it*, and only felt that any evaluation done would only hurt, and not help Ivan's chances) When Dr. Cunningham left our initial meeting, he had in his possession several of the documents Dr. Daneen Milam cites to support her conclusion that Ivan Cantu is afflicted with the Bi-Polar Disorder. Dr.

Page 11 of 13

Cunningham never mentioned these documents to us as indicators of *any* diminished mental capacity of Ivan Cantu. Several other documents we reviewed, and provided to Dr Cunningham indicate that Mr. Cantu was an "excellent student" in his jail education classes and suffered from no mental illness

### Testimony of Dr. Walter Quijano

In an effort to depict the true nature of prison life, Mr High and I asked Dr Walter Quijano to comment on a videotape of a Texas prison unit. Since our central punishment strategy was to show that Mr. Cantu was not a future danger as long as he was incarcerated, we felt it was imperative to show the jury exactly what prison life is like. Mr. High and I had discussed the fact that the State would most likely attempt to minimize the severity of the conditions and/or limitations imposed on inmates inside a prison We wanted to be in a position during closing argument to emphasize the true characteristics of the penitentiary

We viewed the tape, and decided it would be useful piece of evidence for the jury. We successfully petitioned the Court to allow Dr. Quijano to "narrate" the tape as it was played so the jurors could understand what they were seeing

### Testimony of Reverend Maury Davis

During the course of our preparation, and specifically after learning of Mr Cantu's conversion to Christianity, we learned of a previously-convicted murdered who is now an Assembly of God minister. Maury Davis was convicted in 1981 for the murder of a female real estate agent in Dallas, Texas. He served ten (10) years on his sentence in TDC While in prison, he, like Ivan, converted to Christianity, and began studying and later teaching other prisoners about the Bible At one point, his prison ministry numbered over five (500) hundred inmates He was later paroled, and took a job at the Calvary Temple Church in Irving under the supervision of Pastor J. Don George

Mr. Davis began as a janitor there at the church, was given an opportunity to teach some and rapidly progressed to Sunday School teacher and later served as a adjunct minister He was so gifted and capable in the pulpit that he was later called to a full time ministry at a church in Nashville, Tennessee. (This former murderer now pastors a congregation of 5000 people)

162

Pastor Davis was contacted about Ivan, and came to Texas to meet with him, to pray with him, and later testify for him in the punishment phase of his trial. One of Pastor Davis' most salient points was (and a mitigation theme for a life sentence, rather than a death) "How can you give up on a man and kill him when God has not finished his work with him?"

Part of the defense strategy in calling Rev Davis was to thwart the State's intention of calling Dr. James P. Grigson as a rebuttal witness--Dr. Grigson had testified for the State in the early 1980's that Maury Davis was a "future danger". Because Maury Davis is now a nationally-recognized pastor, and heads the one of the largest church congregations in Nashville, TN, the State declined to call Dr. Grigson at trial

Considering the nature of the crime, the State's punishment evidence, and Cantu's history of manipulation and violence, I am of the opinion that the defense punishment strategy of attempting to prevail on the future dangerousness issue, involving the testimony of Dr. Cunningham, Dr. Quijano, and the Rev. Maury Davis, was effective assistance of counsel. Further, affiant sayeth not

J. MATTHEW GOELLER

SUBSCRIBED AND SWORN BEFORE ME on the __11__ day of October, 2005.

SHAREN ARRIAZOLA
MY COMMISSION EXPIRES
November 28, 2005

Notary Public in and for the State of Texas

163