IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IVAN A. CANTU, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | Civil Action No. 2:06-cv-166 |
| | § | (Death Penalty Case) |
| | § | U.S. Dist. Judge T. John Ward |
| NATHANIEL QUARTERMAN, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT QUARTERMAN'S RESPONSE WITH BRIEF IN SUPPORT

Cantu was convicted and sentenced to death for capital murder in the shooting deaths of James Mosqueda and Amy Kitchens. He challenges his conviction and sentence through a petition for writ of habeas corpus. The Court has jurisdiction over the subject matter and the parties. *See* 28 U.S.C. § 2254 (West 2007). The Director through his attorney, the Attorney General of Texas, files this response and supporting brief. Except for those allegations supported by the record and those admitted in this pleading, the Director denies every allegation of fact made by Cantu. Photocopies of the state court records of Cantu's appeal and state writ application have been sent to the Court.

## CANTU'S ALLEGATIONS

Cantu alleges the following:

I.    At sentencing, he received ineffective assistance when counsel did not offer mental-health evidence, Mem. of Law in Supp. of Movant's Pet. for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Mem.") at 12–17;

II.   The evidence was insufficient to support a death sentence, *id.* at 18–22;

III.  Cantu was deprived of due process and is subject to cruel and unusual punishment because, after telling the jurors about his parole eligibility, the trial court told them that in their deliberations they were not to consider its possibility, *id.* at 23–27;

IV.  Cantu was deprived of due process because the State did not have to prove the absence of mitigation beyond a reasonable doubt, *id.* at 27–29;

V.  The state's "10/12 Rule" deprived Cantu of due process and subjects him to cruel and unusual punishment, *id.* at 30–33;

VI.  Cantu was deprived of due process and is subject to cruel and unusual punishment because Articles 37.071 and 44.251 of the Code of Criminal Procedure do not provide meaningful appellate review of sentencing issues, *id.* at 34–35;

VII.  The search of Cantu's apartment was unlawful, *id.* at 36–37;

VIII.  Cantu received ineffective assistance when trial counsel did not investigate his actual-innocence claim, *id.* at 38;

IX.  Cantu received ineffective assistance when trial counsel did not object to the victim-impact testimony, *id.* at 43–44;

X.  Cantu received ineffective assistance when appellate counsel did not raise a claim that the trial court erred by not giving a reasonable-doubt instruction on the extraneous offenses, *id.* at 39–40;

XI.  Cantu was denied his right to be present at all stages of trial, *id.* at 41–42;

XII.  Cantu was deprived of equal protection of the laws when the prosecutor removed a panel member on the basis of race, *id.* at 45–49; and

XIII.  Cantu continues his actual-innocence investigation, *id.* at 50.

## EXHAUSTION

As for the claims presented to this Court, Cantu either has presented the claims to state court for review or is barred from presenting the claims. *See Nobles v. Johnson*, 127 F.3d 409, 422 (5th Cir. 1997). Because Cantu has no state remedy remaining, he has exhausted

his state-court remedies, *see Teague v. Lane*, 489 U.S. 288, 297–98 (1989), and the Director does not move to dismiss these claims for failure to exhaust, *see* § 2254(b).

## STATEMENT OF THE CASE

Cantu was convicted and sentenced to death in the murders of his cousin James Mosqueda and Mosqueda's fiancee, Amy Kitchens. 8 CR 1434–35. The Court of Criminal Appeals affirmed the conviction and sentence, *Cantu v. State*, No. 74,220, 2004 WL 3093156 (Tex. Crim. App. June 30, 2004) (unpublished), and Cantu sought no certiorari review. The state court denied his application for habeas corpus relief. *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (unpublished). This petition follows.

## STATEMENT OF FACTS

### I. Facts of the Crime

The facts of the offense are taken from the original opinion of the Court of Criminal Appeals:

> [Cantu] and [Amy] Boettcher shared an apartment not far from the victims, James Mosqueda and Amy Kitchens. Mosqueda was [Cantu's] cousin. On the night of the offense, [Cantu] told Boettcher he was going to Mosqueda and Kitchens' house to kill them, but Boettcher did not believe him. [Cantu] spoke with Mosqueda on the phone before leaving at about 11:30 p.m. While [Cantu] was gone, Boettcher talked on the phone with her stepfather, whom she and [Cantu] were going to visit in Arkansas the next day. When [Cantu] returned around 12:20 a.m., his face was swollen and he had what looked like blood on his jeans and in his hair. He told Boettcher that "it wasn't pretty" and began unloading his gun, complaining that it had jammed on him. He had the victims' identification and car keys. Boettcher testified that she threw [Cantu's] bloody jeans in the kitchen trash can. After he cleaned up, [Cantu] made Boettcher return with him to the victims' house to see what he had done. They drove Kitchens' Mercedes. Boettcher testified that she could see the victims' bodies through the doorway to the master bedroom. They parked the Mercedes in the garage and left in Mosqueda's Corvette. [Cantu] gave

Boettcher a diamond engagement ring that had belonged to Kitchens. Boettcher did not attempt to elude [Cantu] or turn him in after learning of the murders. She testified that she was terrified of [Cantu] and thought he might kill her. [Cantu] had shot at Boettcher with a pistol the night before the murders and slammed the door on her hand as she tried to leave.

*Cantu v. State*, slip op. at 3, 2004 WL 3093156, at *1.

## II.    Facts Relating to Punishment

Before this murder, Cantu had been convicted of theft, driving while intoxicated, evading arrest, and felony possession of cocaine. 42 RR 10, 22, 205–21. During one arrest, he endangered pedestrians by driving his car through a nightclub parking lot recklessly. 42 RR 11–12, 18. He had defied his probation officer, tested positive for drug, and had his probation revoked. 42 RR 91–94, 160–61. During his drunken driving arrest, he was clocked going twice the speed limit and led police on a chase through a residential area. 42 RR 25–59.

Cantu's first wife, Michelle Traister, testified that her husband beat her, punched her in the face, butted her with his head, slammed her head onto a concrete surface, and threatened her life while he choked her. 43 RR 110–11, 114–16. She said that throughout their marriage, she and Cantu used drugs. 43 RR 151–57, 186–87.

In summer 1999, after the dissolution of his marriage, Cantu enlisted in the Navy but did not complete basic training, going absent without leave and receiving a less-than-honorable discharge. 43 RR 96–97.

Later that year, he remarried, this time to a woman he met in a strip club. 42 RR 53. His second wife, Jennifer, more than once called the police for domestic disturbance. 42 RR 129, 140–41, 157. Each time police arrived, although Cantu was not at home, his wife bore bruises. 42 RR 130–31, 134–36, 142–44, 146–48, 151–53, 158–64, 175–77. Michelle

-4-

Gonzales, a friend of Cantu's wife, also saw the bruises and told her friend to leave her husband. 42 RR 62–66. Jennifer left Cantu in early 2000. 42 RR 66.

After a disturbance at a restaurant in January 2000, Cantu was again arrested for public intoxication. 42 RR 40–47. And in an unrelated incident, he offered to help an acquaintance resolve a dispute by having the acquaintance's rival "knocked off." 43 RR 33–34.

About this time, Cantu's mother had her son arrested for mental evaluation because she thought he was suicidal. 42 RR 180–92. Cantu's confrontations with his mother through fall 2000 at times required that others intervene to ensure her safety. 43 RR 4–14, 54–63.

To counter the State's case, the defense showed that Cantu had been a good child but that his father had been absent from the home for long periods. 44 RR 23–35, 174–78; 45 RR 7–8. After Cantu's father and mother divorced, his mother held a number of jobs while she and her son moved often. 44 RR 20–22. His father did not pay child support regularly, and money was tight. 44 RR 30.

Cantu was a good student and was industrious, lying about his age to get his first job at a fast-food restaurant at fourteen. 44 RR 36.

After leaving high school, Cantu was employed in several legitimate businesses. 44 RR 38–45. But after financial reversals, he began having problems with his temper and started abusing drugs and alcohol. 44 RR 46–49. His mother said that after his first divorce, her son became disoriented, depressed, unfocused, and withdrawn. 44 RR 51. Depression ran in the family, she said. 44 RR 111.

His mother said that after her son's arrest and while he was in Collin County jail, he converted to Christianity, 44 RR 103, and took Bible courses by mail. 44 RR 105–06. He drew no disciplinary actions. 44 RR 561–62.

Testifying for Cantu were two psychologists and a minister. One of the psychologists, Dr. Mark Cunningham, said that studies suggest capital murderers sentenced to life in prison do not pose a danger to other inmates or to prison personnel. 45 RR 52–87, 89–122, 123–210. The other psychologist, Dr. Walter Quijano, another defense psychologist, testified about the Texas prison classification system. 46 RR 154–90, 199–208, 211–12, 218–20, 221–22. He said that an incoming prisoner is evaluated on his physical and mental health, education, employment abilities, and security risk. 46 RR 158–63. The minister, Maury Davis from Tennessee, had served time in Texas for murder. 46 RR 91, 95, 103–04. He spoke of his spiritual conversion and redemption. 46 RR 96–108, 117–18, 125–28, 129–36.

## RESPONSE

Where a claim has been adjudicated on the merits in state court, a prisoner may not obtain federal habeas corpus relief unless the state-court adjudication led to a decision that was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. *See* § 2254(d)(1). A federal court may not grant relief upon finding state-court error alone. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). The court must find that the state court arrived at a conclusion opposite to that reached by the United States Supreme Court on a question of law or that the state court decided a case differently than that Court has on a set of materially indistinguishable facts. *Id.* Where no direct conflict lies, a federal court may grant relief only if it determines that the state decision is factually or legally unreasonable. *Montoya v. Johnson*, 226 F.3d 399, 404 (5th Cir. 2000). In determining whether a state court decision is unreasonable, a federal court reviews not the state court's written opinion, but its decision only. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).

I.    **Cantu Does Not Show That He Received Ineffective Assistance When Counsel Failed to Present a Defense Based Upon His Having Bipolar Disorder.**

Cantu alleges that at sentencing, he received ineffective assistance when counsel did not investigate and offer evidence about his mental health. Mem. at 12. He offers the affidavit of a psychologist, Dr. Daneen Milam, who says that (1) Cantu suffers from a bipolar disorder, and (2) that Cantu's drug-abuse history required counsel to (a) conduct a drug assessment and (b) prepare a social history. *Id.* at 13–14.

A.    **Facts related to the claim**

1.    **Defense psychologist's affidavit**

In state habeas proceedings, Dr. Milam testified through an affidavit. *Ex parte Cantu* at 97–103. She said Cantu had mood swings, grandiose thought patterns, violent nightmares, difficulties working through logical problems, and showed errors in comprehension. *Id.* at 99, para. 6. For example, she said, Cantu left school, had walked off jobs, was discharged from basic training, and was unable to learn from failed relationships. *Id.* She said Cantu's patterns of behavior are commonly seen in a bipolar diagnosis. *Id.* She said, "A Bi-Polar [sic] disorder is caused by a difference in how a person's brain and nervous system regulates [sic] basic behavior patterns. It is not a choice, but is instead, a breakdown of the inhibitory system." *Id.*

Cantu's records, suicidal gestures, grandiose thinking, poor insight, and substance abuse show a pattern of manic highs and depressive lows, she said. *Id.*, para. 7. When he used a stimulant, he became abusive in personal relationships. *Id.* She said that bipolar individuals respond to stimulants with defiance, moodiness, and may become violent. *Id.* She said his behavior "strongly suggest symptoms suggestive" of bipolar disorder. *Id.* at 100, para. 7. Had Cantu been evaluated before sentencing, a mental-health professional would

have recognized that he needed a neuropsychological evaluation to rule out an organic cause for his behavior. *Id.*

She interviewed Cantu on death row for about ten hours. *Id.* at 100, para. 9. She tested him with portions of the Halstead-Reitan Neuropsychological Battery for Adults and other psychological and neuropsychological tests. *Id.*

During the tests, she said, Cantu showed pressured speech, an exaggerated sense of self-confidence, and tended to place himself in leadership positions in his jobs. *Id.* at 100–01, para. 10. Overall, she said, he was impulsive, planned poorly, was distracted easily, was mentally inflexible, and had poor but fast motor skills. *Id.* at 101, para. 10. He showed "constructional dyspraxia," with an error-pattern consistent with difficulty regulating, rather than a dysfunction that was organic. *Id.* Milam said that Cantu had difficulty with "measures of central nervous system integrity; attentional deficits, impulsivity, organizational deficits, constructional dyspraxia, along with partial loss of the ability to inhibit responses." *Id.* The overall results, she said, showed a "consistent pattern of poor regulation of thoughts, feelings and abilities." *Id.* Such a pattern, she said, is "consistent with a diagnosis of Bi-Polar disorder." *Id.*

Bipolar disorder does not result from "lack of will power, oppositional or defiant behavior or poor parenting," she said, although poor parenting will "worsen [its] course." *Id.*, para. 11. The effects of Cantu's inherited disorder, she said, were "no doubt aggravated" by his early home life, which was marked by poverty, alcoholism, drug abuse, physical abuse, neglect, mental illness, and the deaths of more than one family member. *Id.*

On August 29, 2000, some sixty-five days before the murder, Milam said, Cantu was taken to Parkland Hospital for "suicidal gestures." *Id.* at 102, para. 12. He was released the same day, and "an opportunity to remediate his Bi-Polar disorder was missed." *Id.* By the

Labor Day weekend, she said, Cantu had moved into a manic phase and met Amy Boettcher. *Id.* He began to abuse drugs, specifically, crank, ecstasy, and speed, Milam said. "These drugs interact with a Bi-Polar disorder to cause difficult and unpredictable behavior, irritability, agitation, and cause biological and chemical malfunctions to escalate," she said. *Id.*

As "self-medication escalates," she said, "the roller coaster ride of ups and downs" alienates people capable of supporting the individual. *Id.* "People with Bi-Polar disorder rarely realize how impaired they are and blame others for their problems, isolating them even more." *Id.*

During the interview, she said, Cantu denied committing the offense. *Id.*, para. 13.

"Cantu did not choose to be born into a dysfunctional family," she said. "He did not choose to develop a Bi-Polar disorder." *Id.* at 103, para. 14. She suggested that Cantu's drug abuse was an attempt at self-medication. *Id.*

### 2. Affidavits of defense counsel

#### a. J. Matthew Goeller

Cantu's trial counsel, J. Matthew Goeller also testified by affidavit. *Id.* at 151–63. He said that throughout his dealings with Cantu, his client could discuss the allegations against him intelligently. *Id.* at 158. Cantu remembered the facts regarding his involvement with the victims and the trial witnesses and could aid in his own defense. *Id.* Cantu paid attention and proposed questions for witnesses, questions that were generally relevant and helpful. *Id.*

Goeller said that from the start of representation, he, mitigation specialist Vince Gonzales, and co-counsel Don High discussed having Cantu examined by a psychologist. *Id.* They knew that under state law, where the defense introduces or plans to introduce expert

testimony on future dangerousness, the court may order the defendant to submit to a state-sponsored psychiatric exam. *Id.* (citing *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997)).

They were worried about subjecting Cantu to the State's exam. *Id.* Cantu was manipulative, Goeller said, and had on several occasions lied to his own counsel. *Id.* Goeller said that Cantu had at various times told counsel (1) he had nothing to do with the murders; (2) his friends and the real killer, a pizza delivery man, had conspired against him; (3) he, Cantu, had indeed killed Mosqueda for ripping him off on a drug deal and had killed Kitchens to eliminate a witness; (4) and he wanted to advance an insanity defense involving a conspiracy among Mosqueda, Kitchen, and Boettcher to brain-wash him with the drug Rohypnol and that the drug caused him to commit the murders. *Id.* at 158–59. When told that counsel could not advance perjury, Cantu said, " 'Your (counsel's) job is to get me home, period.' " *Id.* at 159. Counsel feared that a State exam would lead to a finding of manipulation, a finding that would be used against their client. *Id.*

Goeller said that counsel decided not to have Cantu evaluated because, first, Cantu did not wish to offer a defense based on mental health, and second, counsel did not believe that the report would be helpful. *Id.* Goeller said that Cantu told counsel that he had killed Mosqueda and Kitchen because after Cantu had supplied Mosqueda with 2.5 kilograms of cocaine, which Mosqueda had sold for several thousand dollars, Mosqueda had not paid Cantu for the drugs. *Id.* Third, Goeller said, counsel feared that given Cantu's history of violence toward women and the gruesome nature of the murders, a state-sponsored psychiatrist would pronounce Cantu a sociopath. Id.

And, Goeller said, they had no evidence that Cantu suffered from a mental-deficiency, particularly bipolar disorder. *Id.* at 160. Goeller said that in his seventeen years of practice,

he had represented clients with bipolar disorder and that he was familiar with the symptoms. *Id.* at 160. Cantu, he said, showed none. *Id.* Nothing in his client's mental-health records suggested that Cantu suffered from bipolar disorder. *Id.* Counsel interviewed Cantu and Cantu's family members and no one mentioned a bipolar or schizophrenic disorder. *Id.* His client's moods did not swing and his personality did not change. *Id.* The social history showed that he was a good student and was a successful mortgage broker. *Id.* at 160–61.

Noting that Cantu was charged with killing two people at home in their bed, Goeller said that counsel determined that the best chance for a life sentence lay not with a mental-defect mitigation case, which likely would lead evidence of sociopathy. *Id.* at 159. Cantu's best chance for a life sentence, Goeller said, lay with a mitigation case based upon his positive history, for example, his being a good student and successful mortgage broker. *Id.* at 160.

### b. Don High

Don High, defense co-counsel, also testified through an affidavit. *Id.* at 164–78. He said that counsel determined that the best sentencing strategy involved four points: (1) Cantu's dysfunctional childhood and family, (2) his abuse of and addiction to alcohol and drugs, (3) his future peaceableness in a controlled prison setting without drugs or alcohol, and (4) his spiritual conversion. *Id.* at 169.

Counsel knew, High said, that the State would introduce evidence of other crimes and bad acts, including, a successfully completed deferred adjudication probation for felony cocaine possession; misdemeanor convictions for driving while intoxicated, evading arrest, and reckless driving; other extraneous offenses, such as issuing a bad check, selling drugs, abusing drugs, public intoxication, failing to maintain insurance, criminal mischief, theft, assault, and possessing an unlawful concealed weapon. *Id.*

During jury selection, High said, counsel sought jurors who would examine punishment-phase issues and who would consider Cantu no danger so long as he was imprisoned. *Id.* at 169–70.

The mitigation specialist, Vince Gonzales, talked to Cantu's mother, Sylvia; his father, Abner; his brother, Erik; two aunts, Penny Leland and Imelda Martinez; and a friend, Jay Swann. *Id.* at 170–71. Counsel said they knew of Cantu's childhood difficulties: his parents' divorce and his being raised by a single parent where money was tight and moves frequent. *Id.* at 171. Cantu was often disappointed by his absent father, who was an alcoholic and drug addict. *Id.* And Cantu's early life was marked by family deaths, a cousin, when Cantu was in junior high. *Id.* (45 RR 9–11), and an uncle who committed suicide in the family home. *Id.* Counsel thought that the mitigating evidence offered by Cantu's childhood difficulties was limited. *Id.* Counsel considered more helpful Cantu's drug and alcohol abuse, his peaceable behavior in jail, and his business success. *Id.*

The defense sentencing strategy was based upon Cantu's good behavior in a drug- and alcohol-free setting, such as prison. *Id.* at 172. High said that the defense psychologist Mark Cunningham testified that Cantu had not been violent in Collin County jail, had a history of employment since the age of fourteen, had a Graduate Equivalency Diploma, was resourceful, intelligent, and had undergone a Christian conversion. *Id.*

High said that counsel did not ask Cunningham to assess Cantu for bipolar disorder or mental retardation. *Id.* at 173. Based on their observations, counsel did not suspect a mental defect. *Id.* And Cunningham did tell counsel that Cantu might be depressed and that he might also be a sociopath. *Id.*

High said that in his fifteen years as an attorney, he had many clients with bipolar disorder, that he knew the disorder's affects and symptoms, and that Cantu showed none. *Id.* at 175.

In evaluating Cantu, counsel reviewed his childhood and adolescent school records, childhood and adolescent awards and certificates, letters and correspondence to friends and family, details of prior offenses, employee awards, filed tax returns and records, employment records, jail records, jail medical records, jail intake screening records, jail grievance and reply forms, Correctional Medical Services Mental Health Evaluation, Screening, and Assessment, Parkland Hospital Medical records (including the medical and psychiatric evaluations performed on August 29–30, 2000), and letters of commendation from the Christian Bible Institute. *Id.* at 176.

High said that defense counsel, as had Dr. Milam, reviewed the records from Parkland Hospital. *Id.* But defense counsel, after talking to witnesses and discussing the matter between themselves, concluded that Cantu did not have bipolar or any other psychiatric disorder. *Id.* First, High said, the Parkland doctors did not diagnose or indicate any disorder. *Id.* Second, he said, no family members suggested that Cantu's mental capacity was diminished or mentioned bipolar disorder or schizophrenia with respect to either Cantu or themselves. *Id.* at 176–77.

High echoed Goeller's response, saying that the defense wanted to avoid a mental-health defense because of the danger that Cantu would be pronounced a sociopath. *Id.* at 177.

### B.    State court findings and conclusions

Sitting as the habeas court, the trial court found that Dr. Milam, a psychologist, was not competent to make a diagnosis of organic brain damage or to conclude that the trial

counsel was ineffective. *Id.* at 187–88, Finding of Fact ("FoF") 5. The court said that Dr. Milam's limited review of the record and her over-reliance upon Cantu as her source led to factual errors in her affidavit. *Id.* at 188, FoF 6. For example, the court said, contrary to her assertions, the trial record contained evidence of Cantu's childhood difficulties, his substance abuse, and cycles of depression.[1] *Id.* The errors[2] reduced her credibility, the court said. *Id.*, FoF 7. Trial counsel, Goeller and High, both board certified in criminal law, were capable and competent. *Id.*, FoF 8. Their explanations about their preparation and strategy were consistent and credible. *Id.*, FoF 9. Based upon their investigation of Cantu's history and background and their interaction with their client, counsel did not believe that a defense based upon a diagnosis of bipolar disorder was warranted. *Id.*, FoF 10. Neither did counsel believe that such evidence, if available, would comport with a viable trial strategy. *Id.* Cantu did not want to advance a defense based upon mental health. *Id.*, FoF 11. Instead, the defense emphasized Cantu's religious conversion and his ability, with self-control and discipline, to change. *Id.* Defenses combining mental-health and his ability to change would not have been wholly consistent. *Id.* Counsel's performance was zealous and competent, their strategy reasonable, and their representation not deficient. *Id.* The Court of Criminal Appeals adopted the findings and denied relief. *Ex parte Cantu*, No. WR-63,624-01, slip op. at 2 (Jan. 18, 2006) (unpublished).

---

[1] Jail records showed that Cantu received Elavil, an antidepressant. 51 RR (Medication Administration Record).

[2] Milan made another error not noted by the state court. She cited as an example of Cantu's manic behavior his hasty marriage to Boettcher. *Ex parte Cantu* at 102, para. 11. But the record does not show that Cantu and Boettcher ever married.

**C.** **Counsel's performance was not deficient; the defense introduced all historical mitigating evidence cited by the defense.**

A petitioner who wishes to show he received ineffective assistance of counsel must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The petitioner must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687–88. In reviewing the merits of a claim, courts must be highly deferential to counsel's conduct, *id.* at 689, and must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance, *id.* at 690. The petitioner must overcome the presumption that under the circumstances the challenged action might be considered sound trial strategy. *See id.* The strategic choices of counsel made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. *Id.* The question is a mixed one of law and fact, *id.* at 698, that this Court reviews under the "unreasonable application" standard. *See* § 2254(d)(1); *Nobles v. Johnson*, 127 F.3d 409, 416 (5th Cir. 1997).

The state trial and habeas records show that counsel knew of all relevant mitigating evidence and, indeed, presented to the jury all the available mitigating evidence. The jury heard of Cantu's difficult childhood with frequent moves and tight money, his distant father, his industry, his drug and alcohol abuse, his depression, and his Christian conversion. To this Court Cantu offers no historical fact that counsel omitted.

But Cantu does not allege that counsel omitted historical facts. Mem. at 12. He alleges rather that counsel erred by not having him examined by a mental-health expert and by not introducing evidence of his (1) mental defects, (2) a dysfunctional childhood, and (3) drug use. *Id.* First, as mentioned by the state habeas court, counsel did in fact introduce

evidence of a dysfunctional childhood and drug use. *Ex parte Cantu* at 188, FoF 6. Second, as for the mental-defect defense, as noted by defense counsel Goeller, *id.* at 159, and as found by the state habeas court, *id.* at 188, FoF 11, Cantu did not want to offer such a defense. And counsel thought it unwise to offer such a defense because, as noted by the defense's own expert, Cantu may have been a sociopath. *Id.* at 159 (Goeller) and 173 (High). A defense based upon mental-defect would have opened the door to evidence of sociopathy. *See Lagrone*, 942 S.W.2d at 611. Defense counsel's reason for not presenting a defense based on mental defect was sound. *See Strickland*, 466 U.S. at 690. Had counsel offered or planned to offer mental-health evidence relevant to the issues of future dangerousness, *see* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1) (West 2007), or mental defect, *see Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), the State would have had the opportunity to examine Cantu. *See Lagrone*, 942 S.W.2d at 611. Counsel wished to avoid such an examination, fearing that it would lead to a diagnosis of sociopathy. *Ex parte Cantu* at 159.

But Cantu argues any unfavorable evidence uncovered by a defense expert would have been protected by attorney-client privilege. Hence, Cantu argues, counsel's fear of unfavorable evidence is groundless. Mem. at 15–16. Cantu misunderstands counsel's reasoning. Had Cantu been examined by a defense expert, the results would have been either mitigating or not mitigating. Had the results been not-mitigating, they would have been useless. But had they been mitigating, they could not be used without triggering a state exam. *See Lagrone*, 942 S.W.2d at 611. Hence, the defense could have used a psychologist just so long as the psychologist found nothing helpful.

And the mental-health evidence proffered by Cantu is not the sort courts find mitigating. The evidence that courts find mitigating is that of mental defect or childhood abuse, evidence that can be a two-edged sword. *See Penry*, 492 U.S. at 324. Such evidence

may reduce the individual's blameworthiness while increasing the probability that he will pose a future danger. *See id.* For evidence of childhood abuse to be mitigating, the evidence need show not mere childhood difficulties but abuse that is horrific. *See Wiggins v. Smith*, 539 U.S. 510, 516–17 (2003) (finding counsel ineffective for failing to discover and present evidence of that petitioner had experienced severe privation and abuse in first six years of his life while in custody of his alcoholic, absentee mother, and had suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care); *Penry*, 492 U.S. at 309 (noting that testimony showed that defendant with severe mental defect frequently beaten over the head with a belt, locked in his room without access to toilet for long periods of time, in and out of state hospitals and schools). In such a case, lack of blameworthiness—or juror sympathy—arising from the abuse or mental defect overwhelms the aggravating aspects of the evidence. But here, the jurors had access to all mitigating evidence: Cantu's childhood difficulties, his drug use, his positive school background, and his industry. The only item omitted was the psychologist's label of "bipolar disorder." In exchange for foregoing such a label, the defense also avoided the label of "sociopath." It is just this balancing of mitigating and aggravating evidence requires professional discretion. *See Strickland*, 466 U.S. at 690.

As for Cantu's reliance upon the counsel's duty to investigate as noted in *Wiggins*, 539 U.S. 510, Cantu misunderstands the duty. The evidence missing in *Wiggins* was historical evidence of which defense counsel was unaware, specifically, evidence of the defendant's childhood abuse. *Id.* at 516–17. Because counsel was aware of some evidence of childhood abuse, the Court said, their decision not to investigate further was not reasonable. *Id.* at 528. But here, not only were Cantu's trial counsel aware of the historical evidence, Cantu cites no historical evidence that was not presented. He complains only that

counsel did not offer an expert opinion—an opinion that is not yet proved—that is of doubtful use, and that could be harmful. *See Lagrone*, 942 S.W.2d at 611.

Counsel was reasonable for not investigating and presenting evidence of mental defect, specifically, evidence of bipolar disorder. *See Strickland*, 466 U.S. at 687.

### D. Had the defense introduced mental-health evidence, the State could have introduced evidence of sociopathy.

Even if it is assumed that counsel's performance was deficient, Cantu shows no harm. *See Strickland*, 466 U.S. at 687. To show harm at the capital sentencing, the petitioner must establish had counsel not erred, it is reasonably probable that the jurors would not have imposed a death sentence. *Carter v. Johnson*, 131 F.3d 452, 463 (5th Cir. 1997) (citing *Strickland*, 466 U.S. at 695). A probability is reasonable when it is sufficient to undermine confidence in the outcome. *Id.*

Counsel omitted no historical evidence. The only evidence of which Cantu complains is an expert opinion regarding bipolar disorder, which, Cantu says, reduces his ability to control his actions. Mem. at 16–17. As for the evidence recited by Dr. Milam that bipolar disorder runs in Cantu's family, *Ex parte Cantu* at 988–99, paras. 4 & 5, nothing in the trial or habeas record shows evidence of bipolar disorder in either Cantu or any of Cantu's family members predating the trial. *Id.* at 160 & 176–77. Cantu offers no records predating the trial suggesting that he or anyone else in his family suffers from or suffered from bipolar disorder. The evidence suggesting that Cantu's family had a history of mental disorder smacks of a postconviction justification.

And by avoiding mental-health-based defense, the defense avoided a pronouncement of sociopathy. Cantu does not show that had counsel investigated and offered evidence of bipolar disorder the result would have been different, *see Carter*, 131 F.3d at 463, and Cantu

does not show that the decision of the state habeas court was unreasonable, *see* § 2254(d)(1); *Strickland*, 466 U.S. at 687.

## II.     The Evidence Was Sufficient to Support the Jury's Death Sentence.

Cantu alleges that the evidence was insufficient to support the jury's punishment findings.  Mem. at 18–22.

### A.     The facts of the crime itself and Cantu's history of violence show that he posed a future danger.

Cantu alleges that the evidence was insufficient to support the jury's finding that he posed a future danger.  Mem. at 18–21.  He argues that the slayings involved drug abuse and the slaying of a family member and a friend, *id.* at 18 & 20; his prior offenses were minor, *id.* at 18–19; he had a good probation record, *id.* at 19; he had completed a drug-abuse program, *id.*; he had converted to Christianity, *id.*; he behaved well in jail, *id.*; he was not aggressive when arrested, *id.*; Dr. Cunningham testified that his risk of reoffending was diminished in a controlled environment such as prison, *id.*; and Dr. Quijano testified that killers of family members as a group do not reoffend, *id.* at 20.

The Court of Criminal Appeals found the evidence sufficient to support the jury's finding.  *Cantu v. State*, slip op. at 7, 2004 WL 3093156, at *4.  The court noted the crime's depravity, that Cantu and Mosqueda were first cousins, that they shared apartments over the years and worked together in various businesses.  *Id.*, slip op. at 6, 2004 WL 3093156, at *3. Mosqueda trusted Cantu and let him into his house to talk at nearly midnight.  *Id.*, slip op. at 6, 2004 WL 3093156, at *3.  Witnesses said that Cantu envied Mosqueda's wealth and success.  *Id.*, slip op. at 6, 2004 WL 3093156, at *3.  After the murders, Cantu searched his cousin's house for drugs and money and stole his cousin's watch and bracelet and Kitchens's diamond engagement ring.  *Id.*, slip op. at 6, 2004 WL 3093156, at *3.

After the slayings, Cantu and Boettcher took Mosqueda's Corvette and went clubbing. *Id.*, slip op. at 6, 2004 WL 3093156, at *3. That evening Cantu proposed to Boettcher and gave her Kitchens's diamond ring as an engagement ring. *Id.*, slip op. at 6, 2004 WL 3093156, at *3. He showed off the ring and announced that he and Boettcher were engaged. *Id.*, slip op. at 6, 2004 WL 3093156, at *3. And he took Boettcher to the scene of the murders to show her what he had done and to continue searching for drugs and money. *Id.*, slip op. at 6, 2004 WL 3093156, at *3.

In the days after the murders, while visiting Boettcher's parents in Arkansas, Cantu acted as if nothing had happened. *Id.*, slip op. at 6, 2004 WL 3093156, at *3. While there, he made several phone calls to friends. *Id.*, slip op. at 6, 2004 WL 3093156, at *3. He told them that the night of the slaying, a man had come to his apartment and had threatened to kill both him and Mosqueda. *Id.*, slip op. at 6, 2004 WL 3093156, at *3.

The State introduced evidence of domestic abuse. Boettcher said that the night before the murders, she and Cantu argued. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. During the argument, he had fired a pistol at her head. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. When she tried to leave the apartment, he slammed the door on her hand and "smacked" her across the face. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. He then held a gun to her head and told her he was "serious." *Id.*, slip op. at 7, 2004 WL 3093156, at *3. He said that going to the police was futile because the police worked for him and would not help her. *Id.*, slip op. at 7, 2004 WL 3093156, at *3.

Cantu's first wife, Michelle Traister, described episodes in which he threw her to the floor, beat her face, and slammed her head repeatedly against concrete or tile surfaces. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. Once, she said, he choked her and told her that he wanted to kill her. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. She blacked out, and after she

came to, Cantu ripped off her clothes, she said, and forced her to have sex. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. Another time, Cantu beat her head and face so severely that she showed bruises days later when she returned to work. *Id.*, slip op. at 7, 2004 WL 3093156, at *3.

As for Cantu's second wife, Jennifer, police told of responding to domestic disturbance calls. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. Each time, officers said, they saw bruises on Jennifer—bruises that she said were caused by Cantu's beating. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. She told one officer that Cantu said that he wanted to kill her. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. A friend of Jennifer's saw the bruises and advised her to leave Cantu. *Id.*, slip op. at 7, 2004 WL 3093156, at *3.

One of Cantu's friends testified about an occasion in which Cantu became so violently angry at his own mother that others had to intervene. *Id.*, slip op. at 7, 2004 WL 3093156, at *3. And the Court of Criminal Appeals noted his prior offenses and bad acts. *Id.*, slip op. at 7, 2004 WL 3093156, at *3.

When a federal habeas court reviews the sufficiency of the evidence supporting the guilty verdict, it views the evidence in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Here, in reviewing the evidence, the state court applied a form of that standard tailored to the punishment phase of a capital trial. The state court reviewed the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found beyond a reasonable doubt that there was a probability that the appellant would commit criminal acts of violence constituting a continuing threat to society. *Manns v. State*, 122 S.W.3d 171, 193 (Tex. Crim. App. 2003). The issue for this Court is whether the state

courts' rejection of Cantu's claim was an objectively unreasonable application of the federal due process standard. *See Martinez v. Johnson*, 255 F.3d 229, 244 (5th Cir. 2001) (citing § 2254(d)).

The evidence supports the jurors' findings. The crime was not one of passion but of revenge and robbery. Cantu killed Kitchens to eliminate a witness. He had a history of domestic violence. He used and dealt drugs. He showed no remorse. All the elements allowed a rational juror to find, beyond a reasonable doubt, that Cantu probably would constitute a continuing threat to society. *See* Art. 37.07, § 2(b)(1); *Jackson v. Virginia*, 443 U.S. at 319.

Cantu argues that the evidence is insufficient because he assaulted and killed a family member and friend only. Mem. at 18. Even if this argument is taken at face value, Cantu's family members and friends are entitled to the same protection deserved by society at large. As for Cantu's argument that he would not be a danger in a controlled environment, such as prison, *id.* at 19–20, the jurors heard the evidence and discounted it. *See Jackson v. Virginia*, 443 U.S. at 319 (stating that in sufficiency review, the responsibility of resolving conflicts in evidence lies with trier of fact). And his having gone AWOL from basic training suggests that Cantu does not adapt to a controlled environment as well as he might suggest.

**B.    The Constitution does not require an evidentiary sufficiency review of the mitigating evidence.**

Cantu alleges that the trial record does not support the jury's finding that there were insufficient mitigating circumstances to warrant a life sentence. Mem. at 21–22. Put another way, he argues that he has proven sufficient mitigation as a matter of law. *See McFarland v. State*, 928 S.W.2d 482, 499 (Tex. Crim. App. 1996) ("We cannot say that evidence is mitigating as a matter of law . . . ."). On direct review, the Court of Criminal Appeals said

that it did not review the sufficiency of the evidence supporting a jury's mitigation finding. *Cantu v. State*, slip op. at 8; 2004 WL 3093156, at *4 (citing *McFarland*, 928 S.W.2d at 499; *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995)).

State courts need not review the sufficiency of the evidence supporting the jury's mitigation findings. *See Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002) (citing *Tuilaepa v. California*, 512 U.S. 967 (1994) (stating that once sentencer has determined that defendant is eligible for death sentence, in determining whether sentence should be imposed, sentencer may be given unbridled discretion)); *Moore v. Johnson*, 225 F.3d 495, 506–07 (5th Cir. 2000). In a Texas capital trial, the question of the sufficiency of the mitigating evidence is left to the discretion of each juror. *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995). Evidence is mitigating where the juror might regard it as reducing the defendant's moral blameworthiness. *Id.* (citing Art. 37.071, § 2(f)(2)). The juror is not required to view any evidence as mitigating *per se*. *Id.* The Court of Criminal Appeals does not review such evidence for sufficiency. *Id.* Nor does the Constitution require such a review. *See Woods*, 307 F.3d at 359; *Moore*, 225 F.3d at 506–07. The state-court decision is in accord with circuit precedent and is reasonable. *See* § 2254(d)(1).

## III.    As for His Parole-Instruction Claim, Cantu Is Entitled to No Relief.

Cantu alleges that the trial court's parole eligibility instructions deprived him of due process and subject him to cruel and unusual punishment. Mem. at 23–26. The trial court told the jurors that if given a life sentence, Cantu would be eligible for parole in forty years. 8 CR 1451. But it told the jurors that in deliberating punishment, they were not to consider or discuss the possible actions of the parole board. 8 CR 1451. Cantu alleges that the court erred in barring the jurors from considering parole. Mem. at 23–26.

### A. Cantu's parole-instruction claim has been defaulted.

#### 1. The state court denied relief relying upon an adequate and independent state-law ground; thus, federal review is barred.

The Court of Criminal Appeals determined that because Cantu could have raised this issue on appeal but did not, review of his claim was barred. *Ex parte Cantu* at 190, Conclusion of Law ("CoL") 29 (citing *Ex parte Ramos*, 977 S.W.2d 616, 617 (Tex. Crim. App. 1998); *Ex parte Sanchez*, 918 S.W.2d 526, 527 (Tex. Crim. App. 1996)).

Where the last state court to consider the claim denied relief by relying upon a state-law default expressly and unambiguously, federal review is barred. *Harris v. Reed*, 489 U.S. 255, 161–62 (1989). Federal courts will not review a question of federal law where the state-court judgment relies upon a state-law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 726 (1991). Under Texas law, where a claim may be raised on appeal and is not, the state habeas court may not review the claim. *See Ex parte Gardner*, 959 S.W.2d 189, 199 (Tex. Crim. App. 1996).

The state habeas court denied relief by relying upon this bar. *Ex parte Cantu* at 190, CoL 29. Because the state court denied relief by relying upon an independent and adequate state-law grounds and did so expressly and unambiguously, federal review of this claim is barred. *See Coleman*, 501 U.S. at 726.

#### 2. Although Cantu can avoid default by showing (a) cause and prejudice or (b) a miscarriage of justice, he pleads neither.

Cantu may avoid the default by showing (1) cause for the default and prejudice attributable to that default or (2) that this Court's failure to consider the claim will result in a miscarriage of justice, *see id.* at 750, that is, that he is actually innocent of the charged

crime, *see Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992). Cantu pleads none of these grounds.

**B.**   **No relevant precedent suggests that where a state court tells jurors about parole, the jurors must be allowed to consider its possibility.**

Were this claim reviewed on the merits, Cantu would not be entitled to relief. The Court of Criminal Appeals noted that Cantu was not entitled to such an instruction. *Ex parte Cantu* at 190, CoL 30 (citing *Turner v. State*, 87 S.W.3d 111, 113 (Tex. Crim. App. 2002); *Luquis v. State*, 72 S.W.3d 355, 366 (Tex. Crim. App. 2002)).

Where the prosecution argues that a defendant will be a danger in the future and where, under state law, he will not be eligible for parole, the jurors must be told of his ineligibility. *Simmons v. South Carolina*, 512 U.S. 154, 161 (1994). Where as a matter of state law the defendant will be eligible for parole, the jurors need not be told of that possibility. *See Miller v. Johnson*, 200 F.3d 274, 290 (5th Cir. 2000). Cantu alleges that where the state court tells the jurors about the possibility of parole, the jurors must be allowed to consider its possibility. Mem. at 23–26. Cantu supports his argument with no relevant precedent. *See* § 2254(d)(1). And where the state court need not instruct the jurors about parole eligibility at all, *see Miller*, 200 F.3d at 290, it follows that where the state nonetheless tells the jurors about his eligibility, the court need not tell them they may consider its possibility.

Indeed, the jurors' instructions benefited Cantu. Were the jurors concerned about the possibility of his being paroled, they likely would be inclined to avoid that possibility by sentencing him to death. The state court's instruction to the jurors that they were not to consider parole, worked to his advantage.

## IV. The Constitution Does Not Require That the Absence of Mitigation Be Proved Beyond a Reasonable Doubt.

Cantu alleges he was deprived of his rights because the State was not required to prove the absence of sufficient mitigation beyond a reasonable doubt. Mem. at 27–29 (citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002)). Cantu acknowledges that the Fifth Circuit has held that despite its failure to assign and quantify a burden of proof, the Texas jury charge is constitutional. He raises the issue to preserve it for future review. Mem. at 27 n.3.

The habeas court said the absence of mitigation need not be proved beyond a reasonable doubt. *Ex parte Cantu* at 190, CoL 31 (citing *Apprendi*, 530 U.S. 466, and *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003)).

The right to a jury trial does not require the State to prove to a jury the absence of mitigation beyond a reasonable doubt. *See Grandos v. Quarterman*, 455 F.3d 529, 536–37 (5th Cir.) (stating that Texas law does not violate Sixth Amendment principles of *Apprendi* or *Ring* by not asking jurors to find an absence of mitigating circumstances beyond a reasonable doubt), *cert. denied*, 127 S. Ct. 732 (2006); *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.) ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof."), *cert. denied*, 126 S. Ct. 103 (2005). The state court's decision accorded with Circuit precedent and was reasonable. *See* § 2254(d).

## V. The State's "12-10 Rule" is Constitutional.

Cantu alleges that the state's "12/10 Rule" deprived him of due process and subjects him to cruel and unusual punishment. Mem. at 30–30. Under the so-called "12/10 Rule," before the jurors may give a "no" answer to the mitigation question, that evidence does not

warrant a life sentence, all twelve must agree.  But for a "yes" answer, that a life sentence is warranted, only ten need agree.  *See* Article 37.071, § 2(f)(2).  Cantu argues that the instruction is unconstitutional because (1) it confuses the jurors and (2) leads a reasonable juror to believe that his "yes" vote means nothing unless nine others joined him.  *Id.* at 30.[3] The state court pronounced the rule neither confusing nor unconstitutional.  *Ex parte Cantu* at 191 CoL 3.  As acknowledged by Cantu, Mem. at 30 n.4, the Fifth Circuit has found that the "12/10 Rule" does not run afoul the Constitution.  *See Miller*, 200 F.3d at 288–89; *Jacobs v. Scott*, 31 F.3d 1319, 1328 (1994).  The decision of the state court is reasonable and accords with Circuit precedent.  *See* § 2254(d)(1).

## VI.    The Interpretation of the Code of Criminal Procedure Is a State-Law Matter; to the Extent That Appellate Review Is Required, State Law Is Sufficient.

Cantu alleges that Articles 37.071 and 44.251 of the Texas Code of Criminal Procedure are unconstitutional because they do not require that state courts review the sufficiency of the mitigating evidence to determine whether a defendant is as a matter of law entitled to a life sentence.  Mem. at 34–35.

The Court of Criminal Appeals, noting that it had rejected similar claims, denied relief.  *Cantu v. State*, slip op. at 11, 2004 WL 3093156 , at *5 (citing *Resendiz v. State*, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003); *Eldridge v. State*, 940 S.W.2d 646, 651–53 (Tex. Crim. App. 1996)).  Cantu acknowledges the Fifth Circuit turned aside similar complaints. Mem. at 34 n.5.

To the extent that the interpretation of Articles 37.071 and 44.251 involves construing state law, the claim is not cognizable upon federal habeas review.  *See Beazley v. Johnson*,

---

[3] Where the jurors cannot reach a decision, the court must sentence the defendant to life.  *See* Article 37.071, § 2(g).

-27-

242 F.3d 248, 261 (2001).  To the extent that the question of appellate review implicates a constitutional issue, state law affords meaningful review.  *Id.*  The decision of the state accords with Circuit precedent and is reasonable.  *See* § 2254(d)(1).

## VII.    In Federal Habeas Proceedings, Unlawful-Search Questions Are Not Reviewable.

Cantu alleges that the search of his apartment was unlawful.  Mem. at 36–36.  On direct review, the Court of Criminal Appeals, assuming without deciding that the search was unlawful, found beyond a reasonable doubt that the evidence did not contribute to Cantu's conviction or sentence.  *Cantu v. State*, slip op. 9,  2004 WL 3093156, at *4.

So long as a state gives a defendant an full and fair opportunity to litigate his search-and-seizure claim, a state prisoner may not receive federal habeas corpus relief on the ground that the evidence obtained from an unlawful search or seizure was introduced at trial.  *Stone v. Powell*, 428 U.S. 465, 494–95 (1976).  Under Texas law, a defendant may at trial challenge his arrest and subsequent search and seizure of his property.  *See* TEX. CODE CRIM. PROC. arts. 1.06, 14.01–.06, 15.01–.26, 16.17 & 38.23 (West 2007).  Not only did Cantu have the opportunity to challenge the search, he in fact challenged it.  3 CR 549–53 (motion to supress); 3 RR 6 through 4 RR 91 (pretrial suppression hearing).  Although Cantu argues that federal bar should not apply in death-penalty cases, he acknowledges that the Fifth Circuit has held otherwise.  Mem. at 37 n.6; *see Janecka v. Cockrell*, 301 F.3d 316, 320–21 (2002).  This Court may not grant relief on Cantu's Fourth Amendment claim.  *See Stone v. Powell*, 428 U.S. at 494–95.

## VIII.   On His Claim That Counsel Was Ineffective for Not Investigating His Actual Innocence, Cantu Is Entitled to No Relief.

Cantu alleges that he received ineffective assistance when counsel failed to investigate the possibility of his actual innocence.  Mem. at 38.

### A. The claim is defaulted, and Cantu cannot avoid the default.

#### 1. Because Cantu never presented the claim to the state court system and because he cannot do so now, the claim is defaulted.

A federal habeas court may not grant relief on a state prisoner's federal writ application unless he has exhausted his state-court remedies. *See* § 2254(b)(1)(A). To exhaust his remedies, the petitioner present the substance of his claim to the state courts. *See Picard v. Connor*, 404 U.S. 270, 275–76 (1971). Where he seeks relief on a claim that he never presented to the state courts, the federal court may find the claim barred. *Coleman*, 501 U.S. at 735 n.1. Where the petitioner did not present the claim to the state courts and where he cannot do so now, federal review is barred. *See id.*

As noted by Cantu, he did not present the issue to the state court for review. Mem. at 38 n.7. Because he already has sought both direct and postconviction review, Br. for Appellant, *Cantu v. State*, No. 74,220; *Ex parte Cantu* at 4–91, he may not seek state court relief now. Hence, the claim is defaulted. *See Coleman*, 501 U.S. at 735 n.1.

#### 2. Counsel deficiency in state habeas proceedings cannot constitution "cause" for avoiding default.

To the extent that Cantu argues that counsel's failure to raise the issue in state habeas proceedings constitutes cause for avoiding default, Mem. at 38 n.7, his argument fails. As mentioned above, a state prisoner may avoid default by showing cause for the default and prejudice attributable to that default. *See Coleman*, 501 U.S. at 750. For purposes of avoiding default, ineffective assistance of counsel may constitute "cause." *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986); *Andrews v. Collins*, 21 F.3d 612, 629 n.34 (5th Cir. 1994). But not any counsel deficiency will do; counsel must have been so ineffective as to violate the Constitution. *See Edwards v. Carpenter*, 529 U.S. 466, 451–52 (2000) (citing *Murray*, 477 U.S. at 488–89).

Because a petitioner has no right to counsel in state habeas proceedings at all, he has no right to counsel that is effective. *See Ruiz v. Quarterman*, 460 F.3d 638, 643–44 (5th Cir. 2006), *cert. denied*, 127 S. Ct. 1815 (2007). Because in state habeas proceedings, the defendant cannot receive ineffective assistance, the performance of counsel in state habeas proceedings cannot amount to "cause" for purposes of avoiding default. *See id.*; *Martinez v. Johnson*, 255 F.3d 229, 239–40 (5th Cir. 2001). This rule applies even where a claim must be brought in state habeas proceedings. *See Ruiz*, 460 F.3d at 644; *see also Thompson v. State*, 9 S.W.3d 808, 813 n.5 (Tex. Crim. App. 1999) (stating that application for state writ relief preferred method to raise ineffective-assistance claims).

Because in state habeas proceedings, Cantu had no right to counsel at all, whatever assistance he received, effective or not, was above the constitutional floor. *See Ruiz*, 460 F.3d at 643–44. And because he could not receive ineffective assistance of counsel, for purposes of avoiding default, the failure of counsel to raise the issue in state habeas proceedings could not amount to "cause." *Id.*; *Martinez*, 255 F.3d at 239–40.

**B.      Because Cantu told counsel that he killed the victims, counsel's decision not to investigate actual innocence was reasonable.**

Even were Cantu's claim reviewed on the merits, he would not be entitled to relief. First, a petitioner who alleges that counsel was deficient for failing to investigate must allege with specificity what the investigation would have revealed and how it would have altered the trial's outcome. *Lockett v. Anderson*, 230 F.3d 695, 713 (5th Cir. 2000) (citing *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)). Cantu alleges only that counsel should have investigated the possibility that he was actually innocent. Mem. at 38. Although Cantu alleges that the investigation continues, Mem. at 39 and 50, he does not allege what such an investigation would have revealed. *See Lockett*, 230 F.3d at 713.

Second, counsel's choices that are made after investigating the law and the facts relevant to plausible options are virtually unchallengeable. *Strickland*, 466 U.S. at 690. The reasonableness of counsel's investigation often relies upon information given counsel by the client. *Id.* Cantu told counsel that he in fact killed Mosqueda because his cousin had failed to pay a drug debt and killed Kitchens to eliminate a witness. *Ex parte Cantu* at 159 (Goeller affidavit). Because Cantu confessed his guilt, counsel's decision not to investigate the likelihood of Cantu's actual innocence was reasonable. *See Strickland*, 466 U.S. at 690.

## IX. The Reasonable-doubt Instruction Cantu Requested Was Not Required by State Law; Appellate Counsel Was Not Deficient for Not Raising Such a Claim.

Cantu alleges that he received ineffective assistance when appellate counsel failed to raise a claim that the trial court erred by not giving the jurors a reasonable-doubt instruction regarding the extraneous offenses. Mem. at 39–40.

### A. Because Cantu did not raise the claim with the state court and because he cannot do so now, the claim is defaulted.

As mentioned by Cantu, Mem. at 39 n.8, this claim is defaulted because he did not raise the issue with the state courts and may not do so now. *See Coleman*, 501 U.S. at 735 n.1. And the failure of counsel to raise the complaint in state habeas proceedings does not constitute cause for avoiding the default. *See Ruiz*, 460 F.3d at 643–44.

### B. Under state law, Cantu was not entitled to the instruction at issue; any appellate claim would not have succeeded.

Were the claim reviewed on the merits, Cantu would be entitled to no relief. Counsel is not deficient, if, in light of state law at the time of trial, an objection would have been futile. *Meanes v. Johnson*, 138 F.3d 1007, 1012 (5th Cir. 1998). Under state law, where the punishment instructions include an instruction on the State's burden of proof, the trial court need not give a separate burden-of-proof instruction on extraneous offenses. *Jackson v.*

*State*, 992 S.W.2d 469, 477 (Tex. Crim. App. 1999) (citing *Burks v. State,* 876 S.W.2d 877, 911 (Tex. Crim. App. 1994); *Boyd v. State,* 811 S.W.2d 105, 123–24 (Tex. Crim. App. 1991); *Lewis v. State,* 815 S.W.2d 560, 567 (Tex. Crim. App. 1991)).  The trial court told the jurors that regarding the future-dangerousness issue, the State bore the burden of proving the issue beyond a reasonable doubt.  8 CR 1450.  Had appellate counsel complained of the trial court's failure to give a similar reasonable-doubt instruction regarding the extraneous offenses, the claim would have failed.  *See Jackson v. State*, 992 S.W.2d at 477.  The case upon which Cantu relies, *State v. Huizar*, 12 S.W.3d 479 (Tex. Crim. App. 2000), deals with a non-capital trial.  In a state non-capital trial such an instruction is required but by statute only, *see id.*; *see also* TEX. CODE CRIM. PROC. art. 37.07, § 3(a) (West 2007)), and is subject to harm analysis, *see Huizar*, 12 S.W.3d at 484–85.

## X.     Regarding His Claim That He Was Deprived His of Right to Be Present at All Phases of His Trial, Cantu Is Not Entitled to Relief.

Cantu alleges that at one point during the trial, he was denied his right to be present. Mem. at 41–42.  During defense cross-examination, Detective Winn mentioned that in the witness room he had a case file or notebook.  33 RR 165.  The defense asked to examine the notebook, arguing that the file might contain material to which it was entitled, such as a witness statement, *see* TEX. R. EVID. 615 (Production of Statements of Witnesses in Criminal Case) or a writing the detective used to refresh his memory, *see* TEX. R. EVID. 612 (Writing Used to Refresh Memory).  33 RR 166–67.  Although the court denied the request, 33 RR 173, the prosecutors nonetheless re-examined the file to see if it contained any writings Det. Winn may have used to refresh his memory.  33 RR 177.  At that point, it was noted that the Cantu was not present.  33 RR 182.  Defense counsel waived his client's right to be present. 33 RR 182.  While the State combed the files, the court dismissed the jurors for the day.  33

RR 182. Later, the prosecutors found a document that arguably was exculpatory. 33 RR 186. The court held a sub rosa hearing during which the defense and prosecutors questioned Winn. 33 RR 189–95. At issue was a note—of which the prosecutor said he had just become aware—made by an unidentified investigator. 33 RR 186. The note recorded an anonymous tipster's accusation that the victims had been killed by a drug dealer named Mario Rojas. 33 RR 186. Winn testified that although investigators learned that Rojas was a drug dealer, they were not able to tie him to the victims. 33 RR 196. As for the purported failure to turn over the note to the defense, Winn said that an investigator from the district attorney's office had photocopied what Winn presumed was the entire file. 33 RR 191–92.

Although the record does not show specifically when Cantu left the courtroom, 33 RR 182, it suggests that he was absent during the sub rosa hearing. 33 RR 189–96. Presumably, before this Court, Cantu complains of this absence. Mem. at 41–42.

A. **Because Cantu never raised the issue with the state court system, the claim is defaulted.**

As mentioned by Cantu, Mem. at 41 n.9, this claim is defaulted because he did not raise the issue with the state court and may not do so now. *See Coleman*, 501 U.S. at 735 n.1. And as mentioned above, the failure of counsel to raise the issue in state habeas proceedings, Mem. at 41 n.9, does not constitute cause for avoiding the default. *See Ruiz*, 460 F.3d at 643–44.

B. **Cantu does not show that his presence was necessary for the defense; he merits no relief.**

Were Cantu's claim reviewed on the merits, he would not be entitled to relief. A defendant's right to be present at trial arises from at least two sources. First, he has a Sixth Amendment right to confront witnesses or evidence against him. *See United States v. Gagnon,* 470 U.S. 522, 526 (1985) (per curiam). This right is not implicated here. The

-33-

witness, Detective Winn, during the sub rosa hearing gave evidence not about the substance of the case, but about the investigation's paperwork, how he compiled the records, and the prosecutors' access to the records. 33 RR 189–96. Although Winn discussed the steps the police took in investigating the Mario Rojas lead, 33 RR 196, it may be presumed that defense counsel told Cantu what occurred in the sub rosa hearing. In fact, the defense incorporated the Mario Rojas lead into its defense. 34 RR 119–20, 122–23, *et seq.*

Second, a defendant has a due process right to be present " 'whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.' " *Gagnon*, 470 U.S. at 526 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). But " 'the presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.' " *Id.* (quoting *Snyder*, 291 U.S. at 107–08). That determination is made in light of the record as a whole. *Gagnon*, 470 U.S. at 526–27.

Cantu likely could have added much if anything to the sub rosa hearing. The hearing dealt not with the crime itself, but with the technicalities of the prosecution's tender of evidence and of the investigators' actions in following a lead. 33 RR 189–96.

### C. Were error presumed, Cantu neither pleads nor shows harm.

Were this Court to assume that Cantu's absence during the sub rosa hearing was constitutional error, such errors, like all trial errors, are subject to a harm analysis. *See Delaware v. Van Arsdall,* 475 U.S. 673, 684 (1986). In federal habeas proceedings, the test for harmful error is whether the error had substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see also Fry v. Pliler*, No. 06-5247, 2007 WL 1661463 (2007) (holding that in federal habeas review, *Brecht* standard applies even where the state court recognized no error). A petitioner is not

entitled to relief based on trial error unless he can establish that the error resulted in actual prejudice. *Id.* Not only does Cantu show no harm, he alleges no harm.

## XI. On His Claim That Counsel Was Ineffective for Failing to Object to Victim-Impact Testimony, Cantu Is Entitled to No Relief.

### A. Cantu did not raise the claim with state courts and may not do so now; the claim is defaulted.

Cantu alleges he received ineffective assistance when trial counsel at sentencing failed to object to the admission of victim-impact testimony regarding decedent Amy Kitchens. Mem. at 43–44. Cantu alleges that under state law, victim-impact testimony is not admissible where the testimony is related to the victim of an extraneous offense. Mem. at 43 (citing *Halley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *(Peter Anthony) Cantu v. State*, 939 S.W.2d 627, 637 (Tex. Crim. App. 1997)).

As mentioned by Cantu, Mem. at 43 n.10, this claim is defaulted because he did not raise the issue with the state court and may not do so now. *See Coleman*, 501 U.S. at 735 n.1. And the failure of counsel to raise the complaint in state habeas proceedings, Mem. at 43 n.10, does not constitute cause for avoiding the default. *See Ruiz*, 460 F.3d at 643–44.

### B. Because the victim-impact evidence dealt with a victim named in the indictment, the evidence was admissible.

Were Cantu's complaint reviewed on the merits, he would not be entitled to relief. He does allege that the introduction of the evidence violated the Constitution; rather, he alleges that counsel was ineffective for not objecting to evidence that was inadmissible as a matter of state law. Mem. at 43–44.

Counsel's objection would have been futile. *Meanes*, 138 F.3d at 1012. Under state law, at punishment jurors are allowed to hear and consider evidence about the victim's personal characteristics and the emotional impact of the murder on the victim's family. *See*

*Banda v. State*, 890 S.W.2d 42, 63 (Tex. Crim. App. 1994) (citing *Payne v. Tennessee,* 501 U.S. 808, 826 (1991)). Cantu was charged with capital murder both by robbery and by committing multiple murders. 1 CR 9 (indictment); 8 CR 1434–35 (jury charge); *see* TEX. PEN. CODE § 19.03(a)(2), (7) (West 2007).[4] The cases upon which Cantu relies, *Halley* and *(Peter Anthony) Cantu*, do not support his argument. Those cases suggest only that victim-impact evidence is not relevant to the charged crime where the evidence deals with the victim of an extraneous offense and where the victim is not named in the indictment. Kitchens was a victim of the charged crime and was named in the indictment. 1 CR 9; *see Saenz v. State*, 166 S.W.3d 270, 272 (Tex. Crim. App. 2005) ("[T]he capital murder statute under [§ 19.03(a)(7)(A)] requires, at minimum, two victims."). The multiple-murder charge required jurors to find that Cantu intentionally[5] killed both Mosqueda and Kitchens. 1 CR 9; 8 CR 1435. The evidence at issue was not related to the unnamed victim of an extraneous offense. For the multiple-murder charge, the intentional killing of Kitchens was an element of capital murder. *See* §19.03(a)(7). Because the evidence was admissible under state law, counsel was not ineffective for remaining silent. *See Meanes v. Johnson*, 138 F.3d at 1012.

## XII. Cantu Is Not Entitled to Relief on His Equal Protection Claim.

Cantu alleges that he was deprived of the equal protection of the laws when the prosecutors used a peremptory challenge to disqualify a Hispanic panel member because of her ethnicity. Mem. at 45–49 (citing *Batson v. Kentucky*, 476 U.S. 79 (1986)).

---

[4] A person commits capital murder if he commits murder as defined under § 19.02(b)(1) of the Penal Code and [1] he commits that intentional murder in the course of committing or attempting to commit robbery or [2] he murders more than one person during the same criminal transaction.

[5] A defendant can be convicted of capital murder where he murders two victims in the same criminal episode. *See* TEX. PEN. CODE § 19.03(a)(7)(A). The murders can be either intentional or knowing. TEX. PEN. CODE § 19.02(b)(1). But in the charge at issue, the State charged Cantu with two intentional killings. 1 CR 9. The jury charge tracked the indictment. 8 CR 1435.

During his examination of panel member Hilda Lauriello, the prosecutor asked her whether she felt she could serve on a death-penalty jury. 11 RR 20. The panel member said:

> Well, it's kind of like I told my husband this morning. I woke up at—I don't know, four o'clock. I couldn't sleep. I thought, what if I really do get on this jury? You know, in theory I believe in the death penalty, but I never had to be personally involved with anything like that.

11 RR 20 ll. 20–25.

Later the prosecutor told her that a trial places a burden on everyone involved. 11 RR 27. The prosecutor referred to a previous discussion he had with another panel member who did not wish serve because his daughter was scheduled for surgery. 11 RR 27. The prosecutor asked Lauriello whether his answer to that other panel member—that everyone associated with the trial would have to sacrifice—had angered her. 11 RR 28. Lauriello said that the prosecutor's explanation did not anger her but, "I thought you were very callous, with all due respect." 11 RR 28 ll. 20–21.

Later, when asked whether she could put aside her negative reaction to the prosecutor's remark or whether she would let her ill-will toward the prosecutor influence her decision, Lauriello said, "I mean, I guess. It's one of those things where I don't think so." 11 RR 29 ll. 7–8. Asked whether she could vote for a death penalty, the panel member said, "I believe so." 11 RR 31.

Later still, during a series of questions about whether she would be able to decide on the probability of Cantu's future dangerousness, the panel member said:

• "I guess without facing the actual situation, I don't know. I mean, it seems kind of problematic in that, how do I know what a person is going to do in the future? Not to say that once—I don't know." 11 RR 37 ll. 2–5.

• "I guess." 11 RR 38 l. 20.

• "I mean, without hearing the evidence all I can think of is, I think I can." 11 RR 39 ll. 5–6.

• "I don't know, maybe I can't. I don't know." 11 RR 39 l. 8.

• "Well, I guess without knowing—I guess my problem with the whole thing is, I have nothing to go by other than this theoretical, I might be able to do something. So I can't tell you for certain that I could." 11 RR 39 ll. 15–19.

Later, pressing Lauriello on whether she could vote for the death penalty, the prosecutor asked, "But even though you've indicated [in your questionnaire] you favor the death penalty, the most you can tell me is you think you could [vote for death], which tells me you think maybe you couldn't also, right?"

"Right." 11 RR 50 ll. 3–7.

Later still, the prosecutor again pressed:

Q. And you can't—you can't assure me—you can't assure me that you can [vote for death]. Is that where we are? You can't say, ["Y]es, I assure you I am able to do that based on the evidence[."]?

A. That's correct.

Q. So you can't assure me you could be fair in a death penalty case for the State?

A. I would like to think I was. But for certain, I can't tell you that. I think I can, but you want me to say absolutely positively, you know, and I don't know that I can tell you that.

11 RR 51 ll. 13–23.

The prosecutor challenged Lauriello for cause on grounds that she could not assure him that she could follow the sentencing instructions. 11 RR 52–53.

The defense asked Lauriello a series of questions to determine whether she could base her decisions upon the evidence. 11 RR 56–60. Lauriello gave a series of one-word answers: "Right" [11 RR 56 l. 1], "Right" [11 RR 56 l. 9], "Yes" [11 RR 56 l. 22], "Yes" [11 RR 57 l. 1], "Right" [11 RR 57 l. 4], "Yes" [11 RR 57 l. 9], "(Moving head up and down.)" [11 RR 57 l. 13], "Right" [11 RR 57 l. 15], "Correct" [11 RR 59 l. 11], "Right" [11 RR 59 l. 19], "Correct" [11 RR 59 l. 23], "Yes" [11 RR 60 l. 2], "Right" [11 RR 60 l. 7], "Right" [11 RR 60 l. 11], and "Right" [11 RR 60 l. 14].

When the prosecutor then asked Lauriello whether her answers to the defense were consistent with her answers to the prosecution, Lauriello said, "Well, the interesting thing about it is that, when he [defense counsel] phrased the question, it seemed more open. When you phrased it, it seemed like it was just absolute, and I couldn't go there." 11 RR 62. After the court denied the State's challenge for cause, the State used a peremptory strike. 11 RR 68.

The defense objected on equal protection grounds. 11 RR 69. Asked to give a race-neutral reason for striking the panel member, the prosecutor said she seemed hostile to him and that her answers were confused and sarcastic. 11 RR 70.

He said that in connection with her statement that she could put aside her opinion that the prosecutor had been "callous," the prosecutor suggested that he found her answer not credible. 11 RR 71. And the prosecutor said that the panel member's answers did not convince him that she ever could vote for the death penalty. 11 RR 71.

Under defense questioning, the prosecutor agreed that he had initiated the "callous" exchange with Lauriello, but disagreed that the exchange was the genesis of the panel member's ill-will. 11 RR 82–83. The prosecutor said that the panel member had been

unfriendly even before individual questioning.  11 RR 83–84.  He said, "I detected an annoyance in there."  11 RR 90.

Asked whether another panel member, Mr. Calhoun, also had been equivocal about his ability to award a death sentence, the prosecutor said he did not know.  11 RR 85–86.

The defense argued that the prosecutor's complaints were subjective, suggesting perhaps that they were pretextual and the panel member was otherwise qualified.  11 RR 94–96.  The  court found that the prosecutor's strike was not based on the panel member's ethnicity or race.  11 RR 97.

**A.    Because Cantu did not raise the equal-protection claim with the state courts and may not do so now, the claim is defaulted.**

As mentioned by Cantu, Mem. at 45 n.11, this claim is defaulted because he did not raise the issue with the state court and may not do so now.  *See Coleman*, 501 U.S. at 735 n.1.

**B.    Cantu cannot plead ineffective assistance of counsel to avoid default on his equal protection claim.**

**1.    Cantu did not plead counsel error as an independent claim; he may not use the claim to avoid default on his equal protection claim.**

Cantu acknowledges that counsel failed to raise this equal protection complaint either on appeal or in state habeas proceedings.  Mem. at 45 n.11.  He alleges that the failure of counsel to act on appeal or in state habeas proceedings constitutes cause sufficient to avoid his default.  *Id.*

As discussed above, the failure of counsel to raise the complaint in state habeas proceedings does not constitute cause for avoiding the default.  *See Ruiz*, 460 F.3d at 643–44. As for counsel's failure to raise the issue on appeal, as mentioned above, although ineffective assistance of counsel may constitute cause for purposes of avoiding default, *Murray*, 477 U.S. at 488–89, the ineffectiveness must be great enough to amount to a constitutional

violation. *See Edwards*, 529 U.S. at 451–52. But a petitioner who pleads ineffective assistance to avoid default also must raise the ineffective-assistance claim as an independent complaint. *See Murray*, 477 U.S. at 488–89. Where the petitioner fails to raise the ineffective-assistance claim in state court as an independent claim for relief, he defaults the ineffective-assistance claim and may not use the claim as "cause" to avoiding default on another claim. *See Edwards*, 529 U.S. at 451–52.

In his state habeas application, Cantu did not raise a Sixth Amendment claim alleging that appellate counsel failed to raise an equal protection challenge. *Ex parte Cantu* 5–89. Hence, Cantu defaulted his independent Sixth Amendment claim, *see Edwards v. Carpenter*, 529 U.S. at 451–52, and may not use that ineffective-assistance claim to avoid default of his equal-protection claim, *see Murray*, 477 U.S. at 488–89. In fact, although Cantu before this Court raises an equal protection claim, Mem. at 45–46, he still does not raise an ineffective-assistance claim mirroring his cause-and-prejudice argument. Mem. at ii–iv.

> **2.    In the alternative, Cantu's counsel-error claim shows no deficiency, no harm, and hence, no "cause" to avoid default.**

But even if Cantu's ineffective-assistance claim had been presented as an independent claim in state court and were asserted as cause and prejudice, he still could not avoid default.

When a petitioner alleges he received ineffective assistance of appellate counsel, the two-pronged *Strickland* test applies. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). The petitioner must show counsel was deficient and that the deficiency prejudiced his case. *Strickland*, 466 U.S. at 687. The petitioner must show that but for counsel's deficient performance he would have prevailed on appeal. *Smith*, 528 U.S. at 285–86. An appellate attorney need not argue every conceivable issue, especially when some may be without merit.

*Jones v. Barnes,* 463 U.S. 745, 745 (1983). Indeed, the attorney has a duty to choose among the issues, using his judgment as to their merits and according to his tactical approach. *Id.*

As will be discussed below, Cantu's equal protection challenge has no merit. Because the claim has no merit, Cantu cannot show that appellate counsel was deficient for failing to raise the issue, *see Strickland*, 466 U.S. at 687, and cannot show that had counsel raised the issue, he would have prevailed on appeal, *see Smith*, 528 U.S. at 285–86. Because Cantu does not show that counsel was ineffective, Cantu does not show cause and prejudice for purposes of avoiding his default. *See Murray*, 477 U.S. at 488–89.

**B.     This Court must defer to the state court's factual finding that the prosecutor's reasons for the peremptory strike were not raced-based.**

Were the claim reviewed on the merits, Cantu still would not be entitled to relief. The state's purposeful exercise of peremptory strikes on racial grounds violates the Equal Protection Clause. *See Batson*, 476 U.S. at 84. For evaluating such claims, courts use a three-step process. *Id.* at 96–98; *Murphy v. Dretke*, 416 F.3d 427, 432 (5th Cir. 2005), *cert. denied*, 126 S. Ct. 1028 (2006). First, the defendant must make a *prima facie* showing that the State has used a peremptory challenge to remove a panel member on the basis of race. *See Batson*, 476 U.S. at 96–97. Second, if the defendant makes the required showing, the burden shifts to the State to rebut the defendant's *prima facie* case by producing a race-neutral explanation for striking the panel member. *Id.* at 94, 97–98. At this second stage, unless the prosecutor's explanation shows discriminatory intent inherently, the reason offered will be deemed race neutral. *Purkett v. Elem,* 514 U.S. 765, 768 (1995). In the third step, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Batson*, 476 U.S. at 94 & n.18, 98. At this third stage, a justification that is implausible or fantastic may be found to be pretexts for purposeful

discrimination. *See Purkett*, 514 U.S. at 768. A state trial court's failure to find an intent to discriminate is an issue of fact that is accorded great deference and will not be overturned unless clearly erroneous. *See Hernandez v. New York*, 500 U.S. 352, 364–65 (1991).

The trial court found that the prosecutor's explanation did not mask discrimination. 11 RR 97. The finding is supported by the record. *See Hernandez*, 500 U.S. at 364–65. The panel member's answers suggested that she would have some difficulty awarding a death sentence. The comparison of the answers she gave to the prosecutor as opposed to those she gave the defense counsel suggests that she viewed the defense more favorably. As for her attitude toward the prosecutor, such a determination should be left to the trial court, who had the opportunity to view her demeanor during questioning. The trial court's determination was not clearly erroneous. *See id.*

Cantu alleges that the trial court misunderstood the law, thinking that the prosecutor could exercise a peremptory strike lawfully if the Cantu were of Mexican descent and the panel member were of Puerto Rican descent. Mem. at 48. The record does not support Cantu's argument. The attorneys and the court discussed the possible ethnicity of Lauriello. The court said that based on his observation, Lauriello appeared to be of Mediterranean descent. 11 RR 97. Upon learning that she was from New York City, the court speculated that she was of Puerto Rican descent. 11 RR 97. In the end, the court construed both the panel member and Cantu as being Hispanic. 11 RR 97. The trial court's discussion, taken in context, shows not that the court misunderstood the law. It shows rather the court was developing the appellate record. Cantu, a Hispanic, had complained that the prosecutor challenged a Hispanic juror on the basis of her ethnicity. 11 RR 68–69. For appellate purposes, Cantu was required to show the ethnicity of the panel member. The court was helping Cantu to develop the record.

**XIII. Cantu Alleges That He Continues to Investigate His Actual Innocence.**

Cantu alleges that the defense team is continuing its investigation into his actual innocence. Mem. at 50 (citing *Herrera v. Collins*, 506 U.S. 390 (1993)). He does not advance the argument at this time but raises the issue only so that he may raise it in the future.

## CONCLUSION

The Director asks this Court to deny Cantu's petition with prejudice and to deny a certificate of appealability on all the issues here raised.

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ERIC J.R. NICHOLS
Deputy Attorney General
 for Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Postconviction Litigation Division


/s/ Thomas M. Jones_____
THOMAS M. JONES*
\*Attorney-In-Charge        Assistant Attorney General
Postconviction Litigation Division
State Bar No. 00784357

P. O. Box 12548, Capitol Station
Austin, Texas 78711-2548
(512) 936-1400
Fax No. (512) 936-1280
E-mail: Thomas.Jones@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Thomas M. Jones, Assistant Attorney General of Texas, certify that in accordance with Local Rule CV-5(a)(3)(C), on June 15, 2007, a true and correct copy of the preceding pleading was electronically served upon:

Counsel for Cantu

F. Clinton Broden III
Broden & Mickelsen
2707 Hibernia St.
Dallas TX 75204

/s/ Thomas M. Jones_____
THOMAS M. JONES
Assistant Attorney General