# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TEXAS

### MARSHALL DIVISION

| | | |
|---|---|---|
| **IVAN A. CANTU,** | § | |
| Petitioner, | § | |
| **v.** | § | No. 2:06cv166 |
| **NATHANIEL QUARTERMAN, Director,** | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional Institutions Division,** | § | |
| Respondent. | § | |

## MEMORANDUM OPINION

Ivan A. Cantu ("Cantu"), an inmate confined to the Texas Department of Criminal Justice, Institutional Division, filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2241 and 2254. Cantu challenged his capital murder conviction and death sentence imposed by the 380th Judicial District Court of Collin County, Texas in cause No. 380-80047-01, styled *The State of Texas vs. Ivan Abner Cantu.* For the reasons set forth below the Court finds that the application is not well-taken and it will be denied.

### Background

*Facts*

Cantu lived with Amy Boettcher in an apartment not far from his cousin, James Mosqueda, who lived with Amy Kitchen. At approximately 11:20 pm on the night of November 3, 2000, Cantu called Mosqueda and asked if he could come to Mosqueda's house and see him. Cantu told Boettcher that he was going to Mosqueda and Kitchen's house to kill them, but Boettcher did not

believe him.  When he left the apartment, Cantu had his gun with him.  When he returned to the

apartment around 12:20 a.m., his face was swollen and he had what looked like blood on his jeans

and in his hair.  He told Boettcher that "it wasn't pretty" and began unloading his gun, complaining

that it had jammed on him.  He had Mosqueda's and Kitchen's identification and car keys.  Boettcher

threw Cantu's bloody jeans in the kitchen trash can.  After Cantu cleaned up, he made Boettcher

return with him to the victims' house to see what he had done.  They drove Kitchen's Mercedes.

Boettcher could see the victims' bodies through the doorway to the master bedroom.  While at the

house, Cantu gathered things he had left at the house, and searched the house for drugs and/or money.

They parked the Mercedes in the garage and left in Mosqueda's Corvette.  Cantu gave Boettcher a

diamond engagement ring that had belonged to Kitchen.

Later that morning, Cantu and Boettcher drove to Arkansas to visit Boettcher's parents for

three days.  That evening, Mosqueda's and Kitchen's bodies were discovered.  After speaking with

Sylvia Cantu, Cantu's mother, authorities searched Cantu's and Boettcher's apartment.  They later

obtained a search warrant and searched it again, finding among other things the bloody jeans,

ammunition, and keys to the victims' house and Kitchen's Mercedes.  When Cantu and Boettcher

returned from their trip, they stopped at the house of Tawny Svihovic, a former girlfriend of Cantu's.

His gun was later found at that residence.

On November 7, 2000, Cantu was arrested.  Shortly after he spoke to Boettcher by telephone

from the police station, she flew back to Arkansas.  The next day, she began cooperating with

authorities investigating the killing.

*Procedural history*

Cantu was indicted for capital murder in violation of Tex Penal Code Ann. S 19.03 (a)(9)(A) (Vernon 1994). After a jury trial, he was convicted and on November 6, 2001, he was sentenced to death. His conviction was affirmed on direct appeal, *see Cantu v. State*, No. 74220, 2004 WL 3093156 (Tex. Crim. App. June 30, 2004)(unpublished), and his state petition for post-conviction relief was denied, *see Ex parte Ivan Cantu*, No. WR-63624-01, 2006 WL 120829 (Tex. Crim. App. Jan. 18, 2006) (unpublished). On January 18, 2007, he filed the present application for a writ of *habeas corpus*.

*Claims*

Cantu raised thirteen claims in his petition:

1. He was denied his sixth amendment right to the effective assistance of counsel.

2. The evidence at his trial was legally insufficient to support his sentence of death.

3. He was denied his right to be free from cruel and unusual punishment and his right to the due process of law when the trial court refused to instruct the jury that he would have to serve forty-years in prison before he would be eligible for parole.

4. He was deprived his constitutional rights because the court's instruction concerning mitigation did not require the state to prove the absence of sufficient mitigation beyond a reasonable doubt

5. He was denied his constitutional rights against cruel and unusual punishment and due process of law by the requirement that at least ten jurors must vote "No" in order for the jury to return a negative answer to the punishment mitigation issue.

6. Texas Code Crim. Proc. Art. 37.071 and Art. 44.251 violate the Eighth and Fourteenth Amendments because they fail to provide meaningful review of punishment issues.

7. The search of Cantu's apartment violated his Fourth Amendment rights.

8. Trial counsel was ineffective for failing to investigate Cantu's claims of actual innocence.

9. Appellate counsel was ineffective for failing to raise an issue on appeal related to the trial court's error in not giving a reasonable doubt instruction for extraneous offenses.

10. Cantu was denied his constitutional right to be present at all stages of his trial.

11. Trial counsel was ineffective for failing to object to extraneous victim impact testimony.

12. The state's use of a peremptory challenge to disqualify an Hispanic juror was improper under *Batson v. Kentucky*.

13. Cantu is actually innocent of capital murder.

*Standard of Review*

Because Cantu's application for *habeas corpus* was filed after 1996, the Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to his claims. Under the AEDPA, a state prisoner seeking to raise claims in a federal petition for *habeas corpus* ordinarily must first present those claims to the state court and exhaust his state remedies. *Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002). If an applicant raises a claim in his federal *habeas corpus* application which was not presented to the state courts, the federal court will attempt to allow the applicant to return to state court and present them to the state court in a successive petition, either by dismissing the entire petition without prejudice, see *Rose v. Lundy*, 455 U.S. 509, 520-22 (1982), or by staying the federal proceedings, s*ee Rhines v. Weber*, 544 U.S. 269, 279 (2005). If the federal court is convinced that the state court would refuse to consider the merits of such a successive petition, however, the federal court will treat the unexhausted claims as if the state court had already refused to hear them on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). The federal court generally does not review procedurally defaulted claims unless the applicant can establish either that he had good cause for failing to fairly present his claims, and he would be prejudiced by not being given an opportunity to do so in the federal court, or that the federal court's failing to address the claims on their merits would result in a fundamental miscarriage of justice, because the petitioner is actually innocent of the offense. *See Coleman v.*

*Thompson,* 501 U.S. 722, 749-750 (1991); *Finley v. Johnson,* 243 F.3d 215, 220 (5th Cir. 2001). If it is not entirely clear that the state court would refuse to hear a successive petition containing the new claims, however, the federal court will allow the state court the first opportunity to consider them. *See Wilder v. Cockrell,* 274 F.3d 255, 262-63 (5th Cir. 2001).

If the state court denied the claim on its merits, a federal court may only grant relief if the state court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254 (d)(1), or the state court's adjudication resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, *see* 28 U.S.C. § 2254 (d)(2). The court reviews questions of law and mixed questions of law and fact under section 2254(d)(1), while it reviews questions of fact under section 2254(d)(2). The state court's findings of fact are presumed to be correct, and the applicant has the burden of rebutting this presumption of correctness by clear and convincing evidence. *Richardson v. Quarterman,* 537 F.3d 466, 472-73 (5th Cir. 2008).

If the state court based its decision on the alternative grounds of procedural default and a rejection of the merits, the general rule in this circuit is that a federal court must, in the absence of good cause and prejudice, or a fundamental miscarriage of justice, deny relief because of the procedural default, *see Hughes v. Dretke*, 412 F.3d 582, 592 (5th Cir. 2005), *cert. denied*, 546 U.S. 1177 (2006), but the rule is not absolute; a court can look past the question of procedural default if the claims can be resolved more easily on the merits. *See Busby v. Dretke*, 359 F.3d 708, 720 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004).

# Analysis

Cantu's first claim is that he was denied his sixth amendment right to the effective assistance of counsel. This claim was denied on the merits by the state court, *see* State Habeas Transcript ("SHTr") p.189, Conclusion of Law 16, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In *Wiggins v. Smith,* 539 U.S. 510 (2003), the Supreme Court stated that in order to establish that a defense lawyer's performance was constitutionally ineffective, an applicant must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. To establish deficient performance, an applicant must demonstrate that counsel's behavior fell below an objective standard of reasonableness and the proper measure of attorney performance remains simply reasonableness under prevailing professional norms. *Id.* at 521. To establish prejudice, an applicant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 534.

Cantu claims that his trial counsel's performance was deficient because they failed to investigate his mental health, and failed to prepare a social history, as a result. He contends that had they done so, they would have discovered that he suffered from bi-polar disorder, the effects of long-term drug abuse, and had a dysfunctional childhood. A psychologist, Dr. Dineen Milam, stated in an affidavit that she would have testified that because of this combination of factors Cantu committed these murders due to a mental defect, rather than because of a venal choice, and the jury would likely have shown leniency toward him.

Cantu's attorneys stated in affidavits that they asked Cantu to provide an account of his life prior to his arrest, including information about his childhood, including any abuse, any traumatic injuries, names of anyone who could testify on these matters, and anything else he could think of that would assist them in convincing a jury to spare his life. They also addressed these same questions to Cantu's mother. They then provided this information to a mitigation specialist, who conducted extensive interviews in an attempt to develop a detailed mitigation plan, and to a psychologist, who testified that based on the information they provided, he was of the opinion that Cantu would not be dangerous as long as he was kept in prison.

Cantu's attorneys decided that their strategy for the punishment determination phase of the trial would be based upon four themes: his dysfunctional childhood and family, his misuse of drugs and alcohol, some of which was supplied by victim Mosqueda, and his lack of future dangerousness as long as he was denied access to drugs and alcohol, and his conversion to Christianity. They testified that they decided not to have Cantu examined by a psychiatrist because they did not believe, based upon their observations of his behavior, that he suffered from any mental illness other than antisocial personality disorder, and even if they were able to obtain evidence of some other psychiatric disorder, if they attempted to introduce any evidence of that disorder the prosecution would then be allowed to examine Cantu with their own psychiatrist, and he would likely testify that Cantu was a sociopath, which would severely undercut their evidence that he would not be dangerous in the future. One of Cantu's attorneys stated that after reviewing the evidence they provided, Dr. Cunningham said to him that Cantu might be suffering from severe depression, and he suspected that Cantu might be a sociopath.

The state court found Cantu's two attorneys' affidavits more credible than Dr. Milam's affidavit. It found that the record did contain evidence of Cantu's childhood, substance abuse, and cycles of depression that the jury was able to consider. It also found that their strategic decision not to employ a psychiatric-based defense strategy was reasonable, because such a defense would have been inconsistent with their strategy of focusing on his conversion to Christianity. This finding cannot be overturned unless it is objectively unreasonable. *See Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) *cert denied*, 537 U.S. 1104 (2003).

The state court's finding does not meet this standard. A decision not to investigate is reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation, and it must therefore be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Wiggins*, 539 U.S. at 521-22. In the present case, Cantu's attorneys based their decision on the assumption that the prosecution, if given the opportunity, would have an expert examine Cantu and opine that he was a sociopath. This assumption was based on their experience, on their understanding that under *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997), the state would have the right to examine Cantu if he attempted to introduce any mental health expert testimony, on their own observations of Cantu, and on the comments of Dr. Cunningham. Applying a heavy measure of deference to counsel's judgments, the Court finds that their decision not to investigate Cantu's mental health was not unreasonable.[1] *Compare Valle v. Quarterman*, No. 08-7005, 2008 WL 4656945 slip op. at *3 (5th Cir. Oct. 22, 2008)(unpublished)(counsel's decision not to obtain a

---

[1] Cantu contends that his trial counsel misunderstood the *Lagrone* decision, and that although the state would have been allowed to examine him if he offered expert mental health testimony on the issue of future dangerousness, they would not have been allowed to examine him if he offered such evidence only in general mitigation. Counsel's understanding does not appear unreasonable in light of *Ward v. State*, No. AP-74695, 2007 WL 1492080 slip op. at *6 (Tex. Crim. App. May 23, 2007)(unpublished) (*Lagrone* rule applies to mitigation as well as future dangerousness.)

psychological evaluation before trial because of the possibility that the state trial court would order a state-sponsored psychological examination pursuant to *Lagrone v. State* held  reasonable).

Because the state court's finding that Cantu's counsel's performance was not deficient is not objectively unreasonable, it is unnecessary for the Court to analyze the prejudice element of the test. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995).[2]  Because the state court's denial of Cantu's first claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Wiggins v. Smith*, the Court will deny this claim.

Cantu's second claim is that the evidence at his trial was legally insufficient to support his sentence of death.  This claim was denied on the merits by the state court, *see Cantu v. State*, No. 74220, 2004 WL 3093156 slip op. at *2-*4, so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Cantu's second claim contains two sub-claims.  His first sub-claim is that the evidence presented at the punishment determination phase of his trial was insufficient to support the jury's finding that there was a probability that he would commit acts of criminal violence which would constitute a continuing threat to society.  In *Jackson v. Virginia,* 443 U.S. 307, 319 (1979), the Supreme Court of the United States held that the standard for reviewing sufficiency of the evidence claims is whether, after reviewing the evidence in the record as a whole in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond

---

[2]  The Court notes that the state court also found that Cantu could not establish the prejudice element of the *Wiggins* test, stating: "Applicant has not shown that any of the deficiencies he alleges caused Applicant to receive a death sentence rather than life imprisonment."  This finding would not be entitled to deference, however, because it applies an incorrect legal standard.  The correct standard is whether there is *a reasonable probability* that the result in the proceeding would have been different, had the attorney's performed competently.

a reasonable doubt. In *Woods v. Cockrell*, 307 F.3d 353, 358 (5th Cir. 2002), the United States Court of Appeals for the Fifth Circuit held that the *Jackson* standard applies to claims of insufficiency of the evidence supporting the future dangerousness issue.

Cantu contends that "[a]lthough the nature of the crime was horrific, there was nothing in Cantu's background to indicate that he would be a future danger to society," *see* Brief in Chief at 18. There are two problems with this argument. First, the fact that the nature of the crime was horrific is considered highly relevant to whether the defendant is likely to be dangerous in the future. *See e.g. Miller v. Johnson*, 200 F.3d 274, 286 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000). Second, Cantu's background contained episodes of violence towards his mother, both of his previous wives, and Boettcher. Previous violent conduct is considered relevant to future dangerousness. *See e.g. Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998), *cert. denied*, 525 U.S. 1119 (1999).

Other evidence showed that Cantu expressed no remorse, which is considered relevant to future dangerousness, *see e.g., White v. Johnson*, 153 F.3d 197, 203 (5th Cir. 1998), *cert. denied*, 525 U.S. 1149 (1999), and that Cantu killed Kitchens because she was a witness, which is also considered relevant to future dangerousness. *See e.g. Rodriguez v. Zavaras,* 42 F.Supp.2d 1059, 1134 (D. Colo. 1999),

Cantu produced evidence that he had successfully completed a term of probation, successfully completed a drug treatment program, and converted to Christianity. He also produced evidence that inmates convicted of capital murder are less likely to commit acts of criminal violence than inmates in the general population, and that his criminal behavior was related to his drug usage and he would not have access to drugs while in prison, and his violent behavior was all family related and the family dynamics which led to his behavior would not be present in prison.

Although Cantu produced evidence under which a reasonable juror could have found that he was not likely to be dangerous to society in the future, the Court finds that the state court's determination that, after reviewing the evidence in the record as a whole, a rational fact-finder could have found beyond a reasonable doubt that there was a probability that Cantu would commit acts of criminal violence which would constitute a continuing threat to society was not unreasonable.

The second sub-claim of Cantu's second claim is that the evidence was insufficient to support the jury's failure to find that mitigating circumstances existed which warranted imposing a sentence of life imprisonment, rather than a sentence of death. This sub-claim is not cognizable in *habeas corpus. See Woods v. Cockrell*, 307 F.3d at 359-60. Because Cantu is not entitled to relief on either of the two sub-claims in his second claim, the Court will deny his second claim.

Cantu's third claim is that he was denied his right to be free from cruel and unusual punishment and his right to the due process of law when the trial court instructed the jury not to consider that he would have to serve forty-years in prison before he would be eligible for parole in determining whether there was a probability that he would be dangerous in the future.[3] The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, see SHTr p. 190, Conclusion of law 30. Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[3] The trial judge's actual instruction to the jury was:
You are instructed not to consider or discuss the possible actions of the Board of Pardons and Paroles or the Governor, nor how long a defendant would be required to serve on a sentence of life imprisonment, nor how the parole laws would be applied to this defendant. Such matters come within the exclusive jurisdiction of the Board of pardons and Paroles and are of no concern to the judge or jury.

In *Simmons v. South Carolina*, 512 U.S. 154, 156 (1994), the Supreme Court of the United States held that when the defendant's future dangerousness is at issue and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant would not be eligible for parole. In *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000), the Supreme Court noted that the parole ineligibility instruction is required only when the only other option besides the death penalty is life imprisonment without the possibility of parole. Because the law in effect in Texas at the time of Cantu's sentencing provided only the alternatives of death or life imprisonment with the possibility of parole, the state court's rejection of Cantu's claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Simmons* and *Angelone*. *See* Title 28 U.S.C. § 2254 (d)(1). The Court will deny Cantu's third claim.

Cantu's fourth claim is that he was deprived his constitutional rights because the court's instruction concerning mitigation did not require the state to prove the absence of sufficient mitigation beyond a reasonable doubt.[4] The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, *see* SHTr p. 190, Conclusion of Law 31. Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

---

[4] The mitigation special issue's actual wording is:
Taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient circumstance or circumstances to warrant that a sentence of life imprisonment, rather than a death sentence be imposed?

In *Ring v. Arizona*, 536 U.S. 584, 589 (2002), the Supreme Court of the United States held that aggravating factors in statutory capital punishment schemes must be found by a jury and beyond a reasonable doubt. The Supreme Court explicitly declined to address whether its holding extended to mitigating factors, *see* 536 U.S. at 597 n.4., and the United States Court of Appeals for the Fifth Circuit denied an identical claim in *Granados v. Quarterman*, 455 F.3d 529, 536-37 (5th Cir.), *cert. denied*, 549 U.S. 1081 (2006). Based upon *Granados*, this Court finds that the state court's rejection of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Ring*. *See* Title 28 U.S.C. § 2254 (d)(1). The Court will deny Cantu's fourth claim.

Cantu's fifth claim is that he was denied his constitutional right to the due process of law and to be free from cruel and unusual punishment by the requirement under TEX CODE CRIM. PROC. art.37.071 § 2 that all twelve jurors must vote "Yes" in order to return a positive answer to the future dangerousness and mitigation special issues, and at least ten jurors must vote "No" in order for the jury to return a negative answer to those special issues. The state court found this claim procedurally barred because Cantu did not raise the claim in his direct appeal, *see* SHTr p. 190, Conclusion of Law 29, and it also denied the claim on its merits, see SHTr p. 190, Conclusion of Law 33. Because it is easier to decide this claim on its merits than to decide it on procedural grounds, *see Busby v. Dretke*, 359 F.3d at 720, the question for the Court is whether the state court's rejection of the claim was contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

Cantu's fifth claim contains two sub-claims. His first sub-claim is that the Texas rule invites juror coercion, because "jurors who would otherwise hold out against voting for a death sentence

13

instead adopt a 'majority rules' approach and change their vote to conform to the will of the majority." *See* Brief in Chief at 31.  Cantu contends that this is unreasonable in light of *Brasfield v. United States,* 272 U.S. 448 (1926), and *Lowefeld v. Phelps*, 484 U.S. 231 (1988).

In *Brasfield*, the Supreme Court of the United States held that when a jury informs the trial judge that it is deadlocked, it is reversible error for the trial judge to inquire as to the numerical division of the jurors on the question of the defendant's guilt.  In *Lowenfeld*, the Supreme Court held that it was not reversible error for the trial judge to inquire about the numerical division of jurors on the question of whether they believed that further deliberations would be helpful in reaching a verdict.  In the present case, no judicial polling of the jurors occurred, so the Court finds that the state court's rejection of this sub-claim was neither contrary to nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Brasfield and Lowenfeld*.

The second sub-claim of Cantu's fifth claim is that under the Texas capital sentencing instructions  "a reasonable juror could well believe that there must be a meeting of the minds between his or her fellow jurors as to whether a mitigating factor sufficient to impose a life sentence is present."  In *Mills v. Maryland*, 486 U.S. 367, 384 (1988), the Supreme Court of the United States held that a state may not require jurors to agree unanimously on particular mitigating circumstances in order to sentence an inmate to a sentence less than death.  In *Jacobs v. Scott*, 31 F.3d 1319, 1328 (5th Cir. 1994), *cert. denied*, 513 U.S. 1067 (1995), however, the United States Court of Appeals held that because the Texas special punishment issues do not require that the jurors agree as to the particular circumstances that each considered mitigating in voting "yes" to the mitigation special issue, the rule in *Mills* was inapplicable.  Based upon *Jacobs*, the Court finds that the state court's

rejection of this sub-claim was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States in *Mills.*

Because the state court's rejection of both sub-claims of Cantu's fifth claim was neither contrary to, nor the result of an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States, the Court will deny this claim.

Cantu's sixth claim is that TEXAS CODE CRIM. PROC. art. 37.071 and 44.251 violate the Eighth and Fourteenth Amendments because they fail to provide meaningful review of punishment issues. This claim was denied on the merits by the state courts, see *Cantu v. State*, No.74220, 2004 WL 3093156 slip op. at *5 (Tex. Crim. App. June 30, 2004)(unpublished), so the issue for this Court is whether the state court's decision is contrary to, or the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In *Parker v. Dugger*, 498 U.S. 308, 321 (1991), the Supreme Court stated that appellate courts must provide meaningful appellate review of death penalty cases. TEXAS CODE CRIM. PROC. Art 44.251(a) states:

> The Court of Criminal Appeals shall reform a sentence of death to a sentence of confinement in the institutional division Texas Department of Criminal Justice for life if the court finds that there is insufficient evidence to support an affirmative answer to an issue submitted to the jury under Article 37.071 (b) of this code or a negative answer to an issue submitted to a jury under Article 37.071 (e) of this code.

The Texas Court of Criminal Appeals has admitted that by its terms, article 44.251 provides for appellate review of the jury's determination of both the future dangerousness (Article 37.071 (b)(2)(1) and mitigation (Article 37.071 (e) punishment issues. *See Mcfarland v. State*, 928 S.W.2d 482, 498-99 (Tex. Crim. App. 1996), *cert. denied*, 519 U.S. 1119 (1997). In that same case, however, the Court of Criminal Appeals held that because reviewing the sufficiency of mitigating evidence was

impossible, it would not attempt to comply with that part of Article 44.251(a).  *Id.*

In *Beazley v. Johnson*, 242 F.3d 248 (5th Cir.) *cert. denied*, 534 U.S. 945 (2001), the United States Court of Appeals for the Fifth Circuit held: "regardless of whether the Texas court reviews the jury verdict under the mitigation special issue or the future dangerousness special issue, 'meaningful appellate review' has been afforded."  Based upon *Beazley,* the Court finds that the state court's denial of this claim was neither contrary to, nor the result of an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States in *Parker.*  The Court will deny Cantu's sixth claim.

Cantu's seventh claim is that the search of his apartment violated his Fourth Amendment rights.  This claim is not cognizable in federal *habeas corpus*.  *Stone v. Powell*, 428 U.S. 465, 494 (1976).  Cantu argues that an exception to the *Stone* doctrine should be made for capital cases.  Such an exception would constitute a new rule of constitutional criminal procedure which cannot be applied to a case pending on collateral review.  *See Teague v. Lane*, 489 U.S. 288, 310 (1989).  The Court will dismiss Cantu's seventh claim.

Cantu's eighth claim is that his trial counsel was ineffective for failing to investigate his claims of actual innocence.  Because Cantu did not raise this claim in his state proceedings, the first question for the Court is whether it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief.  If it is, the court must treat the claim as if the state court had already refused to hear it on procedural grounds.  *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

Cantu contends that it is not entirely clear that the state court would refuse to hear this claim if the Court stayed the case and allowed him to file a successive petition for post-conviction relief.

He relies on TEX. CODE CRIM. PROC. art. 11.071 §5 (a) (2), which provides, in relevant part:

> If a subsequent applicant for writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains specific facts establishing that by a preponderance of the evidence, but for the violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Cantu's claim is that had his attorneys conducted a reasonable investigation, they would have uncovered enough evidence of his innocence that no rational juror could have found him guilty beyond a reasonable doubt. He contends that such investigation would have revealed that:

> 1. A long distance telephone call was made from Cantu's apartment at 8:37 pm on November 4, 2000, yet he and Amy Boettcher had left for Arkansas between 11 a.m. and noon;
>
> 2. Toll tag records show that James Mosqueda's Corvette was driven at 11:15 am on November 4, 2000, possibly after Cantu and Boettcher had left for Arkansas; and
>
> 3. Blood spatter expert Sutton testified that based upon her examination of photos of the crime scene that Amy Kitchen had been kicked or punched in the face with enough force to spray a large amount of blood over the wall behind the bed, but Dr. Rohr's autopsy report contains no notation of any injury to her head except the gunshot wound.

The Court finds that even with this evidence, a rational juror could have found beyond a reasonable doubt that Cantu was guilty of killing Mosqueda and Kitchen. The fact that another person had access to Cantu's house would not lead a rational person to disbelieve the evidence that he committed the murders. Similarly, a rational juror would likely conclude that it was Cantu himself who drove Mosqueda's car at 11:15 am on November 4, 2000, and that he left for Arkansas shortly thereafter. Finally, although Cantu is correct that Rohr's autopsy report does not mention that Kitchen suffered any facial trauma other than the gunshot wound, the trauma is clearly evident in the autopsy photos themselves. A rational juror would likely conclude that Dr. Rohr's autopsy report on Kitchen was less detailed than it could have been, not that Cantu did not kill her.

The Court finds that it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief. Accordingly, the Court will treat this claim as if the state court refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Federal review of such claims is prohibited unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel. This does not constitute good cause for his default. *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). In addition, the Court has already rejected Cantu's actual innocence arguments in the context of the successive petition issue, *see* p.17 *supra*, and therefore finds that refusing to address the merits of this claim would not result in a fundamental miscarriage of justice. Because the Court treats Cantu's eighth claim as if it had been procedurally defaulted in state court, and because Cantu failed to establish either of the two exceptions to the rule prohibiting the federal courts from reviewing procedurally defaulted claims, the Court will dismiss this claim.

Cantu's ninth claim is that his appellate counsel was ineffective for failing to raise an issue on appeal related to the trial court's error in not giving a reasonable doubt instruction for extraneous offenses. Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a

successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel. This does not constitute good cause for his default. *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). The Court finds that Cantu's ninth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's tenth claim is that he was denied his constitutional right to be present at all stages of his trial. Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel. This does not constitute good cause for his default. *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). The Court finds that Cantu's tenth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's eleventh claim is that his trial counsel was ineffective for failing to object to extraneous victim impact testimony. Because he did not fairly present this claim to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or the claimant demonstrates that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his state post-conviction counsel. This does not constitute good cause for his default. *See Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002). The Court finds that Cantu's eleventh claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's twelfth claim is that the state's use of a peremptory challenge to disqualify an Hispanic juror was improper under *Batson v. Kentucky*. Because he did not fairly present this claim

to the state court, and because it is entirely clear that the state court would refuse to consider the merits of this claim if it were presented in a successive state petition for post-conviction relief, the court treats this claims as if the state court had already refused to hear it on procedural grounds. *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Review of the claim is barred unless Cantu demonstrates either cause for the default and actual prejudice as a result of the alleged violation of federal law contained in the claim, or that a fundamental miscarriage of justice would occur if the federal court did not address the defaulted claim on the merits, because he is actually innocent. *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Cantu contends that the reason he failed to present this claim to the state courts was because he received ineffective assistance from his appellate and state post-conviction counsel. While the ineffective assistance of state post-conviction counsel does not constitute good cause for failing to fairly present a claim to the state courts, *see Martinez v. Johnson*, 255 F.3d 229, 239-40 (5th Cir. 2001), *cert. denied*, 534 U.S. 1163 (2002), the ineffective assistance of appellate counsel can. *See Murray v. Carrier*, 477 U.S. 478, 492 (1986). In order to establish good cause, however, Cantu would have had to present a separate claim of ineffective assistance of appellate counsel to the state courts. *Edwards v. Carpenter,* 529 U.S. 446, 450-53 (2000). Because Cantu did not do so, the Court finds that his twelfth claim is barred from review under the doctrine of procedural default, and it will dismiss this claim.

Cantu's thirteenth and final claim is that is actually innocent of capital murder. This claim is not cognizable in *habeas corpus* in this jurisdiction*, see Foster v. Quarterman*, 466 F.3d 359, 367-68 (5th Cir. 2006), so the Court will dismiss it.

**Conclusion**

For the above reasons, the Court will deny Cantu's first, second, third, fourth, fifth, and sixth claims, and dismiss his seventh, eighth, ninth, tenth, eleventh and twelfth and thirteenth claims. An Order and Judgment will be entered.

SIGNED this 17th day of March, 2009.

_T. John Ward_

T. JOHN WARD
UNITED STATES DISTRICT JUDGE