FILED-CLERK
U.S. DISTRICT COURT

2011 MAR 28  PM 12: 08

TX EASTERN-MARSHALL

BY_____

United States Court of Appeals
Fifth Circuit

# UNITED STATES COURT OF APPEALS

# F I L E D

January 26, 2011

# FOR THE FIFTH CIRCUIT

Lyle W. Cayce
Clerk

No. 09-70017

D.C. Docket No. 2:06-CV-166

IVAN ABNER CANTU,

Petitioner - Appellant

v.

RICK THALER, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL
JUSTICE, CORRECTIONAL INSTITUTIONS DIVISION,

Respondent - Appellee

Appeal from the United States District Court for the
Eastern District of Texas, Marshall

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

J U D G M E N T

This cause was considered on the record on appeal and was argued by
counsel.

It is ordered and adjudged that the judgment of the District Court is
affirmed.

ISSUED AS MANDATE:   MAR 2 4 2011

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _____
          Deputy   MAR 2 4 2011

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

January 26, 2011

Lyle W. Cayce
Clerk

————

No. 09-70017

————

IVAN ABNER CANTU,

Petitioner-Appellant

v.

RICK THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division,

Respondent-Appellee

————————

Appeal from the United States District Court
for the Eastern District of Texas

————————

Before WIENER, STEWART, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Petitioner-Appellant Ivan Cantu was convicted of murder and sentenced to death. After the Texas Court of Criminal Appeals denied habeas corpus relief, Cantu filed this federal petition, which the district court dismissed. On appeal, Cantu asserts three claims: (1) ineffective assistance of counsel at the sentencing phase, which the court denied on the merits; (2) ineffective assistance of counsel at the conviction phase, which the court dismissed as procedurally defaulted; and (3) actual innocence, which the court dismissed as not cognizable in the Fifth Circuit. We affirm the district court's dismissal of all three claims.

No. 09-70017

# I. FACTS & PROCEEDINGS

## A. Facts

The relevant facts in this case pertain to the murders of which Cantu was convicted and to the tactical and strategic decisions made by Cantu's trial counsel regarding Cantu's mental health.

### 1. The Murders of James Mosqueda and Amy Kitchen

Cantu lived in an apartment with his girlfriend, Amy Boettcher, near where his cousin, James Mosqueda, lived with his fiancee, Amy Kitchen. According to Boettcher's testimony, Cantu called Mosqueda on the night of November 3, 2000 at approximately 11:30 p.m., and asked if he could come over to Mosqueda and Kitchen's house. Cantu then told Boettcher that he was going to their house to kill them, but Boettcher did not believe him. Cantu left his apartment with his gun and returned an hour later driving Kitchen's Mercedes. His face was swollen and a substance that looked like blood was on his jeans and in his hair. Cantu had Mosqueda's and Kitchen's identifications and keys. Cantu cleaned up, and Boettcher threw his bloody jeans into the trash. Cantu and Boettcher then went together to the victims' house in Kitchen's Mercedes. There, Boettcher saw both victims' bodies through the doorway to the master bedroom, while Cantu was searching the house for drugs and money. Cantu took the engagement ring that had belonged to Kitchen and gave it to Boettcher. Cantu and Boettcher left Kitchen's Mercedes parked in the garage and drove off in Mosqueda's Corvette. The couple later drove to Arkansas to visit Boettcher's parents, where they were when the bodies were discovered the following evening.

Police found no evidence of forced entry at Mosqueda and Kitchen's house. Police spoke with Cantu's mother, then searched Cantu and Boettcher's apartment. Police obtained a search warrant to search the apartment a second time and found the bloody jeans, ammunition, a key to the victims' house, and

2

a key to Kitchen's Mercedes. Police also found Cantu's gun at his ex-girlfriend's house where Cantu and Boettcher had stopped on the way home from Arkansas. Cantu's fingerprints were found on the gun's magazine, and Mosqueda's blood was found on the gun's barrel. Police arrested Cantu for the murders.

## 2. Cantu's Mental Health and Related Trial Decisions

As part of Cantu's state habeas corpus proceedings, Daneen Milam, Ph.D., evaluated Cantu at the request of his habeas counsel. Dr. Milam reported that there were "multiple, overlapping indicators" that suggested that Cantu "may suffer from organic brain damage or a severe mood altering disorder." Dr. Milam expressed the belief that, if a mental health professional had reviewed Cantu's family history and evaluated Cantu prior to the sentencing phase of his trial, "any reasonably competent psychiatric professional would have recognized the need to subject Ivan Cantu to a complete Neuropsychological evaluation to rule out an organic cause of his behavior pattern." In addition, Dr. Milam noted that every time Cantu used a stimulant, he became abusive in his personal relationships and that in the couple of months prior to the murders, Cantu had moved into a "manic phase" and "began to abuse Crank, Ecstasy, and Speed," which "interact with a Bi-Polar disorder to cause difficult and unpredictable behavior, irritability, agitation, and cause biological and chemical malfunctions to escalate."

Cantu's lead trial counsel, J. Matthew Goeller, testified by affidavit that he and his co-counsel, Don High, ultimately decided not to have Cantu complete a neuropsychological evaluation for three main reasons: (1) Cantu did not want to participate in psychiatric-based mitigation evidence; (2) they did not believe Cantu would receive a favorable psychiatric report, based on the fact that he had admitted to them that he killed Mosqueda and Kitchen out of revenge because Mosqueda owed him drug money; and (3) the State's evidence of Cantu's prior

3

violent acts against women,[1] coupled with "the particularly gruesome nature of the execution-style of the instant murders," led them to believe that a state-sponsored psychiatric evaluation could indicate that Cantu was a sociopath, which they believed "would substantially lower [their] already slim chance for a life sentence, considering the fact that Cantu was indicted for the murder of two people who were at home in their own bed."

Goeller rebutted Dr. Milam's report by explaining that "she fail[ed] to recognize that Cantu himself objected to any strategy that involved psychiatric-based mitigation evidence (if any such evidence did exist), and, further, failed to recognize the substantial sociopathic-type punishment evidence in possession of the State." If a psychological evaluation revealed Cantu to be a sociopath, Cantu would have been considered a future danger, which would undermine the mitigating evidence they intended to present in support of a life sentence.

Moreover, it was "[o]f great concern" to Goeller and High in deciding whether to submit Cantu to a psychological examination that "Cantu was manipulative and had lied on several occasions to his own counsel." Goeller explained that Cantu had suggested that his counsel elicit perjured testimony, and they feared that a psychological examination might lead to findings of manipulation, which is "a commonly-sought State theme in punishment phase."

Goeller also attested that after seventeen years as a practicing attorney, he was "well acquainted with [bipolar disorder's] effects and symptoms" and that he and High "had no evidence to support the theory that Mr. Cantu was suffering from any kind of mental deficiency, and in particular a bi-polar disorder." In contrast to Dr. Milam's evidence of Cantu's social history, Goeller and High interviewed many of Cantu's family members, and "none of them ever

---

[1] Cantu had a history of abusive conduct toward his two ex-wives and Boettcher, which involved him flying into a rage and firing shots at them, beating them, or raping them. There was also testimony at trial about incidents in which Cantu attempted to abuse his mother.

No. 09-70017

stated (or even remotely suggested)" that Cantu had a diminished mental capacity or bipolar disorder.

## B. Proceedings

Cantu was indicted for capital murder and pleaded not guilty. A jury convicted him of murder and sentenced him to death. Cantu appealed his conviction and sentence directly to the Texas Court of Criminal Appeals, which affirmed both.[2] Cantu did not file a petition for certiorari in the Supreme Court.

Cantu filed a state petition for post-conviction relief. The state court adopted the State's proposed findings of fact and conclusions of law and recommended denial of habeas relief. The Texas Court of Criminal Appeals adopted those findings and conclusions, and affirmed.[3]

Cantu then filed this application for a writ of habeas corpus in the Eastern District of Texas. The district court dismissed all of Cantu's claims, finding in pertinent part that: (1) "[Cantu's trial counsel's] decision not to investigate Cantu's mental health was not unreasonable"; (2) "it is entirely clear that the state court would refuse to consider the merits of [Cantu's unexhausted claim of ineffective assistance of counsel at the conviction phase] if it were presented in a successive state petition for post-conviction relief" and "Cantu failed to establish either of the two exceptions to the rule prohibiting the federal courts from reviewing procedurally defaulted claims"; and (3) Cantu's claim that he is actually innocent of capital murder "is not cognizable in habeas corpus in this jurisdiction."[4]

---

[2] *Cantu v. State*, No. 74220, 2004 WL 3093156, at *6 (Tex. Crim. App. June 30, 2004) (unpublished).

[3] *Ex parte Cantu*, No. WR-63624-01, 2006 WL 120829, at *1 (Tex. Crim. App. Jan. 18, 2006) (unpublished).

[4] *Cantu v. Quarterman*, No. 2:06-CV-166, 2009 WL 728577, at *3-13 (E.D. Tex. Mar. 17, 2009).

No. 09-70017

Cantu timely filed a notice of appeal. The district court granted a certificate of appealability (COA) on four of the thirteen claims raised in Cantu's petition. This appeal addresses the three of those claims listed at the beginning of this opinion.[5]

## II. ANALYSIS

### A. Ineffective Assistance of Counsel at the Sentencing Phase

Cantu contends that his trial counsel failed to discover and present to the sentencing jury evidence of his alleged bipolar disorder, which he claims "would have put not only the instant offense but also the State's entire punishment-phase case into the proper context."[6] We conduct a *de novo* review of this claim.[7]

Because Cantu filed his federal habeas application after 1996, the Anti-Terrorism and Effective Death Penalty Act (AEDPA) applies to his claims.[8] Pursuant to the AEDPA, a federal court may only grant habeas relief if the state court's adjudication of the claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[9]

In addressing a claim of ineffective assistance of counsel, the "clearly established

---

[5] Cantu did not advance one of the four claims on appeal. *See* Appellant's Br. at 2 n.2.

[6] *Id.* at 43.

[7] *See Ladd v. Cockrell*, 311 F.3d 349, 357 (5th Cir. 2002) ("Because an ineffective assistance claim is a mixed question of law and fact, we review *de novo*.") (citing *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999)).

[8] *See Lindh v. Murphy*, 521 U.S. 320, 324-26 (1997).

[9] 28 U.S.C. § 2254(d).

No. 09-70017

Federal law" is the Supreme Court's decision in *Strickland v. Washington*[10] and its progeny.[11] "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'"[12] Therefore, we must determine whether the state court's dismissal of Cantu's ineffective assistance of counsel claim "involved an unreasonable application (and not merely an incorrect application) of *Strickland*."[13]

Under *Strickland*, relief for ineffective assistance of counsel is appropriate only when a petitioner demonstrates that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the petitioner.[14] Counsel's performance is measured against an objective standard of "reasonableness under prevailing professional norms."[15] According to this standard, "every effort [must] be made to eliminate the distorting effects of hindsight," and "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[16] Strategic judgments in particular are owed a high degree of deference:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable;

---

[10]  466 U.S. 668 (1984).

[11]  *See Williams v. Taylor*, 529 U.S. 362, 391 (2000) ("It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'").

[12]  *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (citations omitted).

[13]  *Neal v. Puckett*, 286 F.3d 230, 236 (5th Cir. 2002) (internal quotation marks omitted).

[14]  *See* 466 U.S. at 687.

[15]  *Wiggins*, 539 U.S. at 521.

[16]  *Strickland*, 466 U.S. at 689.

7

and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.[17]

Therefore, we must "focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of [Cantu's mental health] *was itself reasonable.*"[18] In addition, Cantu must establish that prejudice resulted from his counsel's deficient performance. Specifically, "[w]hen a defendant challenges a death sentence . . ., the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[19]

Cantu's trial counsel, Goeller and High, agreed that their best strategy was to home in on four salient points:

(1) Ivan Cantu's dysfunctional childhood and family,
(2) Ivan Cantu's misuse of drugs and alcohol, some of which was supplied by the decedent Mosqueda.
(3) Ivan Cantu's lack of future dangerousness when drugs and alcohol were removed from his access, i.e., a plea for a life sentence.
(4) The advent of Ivan's recent spiritual conversion experience, making him a "born again Christian", thereby reducing his likelihood for future violence, and *filling the void* brought about for the now-missing drugs and alcohol.

At the sentencing phase of trial, Cantu's counsel adduced the testimony of three witnesses in support of their basic strategy. Dr. Mark Cunningham, a clinical and forensic psychologist, had reviewed Cantu's records—including the same documents that Dr. Milam used to support her conclusion that Cantu has bipolar disorder—and testified that Cantu was not a future danger to society as long as

---

[17] *Id.* at 690-91.

[18] *Wiggins*, 539 U.S. at 523 (emphasis in original).

[19] *Strickland*, 466 U.S. at 695. The Supreme Court further defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

No. 09-70017

he was in a controlled prison environment. Dr. Walter Quijano, another defense pyschologist, testified about the severity of conditions in jail and limitations that would be imposed on Cantu if he were sentenced to life in prison. Finally, Reverend Maury Davis—a former prisoner incarcerated for murder who then became a nationally recognized minister with a congregation of 5,000 persons—testified about Cantu's future leading a life with God.

The state habeas court found that the performance of Cantu's trial counsel was "zealous and competent" and that their explanations of their trial strategy were "consistent and credible." The court agreed with Cantu's counsel that pursuing a bipolar disorder diagnosis for Cantu "would not have been wholly consistent" with the focus on Cantu's "conversion to Christianity and his ability to change with self-control and discipline."

Given that the strategy that Cantu's counsel pursued and the strategy Cantu now believes should have been pursued are inconsistent, Cantu's counsel could not have pursued both—and Cantu does not attack the sufficiency of the evidence that counsel did present in support of their chosen strategy.[20] Cantu's counsel made a conscious decision not to submit Cantu to a psychological examination because, if they had done so with the intention of presenting the results to the jury, the State could have submitted Cantu to its own examination out of the presence of his defense counsel.[21] The potentially detrimental results of such an examination could have strengthened the State's position that Cantu was a sociopath and thus a future danger, thereby warranting the death penalty.

---

[20] *See, e.g., Neal*, 286 F.3d at 238 (detailing the significant amount of additional evidence that could have been presented at trial to support the trial counsel's arguments, including "forty-two pages of affidavits and reports concerning [Appellant's] background as evidence of mitigating factors").

[21] *See Lagrone v. State*, 942 S.W.2d 602, 609-12 (Tex. Crim. App. 1997).

No. 09-70017

The state habeas court's deference to Cantu's counsel's decision not to investigate Cantu's mental health—as a defensive strategy and in light of their "zealous and competent" presentation of Cantu's newfound mental and spiritual stability—was a reasonable application of *Strickland*.[22]

## B. Ineffective Assistance of Counsel at the Conviction Phase

Because Cantu did not raise this ineffective assistance of counsel claim in his state petition for post-conviction relief, the district court had to determine whether the state court would consider the merits of the claim if Cantu now raised it in a successive state petition.[23] The district court concluded that the state court would refuse to consider the merits of this claim and dismissed it as procedurally defaulted.[24] We conduct a *de novo* review of the district court's decision to treat a claim as procedurally defaulted.[25]

Cantu asserts that he may still file a successive state petition. He points to Texas Code of Criminal Procedure art. 11.071, § 5(a)(2), which provides an exception to the Texas bar on successive petitions if a petitioner can establish that "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt."

---

[22] Because we hold that the state court reasonably determined that Cantu's counsel's performance was not deficient, we need not reach the question of prejudice. *See Amos v. Scott*, 61 F.3d 333, 348 (5th Cir.), *cert. denied*, 516 U.S. 1005 (1995) ("In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test.") (citing *Motley v. Collins*, 18 F.3d 1223, 1226 (5th Cir.), *cert. denied*, 513 U.S. 960 (1994)).

[23] *See Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001).

[24] *Cantu*, 2009 WL 728577, at *10-11.

[25] *See Nixon v. Epps*, 405 F.3d 318, 322 (5th Cir. 2005).

No. 09-70017

The Texas Court of Criminal Appeals has explained that "Article 11.071, Section 5(a)(2) was enacted in response to the Supreme Court's decision in [*Schlup v. Delo*, 513 U.S. 298 (1995)]," so that "standards set forth for evaluating a gateway-actual-innocence claim announced by the Supreme Court should guide our consideration of such claims under Section 5(a)(2)."[26] The court summarized:

> [T]o mount a credible claim of innocence, an applicant must support his allegations of constitutional error with reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. . . . To determine whether an applicant has satisfied the burden, we must make a holistic evaluation of all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial. We must then decide how reasonable jurors, who were properly instructed, would react to the overall, newly supplemented record.[27]

Cantu claims that his trial counsel rendered ineffective assistance by failing to investigate evidence of his factual innocence and present it at trial. In particular, he points to three factual inconsistencies that were admitted into evidence at trial: (1) telephone records indicated that someone made a phone call from Cantu's apartment on the night after the murder when he and Boettcher were in Arkansas; (2) toll tag records indicated that someone drove Mosqueda's Corvette at 11:15 a.m. on November 4, even though Boettcher claimed the last time they drove the car was at 6:30 a.m.; and (3) the State's blood-spatter expert testified, based on photos of the crime scene, that Kitchen had been kicked or punched in the face, while the doctor who performed the autopsies found no

---

[26] *Ex parte Reed*, 271 S.W.3d 698, 733 (Tex. Crim. App. 2008) (internal footnote omitted).

[27] *Id.* at 733-74 (internal quotation marks and footnotes omitted).

evidence of injuries to the victims apart from the gunshot wounds.[28] Cantu does not specifically explain, however, how this evidence proves his innocence by a preponderance of evidence,[29] and the district court pointed out that there are rational explanations of these inconsistencies that reasonable jurors could accept:

> The fact that another person had access to Cantu's house would not lead a rational person to disbelieve the evidence that he committed the murders. Similarly, a rational juror would likely conclude that it was Cantu himself who drove Mosqueda's car at 11:15 am on November 4, 2000, and that he left for Arkansas shortly thereafter. Finally, although Cantu is correct that Rohr's autopsy report does not mention that Kitchen suffered any facial trauma other than the gunshot wound, the trauma is clearly evident in the autopsy photos themselves. A rational juror would likely conclude that Dr. Rohr's autopsy report on Kitchen was less detailed than it could have been, not that Cantu did not kill her.[30]

Most importantly, the inconsistencies derive from old evidence that was presented at trial and do not introduce any new information, which is a requirement under *Schlup* and thus under article 11.071, § 5(a)(2).[31]

---

[28]  Appellant's Br. at 33-34.

[29]  Cantu alleges that these inconsistencies "support[] the conclusion that Cantu was framed by the rival drug dealers truly responsible for James Mosqueda's murder." *Id.* at 33. This evidence does not undermine the inculpatory evidence that was admitted at trial though, and there is no reason to believe that these inconsistencies would lead a rational juror to discount the inculpatory evidence admitted at trial in favor of Cantu's alternative theory.

[30]  *Cantu*, 2009 WL 728577, at *10. Furthermore, an officer testified that Cantu's mother placed a call using Cantu's phone at about that time when they were with her at the apartment.

[31]  Cantu argues that "this provision does not require the claim be based on newly discovered evidence" (Appellant's Br. at 23), but he ignores the case law guiding interpretation of the provision that does require as much. *See Schlup*, 513 U.S. at 324 ("To be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").

No. 09-70017

Cantu further contends that his counsel rendered deficient performance (1) by failing to interview Cantu's ex-girlfriend, at whose apartment police found the murder weapon; (2) by failing to question State witnesses as to whether Cantu's face was indeed swollen and Boettcher's hand was indeed injured, as she testified; and (3) by conceding Cantu's culpability for the murders during closing argument. These claims, however, do not constitute "reliable evidence," let alone new evidence, and therefore also cannot support a *Schlup* claim of actual innocence as required to file a successive petition under § 5(a)(2).

In sum, the district court was correct in its conclusion that the state court would clearly refuse to consider the merits of this claim if it were now presented in a successive state petition for post-conviction relief under § 5(a)(2).

In the alternative, Cantu argues that his procedurally defaulted claim may nevertheless be reviewed in federal court pursuant to the *Coleman v. Thompson*[32] exceptions. These exceptions allow for federal habeas review if a petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice."[33] The only cause that Cantu alleges, however, is that his "state habeas counsel's ineffectiveness constitutes cause sufficient to excuse that default."[34] We have repeatedly rejected this argument and held, to the contrary, that "ineffective assistance of habeas counsel cannot provide cause for a procedural default" under these

---

[32] 501 U.S. 722 (1991).

[33] *Id.* at 750.

[34] Appellant's Br. at 26.

13

No. 09-70017

circumstances,[35] which Cantu conceded.[36] Cantu therefore does not satisfy the *Coleman* cause and prejudice exception.

As for the fundamental miscarriage of justice exception, we have held that "the fundamental miscarriage of justice exception is confined to cases of actual innocence, where the petitioner shows, as a factual matter, that he did not commit the crime of conviction."[37] We apply the *Schlup* standard to establish the requisite probability that the petitioner is factually innocent[38]—which Cantu does not meet, as discussed above.

Because Cantu does not qualify for either of the two *Coleman* exceptions, his claim cannot be reviewed in federal court. The district court was correct to dismiss this claim as procedurally defaulted.

## C. Actual Innocence

Cantu makes a freestanding claim of actual innocence based on the factual inconsistencies that evolved at trial. The district court dismissed this claim as legally incognizable in the Fifth Circuit. We review the district court's legal determination *de novo*.[39]

In *Herrera v. Collins*, the Supreme Court addressed the possibility of a freestanding habeas claim of factual innocence based on newly discovered evidence that had not been presented at trial.[40] The Court explained:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual

---

[35] *Martinez v. Johnson*, 255 F.3d 229, 240-41 (5th Cir. 2001).

[36] *See* Appellant's Br. at 26 n.4.

[37] *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999).

[38] *See id.*

[39] *See Buntion v. Quarterman*, 524 F.3d 664, 670 (5th Cir. 2008).

[40] 506 U.S. 390, 416-17 (1993).

14

No. 09-70017

innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.[41]

We have interpreted this language narrowly as "simply assum[ing] such a premise arguendo" while "never h[olding], however, that actual innocence would entitle a petitioner to habeas relief."[42] Never having seen such a claim that was supported by anything that even approached a "truly persuasive demonstration" of actual innocence, "[t]he Fifth Circuit has rejected this possibility and held that claims of actual innocence are not cognizable on federal habeas review" in accordance with our pre-*Herrera* precedent.[43]

Neither do we see a viable claim here. Not one fact that Cantu presents to support his claim of actual innocence is new, and most importantly, none establishes—or even tends to establish—that Cantu is factually innocent of the murders.[44] Inasmuch as Cantu cannot meet even the lesser *Schlup* actual innocence standard discussed above, he surely cannot meet the "extraordinarily high" *Herrera* standard. Like the petitioner in *Herrera*, Cantu "is not innocent, in any sense of the word."[45]

---

[41] *Id.* at 417.

[42] *Lucas v. Johnson*, 132 F.3d 1069, 1075 (5th Cir. 1998).

[43] *Graves v. Cockrell*, 351 F.3d 143, 151 (5th Cir. 2003) (internal citation omitted).

[44] *See Herrera*, 506 U.S. at 417 (describing an actual innocence claim as "a truly persuasive demonstration of 'actual innocence' made *after trial*") (emphasis added). Presumably if the evidence was persuasive enough to meet the *Herrera* standard and *was* presented at trial, the petitioner would have been found not guilty.

[45] *Id.* at 419 (O'Connor, J., concurring).

15

No. 09-70017

## CONCLUSION

For the foregoing reasons, the district court's denial of habeas relief is AFFIRMED.