UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| IVAN ABNER CANTU, | § | CIVIL ACTION |
| | § | |
| Petitioner, | § | No. 2:06CV166 |
| | § | |
| v. | § | |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Criminal Justice, Institutional Division, | § | |
| | § | |
| Respondent. | § | |

**PETITIONER'S REPLY BRIEF**

Now comes Petitioner, Ivan Abner Cantu, who files the following reply to the Director's Brief on Remand Regarding *Martinez v. Ryan,* 132 S. Ct. 1309 (2012). In his brief, the Director advances two meritless objections to Cantu's contention that *Martinez* applies in his case, thus continuing the Director's campaign to ensure that no state or federal court ever reviews the troubling Sixth Amendment issue arising from trial counsel's wholesale failure to engage in any meaningful investigation of the underlying offense. Neither of the Director's arguments bars application of *Martinez* to the instant case, and Cantu should be allowed to demonstrate cause for the procedural default that precluded review of his ineffective-assistance- of-trial-counsel claim.

I. *Martinez* **Applies to Cantu's Case Because State Postconviction Proceedings Were the First Occasion to Raise His Claim of Ineffectiveness at Trial.**

First, *Martinez* does, in fact, apply to Cantu's case, despite the Director's contrary assertion. While the Fifth Circuit appears to have given short shrift to the Supreme Court's mandate in *Martinez*, the Supreme Court itself has indicated that *Martinez* remains vital in Texas. In the past few months, the Court has granted stays of execution, held cases for further review, and even granted certiorari review in another Texas case, all raising the *Martinez* issue.

On August 22, the Supreme Court stayed the execution of Texas death-row inmate John Balentine pending disposition of his petition for writ of certiorari, which raised a *Martinez* issue. *Balentine v. Thaler*, No. 12-5906; *see* Appendix A. The Court distributed the case for conference on September 24, requested the record, then rescheduled the case for conference on October 26. But no order was issued. Similarly, in the Texas capital case *Washington v. Thaler*, No. 11-10870, the Court requested a copy of the record, then distributed the case for conference on October 26, but no order was issued.[1] *See* Appendix B. On October 1, the Court granted certiorari, vacated judgment, and remanded for further consideration in light of *Martinez* in a Third Circuit case which involved a state review process materially indistinguishable from Texas'. *Richardson v. Varano*, No. 11-9302; *see* Appendix C. On October 18, the Court stayed the execution of Texas death-row inmate

---

[1] Often when the Court declines to issue an order after conference, it is holding the case pending disposition of another case before the Court.

Anthony Haynes pending disposition of his petition for writ of certiorari, which raised a *Martinez* issue; the case has been distributed for conference November 9.[2] *Haynes v. Thaler*, No. 12-6760; *see* Appendix D. Finally, on October 29, the Court granted certiorari review in the Texas capital case *Trevino v. Thaler*, No. 11-10189, limited to the *Martinez* issue. *See* Appendix E.

The parties agree that *Martinez* allows petitioners to establish cause to excuse a default when during "the first occasion to raise a claim of ineffective assistance at trial," *Martinez*, 132 S.Ct. at 1315, either (1) no counsel was appointed; or (2) counsel in that proceeding was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). However, the Director suggests that the appropriate inquiry is not when was the first occasion that Cantu could have raised the claim, but when any litigant in Texas – including non-capital-sentenced prisoners whose claims are adjudicated in a materially different habeas corpus procedure – could raise an ineffectiveness claim. According to the Director, the Fifth Circuit has definitively settled that in all Texas cases, the motion for new trial and direct appeal will always be the first occasion on which to raise an ineffectiveness claim. Thus, even though the Director does not suggest that trial counsel – in the motion for new trial he filed on behalf of Cantu – actually could have raised his *own* ineffectiveness for failing to develop and present evidence in Cantu's case, he nonetheless asserts that this motion was the first occasion for Cantu to raise his ineffectiveness claim. This absurd conclusion is neither

---

[2] Both *Balentine* and *Haynes* involve *Martinez* claims raised for the first time in Rule 60(b) motions; thus, these cases present a procedural hurdle that is not an impediment in Cantu's case.

compelled by circuit precedent nor tenable under *Martinez*.

Cantu has explained at length why *Ibarra v. Thaler*, ___ F.3d ___, 2012 WL 2620520 (5th Cir. June 28, 2012), does not control the outcome in this case. *See* Petitioner's Brief on Remand at Section II.A.3. The Director does not dispute that *Ibarra* did not address a situation, as here, when a prisoner could not raise his ineffectiveness claim in a motion for new trial because, *inter alia*, the trial lawyer represented the prisoner during those proceedings – which is the only occasion to introduce new evidence into the record.

Petitioner Ibarra argued broadly that the first occasion to raise such a claim in all Texas cases is in habeas corpus proceedings. The *Ibarra* Court rejected that argument. In so doing, however, it specifically acknowledged that there are in fact Texas cases in which habeas corpus proceeding will be the first occasion for review of an ineffectiveness at trial claim: "[B]oth Texas intermediate courts and the TCCA *sometimes* reach merits of ineffectiveness claims on direct appeal. When they do not, Texas habeas procedures remain open to defendants." *Ibarra*, 2012 WL 2620520, at *4. Thus, *Ibarra* cannot be read to hold that direct review is *always* the first occasion for review of an ineffectiveness claim because it explicitly says otherwise. *Ibarra* specifically contemplates that in some cases, Texas habeas procedures will be the first occasion to litigate an ineffectiveness-at-trial claim.

Cantu has explained at length why, in his case, habeas corpus proceedings were "the first occasion to raise a claim of ineffectiveness at trial," *Martinez*, 132 S. Ct. at 1315. *See* Petitioner's Brief on Remand at Section II.A. Chief among the factors precluding the

compelled by circuit precedent nor tenable under *Martinez*.

Cantu has explained at length why *Ibarra v. Thaler*, ___ F.3d ___, 2012 WL 2620520 (5th Cir. June 28, 2012), does not control the outcome in this case. *See* Petitioner's Brief on Remand at Section II.A.3. The Director does not dispute that *Ibarra* did not address a situation, as here, when a prisoner could not raise his ineffectiveness claim in a motion for new trial because, *inter alia*, the trial lawyer represented the prisoner during those proceedings – which is the only occasion to introduce new evidence into the record.

Petitioner Ibarra argued broadly that the first occasion to raise such a claim in all Texas cases is in habeas corpus proceedings. The *Ibarra* Court rejected that argument. In so doing, however, it specifically acknowledged that there are in fact Texas cases in which habeas corpus proceeding will be the first occasion for review of an ineffectiveness at trial claim: "[B]oth Texas intermediate courts and the TCCA *sometimes* reach merits of ineffectiveness claims on direct appeal. When they do not, Texas habeas procedures remain open to defendants." *Ibarra*, 2012 WL 2620520, at *4. Thus, *Ibarra* cannot be read to hold that direct review is *always* the first occasion for review of an ineffectiveness claim because it explicitly says otherwise. *Ibarra* specifically contemplates that in some cases, Texas habeas procedures will be the first occasion to litigate an ineffectiveness-at-trial claim.

Cantu has explained at length why, in his case, habeas corpus proceedings were "the first occasion to raise a claim of ineffectiveness at trial," *Martinez*, 132 S. Ct. at 1315. *See* Petitioner's Brief on Remand at Section II.A. Chief among the factors precluding the

introduction of an ineffectiveness claim during the motion for new trial proceedings was that Cantu's motion for new trial was filed by his ineffective trial counsel. The Director does not dispute these circumstances. The Director's unexplained assertion that Cantu nonetheless could have raised his *Strickland* claim during his motion for new trial proceedings is, as a matter of Texas law, "absurd": "it would be absurd to require trial counsel to litigate his own ineffectiveness in a motion for new trial in order to preserve the claim for appeal." *Robinson v. State*, 16 S.W.3d 808, 811 (Tex. Crim. App. 2000).

First, trial counsel was precluded by the Rules of Professional Conduct from raising the claim. "Rule 1.15(a)(1) [of the Texas Disciplinary Rules of Professional Conduct], requires that a lawyer withdraw if the lawyer knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the client." Professional Ethics Committee of the Supreme Court of Texas, Opinion 565 (Jan. 2006); *see also* Rule 3.08 ("A lawyer shall not accept or continue employment as an advocate before a tribunal in a contemplated or pending adjudicatory proceedings if the lawyers knows or believes that the lawyer is or may be a witness necessary to establish an essential fact on behalf of the lawyer's client" in all but a limited set of circumstances not relevant here). The Texas Court of Criminal Appeals has held that, in raising an ineffective assistance of trial counsel claim, "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective," and accordingly becomes a witness in ineffectiveness proceedings. *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003).

Second, trial counsel had a conflict between his own pecuniary interests and Cantu's interest in raising the deprivation of his Sixth Amendment right to effective trial counsel. Under Texas's rules, an attorney who has been found by a state or federal court to have rendered ineffective assistance of counsel at trial or on the appeal of a capital case may not thereafter be appointed lead counsel in a capital case, in the direct appeal of a capital case, or in state habeas proceedings, absent a special finding by the appointment committee that counsel's ineffective conduct no longer accurately reflects counsel's abilities. Tex. Code. Crim. Proc. §§ 26.052(d)(2)(C), 26.052(d)(3)©, 26.052(n); 11.071(2)(d). Thus, raising the ineffectiveness claim would have eliminated trial counsel from the pool of attorneys eligible to handle the most lucrative appointments in Texas criminal cases.

The Supreme Court recently noted that a conflict of interest arises when counsel continues to represent a client whose strongest argument is that counsel's errors caused a procedural default. *Maples v. Thomas*, 132 S.Ct. 912, 925 n.8 (2012). In *Maples*, the same law firm responsible for the petitioner's default represented him in proceedings at which they should have argued that their abandonment excused the default. *Id*. The Court explained that,

> a significant conflict of interest arose for the firm once the crucial deadline passed. Following the default, the firm's interest in avoiding damage to its own reputation was at odds with Maples' strongest argument—*i.e.*, that his attorneys had abandoned him, therefore he had cause to be relieved from the default. Yet, [the law firm] did not cede Maples' representation to a new attorney, who could have made Maples' abandonment argument plain to the Court of Appeals. Instead, the firm represented Maples through briefing and oral argument in the Eleventh Circuit, where they attempted to cast responsibility for the mishap on the clerk of the Alabama trial court. Given [the law firm's] conflict of interest, Maples' federal habeas petition, prepared

and submitted by the firm, is not persuasive evidence that Maples, prior to the default, ever "viewed himself" as represented by "the firm," rather than by his attorneys of record . . . .

*Id*. (citations omitted).

Cantu's trial attorney suffered from the same conflict of interest and, not surprisingly, like Maples' attorneys, filed a motion for new trial that both "attempted to cast responsibility" for Cantu's conviction and sentence elsewhere, instead of laying the blame at counsel's own feet. *Id*. It is simply unreasonable in these circumstances to suggest that Cantu's first opportunity to raise his ineffectiveness-of-trial-counsel claim was in his motion for new trial, and he could not have introduced any of the necessary evidence for the first time on direct appeal. Neither *Ibarra* nor *Martinez* compel this Court to adopt what the Texas courts themselves deem an absurd characterization of Texas procedure. There is no question that state postconviction proceedings were Cantu's first opportunity to litigate his claim, thus *Martinez* applies in the procedural context of this case.

**II.     Cantu's underlying claim of ineffective assistance of trial counsel is substantial and has sufficient merit to satisfy the threshold showing of *Miller-el v. Cockrell*.**

Second, contrary to the Director's contentions, Cantu's claim of trial-counsel ineffectiveness satisfies *Martinez*'s threshold showing of substantial merit. Despite the Director's best attempts to minimize their shortcomings, Cantu's trial attorneys – Matt Goeller and Don High – rendered constitutionally ineffective assistance by failing to conduct any significant investigation into the facts of the crime for which their client was accused. They failed to discover and/or effectively utilize several critical pieces of evidence that supported Cantu's unwavering insistence that he had no involvement in the murders of his cousin and his cousin's fiancee. In fact, during closing argument at the guilt-innocence phase of trial, counsel repeatedly conceded Cantu's culpability for the murders. But no court has ever scrutinized the performance of Cantu's attorneys at the guilt-innocence phase of his trial.

As an initial matter, the Director's reliance on a contention in Mr. Goeller's state habeas affidavit that Cantu in fact admitted his guilt to trial counsel is unsound. *See* Director's Brief on Remand at 19. First, the affidavit was submitted in response to Cantu's state habeas claim that counsel rendered ineffective assistance *at the sentencing phase*. SHCR[3] at 156, 158-159. Therefore, Mr. Goeller's claim that Cantu admitted guilt clearly exceeded the scope of the inquiry; the claim was gratuitous and utterly self-serving.

---

[3] "SHCR" refers to the State Habeas Clerk's Record – the documents filed with clerk's office during the course of Cantu's state habeas corpus proceeding – followed by citation to page numbers.

Furthermore, due to state habeas counsel's complete failure to communicate effectively with Cantu, *see* Petitioner's Brief on Remand at Section II.B.3, Cantu was never advised that trial counsel had even submitted an affidavit, much less that the affidavit contained a claim that he had admitted guilt. Cantu did not learn of the affidavit until he received a copy of it attached as an appendix to his federal habeas corpus petition. Thus, he has never had an opportunity to rebut the claim by trial counsel that he admitted his guilt, a claim that he emphatically denies. And perhaps most significantly, this portion of Mr. Goeller's affidavit was neither specifically credited nor relied upon by the state habeas judge in its findings of fact and conclusions of law. SHCR at 187-192. Under these circumstances, it would be improper for this Court to credit the claim and rely upon it as a basis for denying this claim of ineffective assistance of counsel.

Moreover, the record does not support the Director's claim that Cantu's mother placed the long-distance telephone call from Cantu's apartment. *See* Director's Brief on Remand at 20. The telephone call was placed at 8:53 p.m., not 8:37 p.m., as the Director stated. *Id.*; *see* SX 119. And the record shows that Dallas police had cleared and secured the apartment by 8:37 p.m. 32 RR 86-88, 97. Dallas police officer Steven Junger testified that he and another officer arrived at Cantu's apartment with Cantu's mother at about 8 or 8:15 p.m. on November 4. 32 RR 81. The officers entered the apartment at about 8:25 p.m., and after a quick sweep of the apartment they allowed Mrs. Cantu to enter 32 RR 82. Officer Junger testified that he was inside the apartment between five and ten minutes. 32 RR 102, 104,

107. And he was the last person to exit the apartment. 32 RR 86. Then he generated the incident report from his squad car at 8:37 p.m. 32 RR 97. While Officer Junger did state that Mrs. Cantu made a telephone call from the apartment, it was unclear from his testimony whether the call was made from the apartment's landline or from Mrs. Cantu's cell phone. 32 RR 84, 88. Further, according to Officer Junger's testimony, Mrs. Cantu made the call at about 8:30 p.m., more than twenty minutes before the long-distance call reflected on State's Exhibit 119. 32 RR 84. This evidence indicated that someone else had access to Cantu's apartment long after he and Amy Boettcher had left for Arkansas, *and* after police and Mrs. Cantu had vacated the apartment, supporting the conclusion that Cantu was framed by rival drug dealers truly responsible for James Mosqueda's murder.[4] But the jury did not hear this due to trial counsel's ineffectiveness.

The Director also tries to downplay the potential impact of toll tag records showing that James Mosqueda's Corvette was driven at 11:15 a.m. on November 4, possibly after Cantu and Boettcher had left for Arkansas. *See* SX 117, 188; 37 RR 41-53; 36 RR 25 (Boettcher's testimony that they left for Arkansas sometime between 11 a.m. and noon on November 4). Boettcher gave no explanation for this toll tag hit in her testimony; according to her testimony, the last time they drove the Corvette was about 6:30 that morning, when they arrived back at the apartment from downtown Dallas. 35 RR 158-159. At the very least,

---

[4] The lead detective in the case testified at trial that police had received an anonymous tip during the course of the investigation that Mosqueda had owed Mario Rojas, a rival drug dealer, a large sum of money for drugs. 33 RR 186; 34 RR 119-121.

the discrepancy indicated that someone else besides Cantu could have driven the Corvette before it was discovered by law enforcement on November 5 in the parking lot of Cantu's apartment complex,[5] again supporting the conclusion that Cantu was set up as the fall guy for a drug-business hit. But trial counsel failed to capitalize on these critical discrepancies in the State's case, discrepancies that would have seriously undermined the physical evidence relied upon by the State to corroborate the testimony of Amy Boettcher. Counsel basically opted to take the State's case for guilt at face value to the detriment of their client. Thus, keys facts concerning the offense were never explored.

There is simply no conceivable strategy that would have supported these omissions, which clearly constitute a significant departure from prevailing professional norms. Counsel's failure to request an investigator in the defense of a capital murder charge standing alone constitutes deficient performance.

But perhaps most harmful of all, trial counsel stood in front of the jury during final argument at the guilt-innocence phase of trial and repeatedly conceded Cantu's complicity in the murders, arguing only that he was technically not guilty of capital murder. 41 RR 31 ("I didn't say he was innocent. I said he's not guilty of capital murder"), 33 ("I'm not saying he's innocent. He's not guilty of capital murder."), 43 ("there's nothing I can tell you that the murder of Amy Kitchens (sic) was not intentional"), 45 ("He's not innocent, but he's not

---

[5] Significantly, police conducting an emergency search of Cantu's apartment on the evening of November 4 did not see Mosqueda's Corvette, which according to State's witnesses was found the next day parked in close proximity to Cantu's apartment.

guilty of capital murder"), 46 ("you're not saying he's innocent. You're saying . . . it's not capital murder"). And the State was quick to capitalize on counsel's concessions in its own closing argument. *See* 41 RR 55 ("His own attorney concedes it. I mean, his own attorney argued – it's already made him the killer. . . . You look at the killing that Mr. Goeller has already conceded, and you find some way one of those cases is not intentional."). Trial counsel's decision to concede guilt was not based on a truly thorough investigation. *See Wiggins v. Smith*, 539 U.S. 510, 521-522 (2003). In a case such as this, where there was ample evidence to argue in support of your client's innocence, such a concession certainly fell below the bounds of reasonably professional assistance.

Trial counsel's many failures amounted to deficient performance, and had trial counsel performed differently, there is a reasonable likelihood that at least one juror would have found a reasonable doubt as to Cantu's guilt and voted "not guilty." At the very least, this claim meets the threshold showing of substantial merit required by *Martinez* to necessitate merits review.

## CONCLUSION

For the foregoing reasons, Cantu respectfully requests that the Court review the merits of his claim of ineffective assistance of trial counsel. Furthermore, because pre-*Martinez* circuit precedent precluded any substantive review of either Cantu's underlying claim of trial-counsel ineffectiveness or his assertion of cause based on state-habeas-counsel ineffectiveness, Cantu has never had an opportunity to factually develop these claims. Therefore, this Court should conduct an evidentiary hearing regarding the performance of both state habeas counsel and trial counsel.

Respectfully submitted,

/s/
GENA BUNN
Attorney for Petitioner
HOLMES & MOORE, P.L.L.C.
P.O. Box 3267
Longview, Texas 75606
Telephone: (903) 758-2200
Fax No. (903) 758-7864

## CERTIFICATE OF SERVICE

On this 1st day of November, 2012, I do certify that a true and correct copy of the foregoing Reply Brief was sent via electronic filing to counsel for the Director, Assistant Attorney General Thomas Merrill Jones.

/s/ _____

GENA BUNN